UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICHARD GRUNDY,
     Plaintiff,

      v.                          CIVIL ACTION NO.
                                     17-11449-PBS

HSBC BANK USA, N.A. AS
INDENTURE TRUSTEE FOR THE
REGISTERED NOTEHOLDERS OF
RENAISSANCE HOME EQUITY LOAN TRUST
2006-3, AND OCWEN LOAN SERVICING,
LLC, DIVISION OF OCWEN, INC.,
     Defendants.

**REPORT AND RECOMMENDATION RE:**
**DEFENDANTS HSBC BANK USA, N.A. AS INDENTURE TRUSTEE FOR THE**
**REGISTERED NOTEHOLDERS OF RENAISSANCE HOME EQUITY LOAN TRUST**
**2006-3 AND OCWEN LOAN SERVICING, LLC, A DIVISION OF OCWEN,**
**INC.'S MOTION TO DISMISS THE COMPLAINT**
**(DOCKET ENTRY # 22)**

**July 16, 2018**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to dismiss filed by

defendants HSBC Bank USA, N.A. as Indenture Trustee for the

Registered Noteholders of Renaissance Home Equity Loan Trust

2006-3 ("HSBC") and Ocwen Loan Servicing LLC ("Ocwen").

(Docket Entry # 22).  Plaintiff Richard Grundy ("plaintiff")

opposes the motion.  (Docket Entry # 34).  After conducting a

hearing, this court took the motion (Docket Entry # 22) under

advisement.

PROCEDURAL BACKGROUND

Plaintiff alleges misconduct by HSBC and Ocwen

("defendants") in connection with a 2006 mortgage loan on his
home.  He initially filed suit in state court on July 3, 2017,
and HSBC removed the action to federal court.  In the pro se
complaint, plaintiff seeks injunctive relief and damages
against defendants to prevent a foreclosure on his home in
Salem, Massachusetts.  The complaint sets out the following
causes of action:  (1) breach of contract; (2) violation of the
Fair Housing Act; (3) fraud; and (4) violation of Massachusetts
General Laws chapter 93A ("chapter 93A").  (Docket Entry # 15,
p. 10).[1]  Plaintiff withdrew the Fair Housing Act claim in open
court at the hearing.  (Docket Entry # 43).

STANDARD OF REVIEW

When considering a motion to dismiss under Fed. R. Civ.
P. 12(b)(6) ("Rule 12(b)(6)"), a court "accept[s] as true all
well pleaded facts in the complaint and draw[s] all
reasonable inferences in favor of the plaintiffs." Gargano v.
Liberty International Underwriters, Inc., 572 F.3d 45, 48 (1st
Cir. 2009).  "To survive a motion to dismiss, the complaint
must allege 'a plausible entitlement to relief.'" Fitzgerald
v. Harris, 549 F.3d 46, 52 (1st Cir. 2008).  While "detailed
factual allegations" are not required, "a plaintiff's
obligation to provide the 'grounds' of his 'entitlement for

---

[1]  Page numbers refer to the docketed page number in the
upper right hand corner of the document.

relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic v. Twombly, 550 U.S. 554, 555 (2007); Maldonado v. Fontanes, 568 F.3d 263, 266 (1st Cir. 2009). Additionally, "a well-pleaded complaint may succeed even if . . . actual proof of those facts is improbable." Bell Atlantic v. Twombly, 550 U.S. at 556.

In evaluating a Rule 12(b)(6) motion, a court may "consider 'documents the authenticity of which are not disputed by the parties'" as well as "'documents central to the plaintiffs' claim'" and "'documents sufficiently referred to in the complaint,'" such as the mortgage and the note at issue in this action. Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007); see also Trans-Spec Truck Service, Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008); Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). This court also "may consider matters of public record and facts susceptible to judicial notice." U.S. ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 208 (1st Cir. 2016); accord Humphrey v. Comoletti, Civil Action No. 15-14170-ADB, 2017 WL 1224539, at *3 (D. Mass. Mar. 31, 2017) (quoting U.S. ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 208 (1st Cir. 2016)); see Mississippi Pub. Emps. Ret. Sys. v. Boston Sci. Corp., 523 F.3d 75, 86 (1st Cir. 2008) ("sources courts ordinarily examine when

ruling on Rule 12(b)(6) motions to dismiss" include "matters of which a court may take judicial notice"). Exhibits attached to a complaint comprise part of the complaint and are therefore considered part of the Rule 12(b)(6) record. See Fed. R. Civ. P. 10(c).

In the motion to dismiss, defendants attach the mortgage, the note, a publicly recorded assignment of the mortgage, and publically recorded documents regarding the Servicemembers Civil Relief Act, 50 U.S.C. §§ 3901-4043 ("SCRA"), and Massachusetts General Laws chapter 244, section 34B ("chapter 244"). (Docket Entry # 15, p. 6) (referring to both statutes) (Docket Entry ## 23-2 to 23-7). The complaint also attaches a loan modification agreement between plaintiff and Ocwen as well as written correspondence between the two parties. (Docket Entry # 15, pp. 26-46). In accordance with the above principles, the foregoing documents are properly considered part of the Rule 12(b)(6) record.

                    FACTUAL BACKGROUND

Plaintiff owns property located at 6 North Pine Street in Salem, Massachusetts ("the property"). (Docket Entry # 23-2). On August 17, 2006, he executed a promissory note for $190,000 to Delta Funding Corporation ("Delta"), the lender. (Docket Entry # 23-2). The note designates plaintiff as the borrower and authorizes the lender to transfer it. (Docket Entry # 23-

2).  On the same date, he executed a mortgage pledging the property as security for the note to Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for Delta.[2] (Docket Entry # 23-3).  Under the mortgage, plaintiff agreed that the note "together with" the mortgage "can be sold one or more times without prior notice to Borrower."  (Docket Entry # 23-3, p. 14).

Also under the mortgage, MERS, which is designated the mortgagee in the mortgage, held only legal title to the interests that plaintiff conveyed in the mortgage.  (Docket Entry # 23-3).  The mortgage gave MERS, as holder of legal title, the right to exercise the interests granted by plaintiff in the mortgage, including the right to foreclose.  (Docket Entry # 23-3, p. 4).  The relevant language reads as follows:

> Borrower understands and agrees that MERS holds only legal title to the interests granted by the Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:  to exercise any or all of those interests, including, but not limited to, the right *to foreclose and sell the Property*; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

(Docket Entry # 23-3, p. 4) (emphasis added).

The mortgage also gave MERS, as mortgagee, the power of

---

[2]  The mortgage is also referred to as the "security instrument."

sale and allowed MERS to assign the mortgage.[3]  (Docket Entry #
23-3, p. 4).  The relevant language states that:

> Borrower does hereby mortgage, grant and convey to MERS
> (solely as nominee for Lender and Lender's successors and
> assigns) and to the successors and assigns of MERS, with
> power of sale, the following described property . . ..

(Docket Entry # 23-3, p. 4).

The mortgage secured to Delta, as the lender, "the
repayment of the Loan."[4]  (Docket Entry # 23-3).  On March 2,
2011, MERS, as mortgagee, assigned the mortgage to HSBC.
(Docket Entry # 23-4).  Throughout the relevant time period,
Ocwen was the servicer of the mortgage.  (Docket Entry # 15,
pp. 2, 6).  The mortgage also states that, "If there is a
change of the Loan Servicer, Borrower will be given written
notice of the change which will state the name and address of
the new Loan Servicer."[5]  (Docket Entry # 23-3, p. 14).

The mortgage carried an adjustable interest rate with an

---

[3]   Interpreting the same language, the First Circuit in
Culhane v. Auroa Loan Service of Nebraska determined that it
gave MERS the authority to transfer the mortgage to an assignee
of the original lender.  708 F.3d 282, 293 (1st Cir. 2013).

[4]   The mortgage defines the "Loan" as "the debt evidenced by
the Note."  (Docket Entry # 23-3).

[5]   The complaint provides that Ocwen began servicing the
loan as the nominee of HSBC as early as September 2006, and that
plaintiff was "never notified that the loan had been sold or who
the new owner was purported to be."  (Docket Entry # 15, ¶ 5).
In opposition to the motion to dismiss, plaintiff does not raise
an argument that either defendant breached the mortgage by not
providing notification.  (Docket Entry # 34).

initial interest rate of 9.09% and a maximum rate of 12.09%.
(Docket Entry # 23-3).  The note specifies that the initial
interest rate may change on the "first day of September, 2009,
and on that day every sixth month thereafter . . .." (Docket
Entry # 23-2).  It further provides that, "The Note Holder will
determine [t]he new interest rate and the changed amount of
[t]he monthly payment in accordance with Section 4 of this
Note." (Docket Entry # 23-2).

Under the terms of the note, plaintiff promised to pay
$1,541.10 in monthly payments "on the first day of each month"
beginning in October 2006.  (Docket Entry # 23-2).  The note
states that if plaintiff "[d]oes not pay the full amount of
each monthly payment on the date it is due, [he] will be in
default." (Docket Entry # 23-2).  The note also provides that,
upon default, "the Note Holder may require [plaintiff] to pay
immediately the full amount of principal which has not been
paid and all the interest . . . owe[d] on that amount."
(Docket Entry # 23-2).

As stated in the complaint, the mortgage included a
provision which created an "Escrow for Repairs" account in the
amount of $25,000.  (Docket Entry # 15, ¶ 6).  Funds from this
account were to be distributed in two disbursements of $12,500,
the first of which was to occur upon the closing of the loan.
(Docket Entry # 15, ¶ 6).  Under the "Funds for Escrow Items"

section of the mortgage, an "Escrow for Repairs" account is not expressly identified.  Instead, in this section of the mortgage, plaintiff agreed to the following obligations:

> Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for:  (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by the provisions of Section 10.

(Docket Entry # 23-3, ¶ 3).  Ocwen agreed to the following notice obligations regarding accounting of the escrow funds:

> If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments.  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

(Docket Entry # 23-3, p. 6).

Plaintiff repeatedly requested the second disbursement from Delta and Ocwen, but did not receive either a payment or a response.  (Docket Entry # 15, ¶¶ 7, 8).  Instead, this second $12,500 was included as part of the mortgage principal, thereby increasing plaintiff's required monthly mortgage payments.

(Docket Entry # 15, ¶ 9).  As a result of Ocwen's failure to make
this payment, plaintiff was not able to complete a renovation of the
home, leaving a portion of it uninhabitable.[6]  (Docket Entry # 15, ¶
8).  The reduction in rent-producing space resulted in a financial
hardship for plaintiff.  (Docket Entry # 15, ¶ 8).  The mortgage
placed the obligation to perform repairs and a duty to maintain the
property on the borrower, stating in pertinent part that, "[u]nless
. . . repair or restoration is not economically feasible, Borrower
shall promptly repair the Property if damaged to avoid further
deterioration or damage."  (Docket Entry # 23-3, ¶ 7).

     The mortgage contained a provision that required owner-
occupancy of the property unless the lender agreed otherwise.
The relevant language in section six states as follows:

> Borrower shall occupy, establish, and use the Property as
> Borrower's principal residence within 60 days after the
> execution of this Security Instrument and shall continue
> to occupy the Property as Borrower's principal residence
> for at least one year after the date of occupancy, unless
> Lender otherwise agrees in writing, which consent shall
> not be unreasonably withheld, or unless extenuating
> circumstances exist which are beyond Borrower's control.

(Docket Entry # 23-3, ¶ 6).  A family rider to the mortgage
states that, "[u]nless Lender and Borrower otherwise agree in
writing, Section 6 concerning Borrower's occupancy of the

---

[6]  Plaintiff states that a portion of the property was left
with open walls and without wiring and plumbing.  (Docket Entry
# 15, ¶ 9).

Property is deleted." (Docket Entry # 23-3, p. 21). Hence, the mortgage did not require owner-occupancy.

In 2013, Ocwen provided plaintiff with a proposed, unsigned loan modification agreement which "included an incorrect calculation" in excess of $8,500 of "both past due monies and the unadjusted principal." (Docket Entry # 15, ¶ 11). The loan modification agreement required plaintiff to perform "all preconditions," including making three trial period payments of $1,525.77 on August 1, September 1, and October 1, 2013. (Docket Entry # 15, pp. 28-29). It provides that, if all preconditions "have been met, then the Loan Documents," defined as the mortgage and the note, "shall automatically become modified on 10/1/2013." (Docket Entry # 15, p. 28).

Plaintiff remitted the required payments for August, September, and October 2013, which Ocwen accepted and cashed. (Docket Entry # 15, ¶ 13). Notably, plaintiff signed the loan modification agreement on July 29, 2013 with a notation next to his signature reading, "pursuant to Addendum A attached." (Docket Entry # 15, p. 35). The addendum states that, "the modification agreement inadvertently included $8,584.39 of unpaid principal twice." (Docket Entry # 15, pp. 33-34). The addendum further states that the correct, unpaid principal balance is $214,195.19 after completing the three-month trial period and making the required three monthly payments, whereas

10

the agreement set out a principal balance of $225,758.89. (Docket Entry # 15, pp. 29, 33-35).  Thus, due to a "double billing" error, the unpaid principal increased by $8,584.39, a mistake that Ocwen acknowledged but never corrected.  (Docket Entry # 15, ¶¶ 11, 15-16) (Docket Entry # 15, pp. 33-34).  This error resulted in the required monthly payment of $1,525.77 in the loan modification agreement to be too high because it was based on an erroneously high principal.[7]  (Docket Entry # 15, ¶ 16) (Docket Entry # 15, p. 29).  Ocwen continued to collect these payments. (Docket Entry # 15, ¶ 16).

Plaintiff returned the loan modification agreement to Ocwen with the aforementioned addendum that his acceptance was contingent upon correction of the principal amount.  (Docket Entry # 15, ¶ 12) (Docket Entry # 15, p. 35).  Ocwen initially responded it was rejecting the agreement based on this correction; however, in December 2013, it signed the corrected agreement and returned it to plaintiff ("the 2013 loan modification agreement").[8]  (Docket Entry # 15, ¶¶ 14, 15) (Docket Entry # 15, p. 35).  Plaintiff also

---

[7]  The complaint alleges that this error "appear[s] to have been done purposely" based on "the methodology employed and the defendants' response."  (Docket Entry # 15, ¶ 11).

[8]  Plaintiff argues that Ocwen breached the 2013 loan modification agreement because it charged him higher monthly payments due to the "double billing" of principal in the aforementioned amount of $8,584.39 included as part of the principal balance.  (Docket Entry # 15, ¶ 16).

11

gave Ocwen a check, which it cashed, "representing payments for the months of November, December, 2013, and January 2014." (Docket Entry # 15, ¶ 15).

In February 2014, Ocwen began including additional charges labeled "'other expenses'" or charges in monthly statements. (Docket Entry # 15, ¶ 18) (Docket Entry # 15, p. 42). These "charges fluctuated greatly from month to month." (Docket Entry # 15, ¶ 18). Ocwen did not provide an explanation for the increases and did not respond to plaintiff's numerous requests for information or correction.[9] (Docket Entry # 15, ¶¶ 19, 20).

Meanwhile, at the end of 2013, Ocwen reported an erroneous escrow account shortfall of $3,638.23, which plaintiff did not owe. (Docket Entry # 15, ¶ 17) (Docket Entry # 15, pp. 43-44). In March 2015, Ocwen raised the monthly escrow payment by $125. (Docket Entry # 15, ¶ 21) (Docket Entry # 15, pp. 43-44). Ocwen again did not provide an explanation for the increase. (Docket Entry # 15, ¶ 22). Furthermore, plaintiff made $12,332 in total escrow payments, yet statements that he received from Ocwen reflected an amount less than $10,000.[10] (Docket Entry # 15, ¶

---

[9] The complaint states that plaintiff notified "defendants" about the incorrect billing in writing in February, March, and May of 2014, as well as April, May, July, and September of 2015. (Docket Entry # 15, ¶ 19).

[10] In opposing the motion to dismiss, plaintiff points out that the complaint alleges a breach of contract based on the above-noted mismanagement of escrow funds, which defendants do

22).

In July 2016, Ocwen "solicited" plaintiff to enter a second loan modification ("the 2016 loan modification agreement"). (Docket Entry # 15, ¶ 24).  The 2016 loan modification agreement required plaintiff to make three payments over the course of consecutive months.  (Docket Entry # 15, ¶ 25).  "Under threat of foreclosure," plaintiff signed the agreement, made the required payments, and forwarded the signed agreement to defendants. (Docket Entry # 15, ¶ 25).  Following receipt of the signed agreement, Ocwen required an additional payment in the amount of $5,885, "upon the receipt of which defendants stated that "the loan modification would be completed."  (Docket Entry # 15, ¶ 27). In response, plaintiff sent Ocwen a timely payment in the amount of $6,000.  (Docket Entry # 15, ¶ 28).  After completing "all that was required of him" under the 2016 loan modification agreement, "defendants" refused "to honor their obligations" under the agreement and "pursue[d] a foreclosure sale."  (Docket Entry # 15, ¶¶ 34-35).

---

not address in the motion to dismiss.  (Docket Entry # 34, p. 15).  Plaintiff is correct that the complaint alleges a breach of contract claim based on Ocwen overcharging plaintiff for escrow payments and/or failing to provide an explanation for the increase in escrow charges.  (Docket Entry # 15, ¶¶ 17, 21-23). Defendants do not address this aspect of the breach of contract claim, which therefore remains in this action at this point in time.

Defendants provide two recorded notices concerning the SCRA. (Docket Entry ## 23-5, 23-7).  They also filed a recorded affidavit captioned, "Affidavit Regarding Compliance M.G.L. 244 sec. 35B." (Docket Entry # 23-6) (capitalization omitted).

<u>DISCUSSION</u>

Defendants move to dismiss the breach of contract, fraud, and chapter 93A claims.  (Docket Entry # 22).  In opposing the motion, plaintiff argues that Ocwen breached obligations or requirements of: (1) the "Escrow for Repairs" fund; (2) the 2013 loan modification agreement; (3) the 2016 loan modification agreement; and (4) the escrow provision in section three of the mortgage.[11]   (Docket Entry # 15).

Defendants seek to dismiss the breach of contract claim pertaining to the "Escrow for Repairs" on the basis that there was no contract that required Ocwen to pay $12,500 to plaintiff from an "Escrow for Repairs" fund.  (Docket Entry # 23).  More specifically, defendants argue that neither the mortgage nor the promissory note obligated Ocwen to disburse a second, $12,500 payment for repairs. (Docket Entry # 23).  Further, even if this obligation existed, defendants contend that the statute of limitations bars the claim. (Docket Entry # 23).  Defendants also maintain that the breach of

---

[11]   As explained in the previous footnote, defendants do not address the fourth item, i.e., the breach of contract claim with respect to the escrow overcharges and lack of explanation therefore remains in this action.

contract claim pertaining to the 2016 loan modification agreement
fails to sufficiently plead facts indicating the terms of this
agreement.  (Docket Entry # 23).  Defendants do not adequately raise
an argument regarding the breach of contract claim pertaining to the
2013 loan modification agreement.[12]

Next, defendants seek to dismiss the fraud claim because the
complaint fails to satisfy Fed. R. Civ. P. 9(b) ("Rule 9(b)"), or
set out facts to support "any of the substantive elements of fraud."
(Docket Entry # 23).  Defendants seek to dismiss the chapter 93A
claim based on plaintiff's failure to allege in the complaint that
he sent a demand letter to either defendant.  (Docket Entry # 23).

A.   Breach of Contract

A breach of contract under Massachusetts law "requires the
plaintiff to show that (1) a valid contract between the parties
existed, (2) the plaintiff was ready, willing, and able to
perform, (3) the defendant was in breach of the contract, and
(4) the plaintiff sustained damages as a result." Bose Corp. v.
Ejaz, 732 F.3d 17, 21 (1st Cir. 2013).  In short, the plaintiff
must show that a valid "'contract existed, the defendant

---

[12]   At best, defendants state in a footnote, "Of note, the
[2013 loan modification agreement] . . . is not fully executed
by the parties."  (Docket Entry # 23, n.3).  The court is "not
bound . . . to develop legal arguments merely mentioned in
passing." Alberti v. Carlo-Izquierdo, 548 Fed. Appx. 625, 635
(1st Cir. 2013); see also Coons v. Industrial Knife Co., Inc.,
620 F.3d 38, 44 (1st Cir. 2010).

breached the terms of the contract, and the plaintiff sustained damages as a result of the breach.'" Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 232 (1st Cir. 2013) (internal brackets omitted) (quoting Brooks v. AIG SunAmerica Life Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007)).

As an initial matter, the complaint alleges that defendants failed to file "any notice of compliance with the [SCRA]" or Massachusetts General Laws chapter 244, section 34B ("chapter 244"), leaving them "without standing to foreclose on the Mortgage." (Docket Entry # 15, ¶ 35).  Defendants seek to dismiss "any claim founded upon" the purported failure to record any notice of compliance in light of the recorded notices concerning the SCRA and the recorded chapter 244 affidavit.[13]  (Docket Entry ## 23-5 to 23-7)

---

[13]  A "failure to comply with the SCRA does not justify enjoining foreclosure." Asfour v. Citizens Bank, N.A, Civil Action No. 16-11732-FDS, 2016 WL 7428224, at *4 (D. Mass. Dec. 23, 2016) (citing HSBC Bank USA, N.A. v. Matt, 981 N.E.2d 710, 716 (Mass. 2013)), appeal filed, (1st Cir. Feb. 6, 2017) (No. 17-1135).  Rather, the statute "simply ensures that a foreclosure will not be rendered invalid for failure to provide the protections of the SCRA to anyone so entitled." HSBC Bank USA, N.A. v. Matt, 981 N.E.2d at 716; Asfour, 2016 WL 7428224, at *4.  A "lender's failure to comply with its strictures leaves the title vulnerable to a challenge that the foreclosure was defective after the fact if a mortgagor was covered by the Act." Asfour, 2016 WL 7428224, at *4.
Section 35B of chapter 244 applies to owner-occupied residential property, see Haskell v. Santander Bank, N.A., Civil Action No. 17-11288-LTS, 2018 WL 1750459, at *1 (D. Mass. Apr. 10, 2018); Mass. Gen. Laws ch. 244, § 35B(a), and "requires a creditor to take 'reasonable steps and make a good faith effort to avoid foreclosure.'" Rose v. Bank of Am., Civil Action No. 16-11558-FDS, 2018 WL 443451, at *2 (D. Mass. Jan. 16, 2018).

(Docket Entry # 15, ¶ 35).  According to defendants, the notices and the affidavit establish as false the complaint's allegation (Docket Entry # 15, ¶ 35) that defendants failed to file any notice of compliance under both statutes.  (Docket Entry ## 23-5 to 23-7).

In a 21-page opposition to the motion to dismiss (Docket Entry # 34), plaintiff does not respond to defendants' argument. He therefore waives the argument that defendants did not comply with either statute by failing to record "any notice of compliance" (Docket Entry # 15, ¶ 35). See Vallejo v. Santini-Padilla, 607 F.3d 1, 7, n.4 (1st Cir. 2010) ("[p]laintiffs have not cited a single authority in support of their assertion that their failure to timely oppose the motion to dismiss did not constitute waiver" and noting that "[p]laintiffs did not properly raise their arguments below"); see also Curet-Velazquez v. ACEMLA de Puerto Rico, Inc., 656 F.3d 47, 54 (1st Cir. 2011) ("[a]rguments alluded to but not properly developed before a magistrate judge are deemed waived"); Coons v. Industrial Knife Co., Inc., 620 F.3d at 44 ("district court was 'free to disregard' the state law argument that was not developed in Coons's brief").

---

"[B]y its own terms," the statute "only requires certification of compliance 'prior to publishing a notice of a foreclosure sale, as required by section 14.'"  Id. (quoting chapter 244, section 35B(f)).

Defendants next move to dismiss the breach of contract claim regarding the "Escrow for Repairs" because no such agreement exists in either the note or the mortgage. (Docket Entry # 23). In opposition to the motion, plaintiff argues that the "Escrow for Repairs" funds "bore no specialized designation in either the Note or the Mortgage," but that the failure to disburse the second payment was nonetheless a breach of the mortgage. (Docket Entry # 34, pp. 8-9). The complaint itself, which plaintiff quotes in the opposition, alleges that, "To date[,] OCWEN has failed to disburse the second payment in the amount of twelve thousand five hundred dollars ($12,500) as required *by the Mortgage* . . . As a direct result of this *breach of the Mortgage*, a portion of the Property has been left with open walls" and other damage rendering a portion of the home "uninhabitable." (Docket Entry # 15, ¶ 8) (emphasis added).

As set out in the complaint and confirmed in plaintiff's opposition, plaintiff relies on the mortgage as the source of the "Escrow for Repairs" obligation. In no uncertain terms, the complaint states that, "The aforesaid mortgage included an 'Escrow for Repairs' in the amount of $25,000.00." (Docket Entry # 15, ¶ 6).

"'It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.'" Clorox Co.

18

Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32
(1st Cir. 2000) (quoting Northern Indiana Gun & Outdoor Shows,
Inc. v. City of South Bend, 163 F.3d 449, 454 (7th Cir. 1998),
in parenthetical)).  "'Were the rule otherwise, a plaintiff
could maintain a claim'" by importing only an isolated statement
from the document into the complaint.  Id. (citation omitted).
Accordingly, this court turns to the terms of the mortgage.

Absent an ambiguity, "'the terms of an . . . agreement must
be deduced, construed, and enforced as written.'"  Artuso v.
Vertex Pharms., Inc., 637 F.3d 1, 6 (1st Cir. 2011) (quoting
Cochran v. Quest Software, Inc., 328 F.3d 1, 7 (1st Cir. 2003))
(applying Massachusetts law).  Language is only ambiguous "if it
is susceptible of more than one meaning and reasonably
intelligent persons would differ as to which meaning is the
proper one."[14]  Barclays Bank PLC v. Poynter, 710 F.3d 16, 21
(1st Cir. 2013).  Here, the language of the mortgage contains no
ambiguity regarding the escrow obligations between the parties.
(Docket Entry # 23-3).  Under the caption "Funds for Escrow
Items," payment obligations refer only to responsibilities of
the borrower.  (Docket Entry # 23-3, ¶ 3).  This provision

---

[14]   "[E]xtrinsic evidence cannot be used to contradict or
change the written terms, but only to remove or to explain the
existing uncertainty or ambiguity."  General Convention of New
Jerusalem in the U.S. of America, Inc. v. MacKenzie, 874 N.E.2d
1084, 1087 (Mass. 2007) (applying Massachusetts law).

explains, "Borrower shall pay to Lender . . . a sum (the 'Funds') . . . amounts due for" taxes, leasehold payments, and insurance premiums. (Docket Entry # 23-3, ¶ 3). The mortgage is otherwise silent with respect to the existence of an escrow account, let alone an escrow account requiring the lender to issue $25,000 for repairs to the property. (Docket Entry # 23-3). The mortgage also provides that, "Borrower shall promptly repair the Property if damaged" unless it is not economically feasible under section five of the mortgage. (Docket Entry # 23-3, ¶ 7). As repeatedly stated in the complaint, plaintiff nevertheless seeks to impose an obligation on Ocwen, acting on behalf of HSBC, on the basis that an "Escrow for Repairs" to pay funds "earmarked for construction" is included in the mortgage. (Docket Entry # 15, ¶ 6) (the "mortgage included an 'Escrow for Repairs'") (Docket Entry # 15, ¶¶ 8, 10) ("Ocwen has failed to disburse the second payment" and never "offered a rationale for breaching the mortgage by failing to make this disbursement"). The mortgage contains no express obligation for the lender to put aside and disburse funds for repairs to the property. There is also no language in the mortgage that would give rise to an ambiguity vis-à-vis the existence of such an obligation imposed on the lender or the existence of such a fund. (Docket Entry # 23-3). Plaintiff's assertion that correspondence and documents from Ocwen acknowledge the existence of the fund (Docket Entry #

34, pp. 9, 11-12) does not provide a basis to alter the terms of the mortgage where, as here, no ambiguity exists.[15]  See General Convention, 874 N.E.2d at 1087.  An "Escrow for Repairs" fund is therefore not part of the mortgage agreement.  See Barclays, 710 F.3d at 21.  Consequently, defendants are not in breach of the mortgage by failing to disburse the second payment of $12,500.  See id.

The complaint additionally states that Ocwen "continued to include this" $12,500 "as part of the Mortgage," thereby causing plaintiff to pay interest on this amount.  (Docket Entry # 15, ¶ 9).  Defendants thus "collected both undue principal and interest regarding these monies."  (Docket Entry # 15, ¶ 9).  Here again, because there was no obligation to disburse $12,500, the purported inclusion of these funds in the loan did not breach the mortgage.  In other words, the purported damages to plaintiff in the form of higher interest payments and the purported benefit to defendants in retained principal and receipt of higher interest payments arises only by virtue of Ocwen's failure to disburse the second $12,500 payment.

In the alternative, defendants move to dismiss the breach of contract claim regarding the purported "Escrow for Repairs" account as untimely under the six-year statute of limitations

---

[15]  See the previous footnote.

applicable to contract claims.  (Docket Entry # 23)(citing
Mass. Gen. Laws ch. 260, § 2).  Plaintiff does not address or
otherwise oppose defendants' assertion that the contract claim
arising out of this fund is time barred, and therefore waives
the issue.  See Vallejo v. Santini-Padilla, 607 F.3d at 7, n.4;
see also Curet-Velazquez v. ACEMLA de Puerto Rico, Inc., 656
F.3d at 54; Coons v. Industrial Knife Co., Inc., 620 F.3d at 44.

Defendants next move to dismiss the breach of contract
claim as to the 2016 loan modification because the complaint
does not adequately plead the terms of the agreement.  (Docket
Entry # 23).  They submit that the complaint fails because it
neither alleges a contract nor a breach of any such contract.
(Docket Entry # 23, p. 8).  In opposition, plaintiff insists
that the complaint provides enough facts to survive a motion to
dismiss.  (Docket Entry # 34).

The complaint states that, "defendants" offered plaintiff a
loan modification agreement in July 2016, and he accepted the
agreement by making the necessary three payments, signing the
agreement, and forwarding the signed agreement to defendants.
(Docket Entry # 15, ¶¶ 24-34).  The complaint further states that
after defendants acknowledged the signed agreement, they
required plaintiff to make the payment of $5,885.  (Docket Entry
# 15, ¶¶ 24-27).  Upon receipt of the additional payment,
"defendants stated the loan modification would be completed."

(Docket Entry # 15, ¶ 27).  After accepting the payments and acknowledging the signed agreement, defendants refused "to honor their obligations under [the] modification" and pursued "a foreclosure sale," according to the complaint.  (Docket Entry # 15, ¶¶ 26, 31, 34-35).

As noted above, the elements of a breach of contract claim include a valid contract and that defendants breached the terms of the contract.  Young v. Wells Fargo Bank, N.A., 717 F.3d at 232.  "[T]he mechanics of Rule 12(b)(6)" require a plaintiff to "'allege a factual predicate concrete enough to warrant further proceedings.'"  Buck v. Am. Airlines, Inc., 476 F.3d 29, 38 (1st Cir. 2007) (quoting United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 240 (1st Cir. 2004)) (internal quotation marks omitted).  "In a contract action, this irreducible minimum requires the pleader to 'explain what obligations were imposed on each of the parties by the alleged contract.'"  Buck v. Am. Airlines, Inc., 476 F.3d 29, 38 (1st Cir. 2007) (quoting Doyle, 103 F.3d at 194-95, in parenthetical).  With respect to the factual predicate relative to a breach, "[c]onclusory statements that" a defendant company "'and its executives failed to meet their contractual requirement,' . . . are insufficient to satisfy the pleading requirements."  Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996); Brooks v. AIG SunAmerica Life Assur. Co., 480 F.3d

579, 586 (1st Cir. 2007) (quoting Doyle, 103 F.3d at 194-95, in parenthetical).

Here, the complaint adequately pleads the existence of a valid contract.  Plaintiff performed his obligations to make all of the required payments, signed the agreement, and returned it to defendants.  Defendants cashed the payments and acknowledged the signed the agreement.  These actions sufficiently plead facts that give rise to a contract, namely, the 2016 loan modification agreement.  These facts indicate little, however, about the terms of the contract that defendants breached.  Like the insufficiency of the breach pled in Doyle, the complaint simply states that defendants "are refusing, clearly in bad faith, to honor their obligations under this modification." (Docket Entry # 15, ¶ 34).  The complaint does not articulate facts regarding the term or terms that defendants breached or otherwise explain the obligations that defendants failed to perform in breach of the agreement.

Plaintiff requests an "opportunity to file a Supplemental Complaint." (Docket Entry # 34, n.4).  Under certain circumstances, a court may allow a plaintiff an opportunity to amend in lieu of a dismissal of a claim with prejudice.  See Eastern Food Services, Inc. v. Pontifical Catholic University Services Ass'n, Inc., 357 F.3d 1, 8 (1st Cir. 2004) (permission to amend complaint "often granted not only pretrial but after

dismissal for failure to state a claim where court thinks that the case has some promise"); see, e.g., Rodi v. Southern New England School of Law, 389 F.3d 5, 20 (1st Cir. 2004) (directing district court to afford the plaintiff opportunity to amend and replead chapter 93A claim).  In light of plaintiff's pro se status, the preference of deciding cases on the merits, see generally Rodi v. Southern New England School of Law, 389 F.3d at 20 (noting "'the purpose of pleading is to facilitate a proper decision on the merits'"), and the nature of the deficiency, it is appropriate to allow plaintiff the opportunity to file a motion for leave to amend the complaint to replead the breach of contract claim with respect to the 2016 loan modification agreement to cure the deficiencies in accordance with any scheduling deadline for amendments.  This court expresses no opinion of the merits of such a motion.

As a final matter, the pro se complaint raises a breach of contract claim based on the 2013 loan modification agreement. (Docket Entry # 15).  More specifically, the complaint asserts that a "double billing" error occurred by designating $8,584.39 as unpaid principal, thereby causing plaintiff to make higher principal and interest payments on the additional $8,584.39 amount.  (Docket Entry # 15, ¶¶ 11-16) (Docket Entry # 15, p. 33).  The complaint includes additional allegations regarding the 2013 loan modification agreement, including additional

charges on monthly statements. (Docket Entry # 15, ¶¶ 15, 18-20).  As previously indicated, defendants do not address the breach of contract claim as it applies to the 2013 loan modification agreement in the supporting memorandum.[16]  (Docket Entry # 23).  The breach of contract claim as it pertains to the 2013 loan modification agreement therefore remains in this action at this juncture.

B.  Fraud

As previously stated, defendants argue that the complaint fails to plead fraud with particularity under Rule 9(b) and to plead the substantive elements of fraud.  (Docket Entry # 23).   Plaintiff submits that the complaint pled all material elements of fraud with sufficient particularity.  (Docket Entry # 34).  He also clarifies that he grounds the fraud claim on allegations regarding the "reserve repair fund," the 2013 loan modification, and the 2016 loan modification.  (Docket Entry # 34, p. 19).

A common law fraud claim under Massachusetts law requires: "(1) that the statement was knowingly false; (2) that defendants made the false statement with the intent to deceive; (3) that the statement was material to the plaintiffs' decision; (4) that the plaintiffs reasonably relied on the statement; and (5) that the plaintiffs were injured as a result of their reliance."

_____

[16]  See footnote 12 and related text.

Juarez v. Select Portfolio Servicing, Inc., 708 F.3d 269, 279
(1st Cir. 2013) (suit by homeowner alleging wrongful foreclosure
by mortgagee's assignee and mortgage servicer); accord Cremaldi
v. Wells Fargo Bank, N.A., Civil Action No. 3-11767-MLW, 2017 WL
1190377, at *12 (D. Mass. Mar. 30, 2017) (fraud requires
plaintiffs to "show that (1) Wells Fargo made a false
representation of material fact; (2) Wells Fargo knew that the
fact was false; (3) Wells Fargo intended that [plaintiffs] rely
on the misrepresentation; and (4) [plaintiffs] reasonably relied
on Wells Fargo's misrepresentation to their detriment").

To survive a motion to dismiss, a plaintiff alleging fraud
must "state with particularity" the circumstances constituting
fraud.  Rice v. Santander Bank, N.A., 196 F. Supp. 3d 146, 152
(D. Mass. 2016).  Rule 9(b) requires the complaint to allege the
"time, place, and content of the alleged misrepresentations with
specificity."  Juarez, 708 F.3d at 279-80; SEC v. Druffner, 353
F. Supp. 2d 141, 148 (D. Mass. 2005).  "Malice, intent,
knowledge, and other conditions of a person's mind may be
alleged generally."  Fed. R. Civ. P. 9(b).  To comply with Rule
9(b), a complaint must specify:  "(1) the allegedly fraudulent
statements; (2) the identity of the speaker; (3) where and when
the statements were made; and (4) why the statements were
fraudulent."  Druffner, 353 F. Supp. 2d at 148 (internal
quotation marks omitted).  For example, the First Circuit in

<u>Woods</u> considered a complaint insufficient because, although it
"include[d] a basic recitation of the elements of fraud, [Woods
did] not indicate when, where, and how often the allegedly false
statements were made or what, specifically, was stated." <u>Woods</u>
<u>v. Wells Fargo Bank, N.A.</u>, 733 F.3d 349, 358 (1st Cir. 2013).
The complaint was also "wholly silent on the issue of her actual
reliance." <u>Id.</u>

Defendants argue that all four aspects of pleading fraud
with particularity are absent from the complaint. (Docket Entry
# 23). Plaintiff submits that the complaint adequately pleads a
fraud claim and, as previously noted, grounds the claim on
defendants' fraud regarding the "reserve repair fund," the 2013
loan modification, and the 2016 loan modification. (Docket
Entry # 34, pp. 19-20).

Turning to the "reserve repair fund" as to the fraud claim,
the complaint designates fraud as one of the four causes of
action and states that Ocwen failed to disburse a second,
$12,500 payment to plaintiff from the "Escrow for Repairs"
account. (Docket Entry # 15, ¶¶ 6-10, 23). The complaint also
states that the "Escrow for Repairs" was part of the mortgage
and the money was owed to plaintiff under its terms. (Docket
Entry # 15, ¶ 6). The complaint therefore identifies a
representation made in the mortgage by Delta that there was an
"Escrow for Repairs" account under which plaintiff was to receive

two disbursements and that he did not receive the second
disbursement.  (Docket Entry # 15, ¶¶ 6-8).  The complaint further
states that Ocwen, acting "on behalf of the lienholder, ignored" and
failed to respond to plaintiff's requests to disburse the second,
$12,500 payment.  (Docket Entry # 1, ¶ 7).  The dates when plaintiff
sent the demands, which would frame the time period in which Ocwen
failed to respond, are not set out in the complaint.  The attached
correspondence does not refer to a reserve repair fund or "Escrow
for Repairs" or set out a request to disburse the second payment of
$12,500.  At best, the complaint notes that plaintiff made
"[n]umerous demands" to Ocwen for "documentation regarding [its]
refusal to disburse funds" and Ocwen failed to respond.  (Docket
Entry # 15, ¶ 10).  The complaint also fails to articulate the
statement that Ocwen made or, alternatively, the time period when
Ocwen had a duty to speak and concealed the information.  See Smith
v. Zipcar, Inc., 125 F. Supp. 3d 340, 344 (D. Mass. 2015) (without
"an affirmative misrepresentation, an action for fraud requires
'both concealment of material information and a duty requiring
disclosure'") (quoting Sahin v. Sahin, 758 N.E.2d 132, 138 n.9
(Mass. 2001)); see also Suna v. Bailey Corp., 107 F.3d 64, 68 (1st
Cir. 1997) (to satisfy Rule 9(b), complaint must "explain why the
statements were fraudulent") (internal quotations marks omitted).
Accordingly, the complaint does not comply with Rule 9(b) with
respect to the fraud based on the "reserve repair fund" or the

29

"Escrow for Repairs."  See, e.g., Stine v. Bank of Am., N.A., No. 2:16-CV-109-GZS, 2016 WL 5135607, at *4 (D. Me. Sept. 21, 2016).

As to the Rule 9(b) sufficiency of the fraud claim based on the 2013 loan modification agreement, the complaint identifies the fraudulent statement as made by HSBC through Ocwen.  (Docket Entry # 15, ¶ 16).  It also sets out the false statement that HSBC, or Ocwen acting on HSBC's behalf, stated it would adjust the principal amount downward by the $8,584.39 figure noted in the addendum that plaintiff attached and referenced next to his signature in the 2013 loan modification agreement.[17]  (Docket Entry # 15, ¶ 16).  The complaint, however, does not articulate the "where and [the] when the statements were made."  Druffner, 353 F. Supp. 2d at 148. Rather, the complaint simply states that, HSBC, through Ocwen, "stated on numerous occasions that the principal amount would be adjusted . . ." but "defendants never did so . . .." (Docket Entry # 15, ¶ 16).  Plaintiff was then "forced to pay interest and principal" on the additional and incorrect $8,584.39 amount. (Docket Entry # 15, ¶ 16).  The fraud claim regarding the 2013 loan modification agreement therefore fails to comply with Rule 9(b).

Turning to the fraud vis-à-vis the 2016 loan modification agreement, the complaint states that plaintiff signed the 2016 loan

---

[17]  See footnote eight.  The complaint theorizes that, by accepting the 2013 loan modification agreement in December 2013, HSBC agreed to change the principal to reflect the correct amount.  (Docket Entry # 15, ¶¶ 15-16).

modification, made all three payments, and made another payment of
$6,000.  (Docket Entry # 15, ¶¶ 25-34).  The complaint also notes
that Ocwen acknowledged receipt of the misplaced payment and "would
'research' what happened to" it in light of the information from
plaintiff that "the funds had yet to be drawn from" plaintiff's bank
account.  (Docket Entry # 15, ¶¶ 27-33).  Beyond these allegations,
the complaint then simply states that, "defendants . . . are
refusing, clearly in bad faith, to honor their obligations under
this modification."  (Docket Entry # 15, ¶ 34).

In addition to asserting that the fraud allegations regarding
the 2016 loan modification agreement do not comply with Rule 9(b),
defendants argue that the complaint does not set out sufficient
facts to support the substantive elements of a fraud claim,
including the elements that defendants intended plaintiff to rely on
the false representation and that plaintiff did, in fact, rely on
the false representation to his detriment.  (Docket Entry # 23).
First, plaintiff's failure to address this argument amounts to a
waiver.  See Vallejo v. Santini-Padilla, 607 F.3d at 7, n.4.
Second, there are no facts showing that defendants intended
plaintiff to rely on a misrepresentation vis-à-vis the missing funds
regarding the 2016 loan modification or on any representation
regarding the 2016 loan modification agreement.  Indeed, except for
Ocwen's statement that it would research what happened to the
payment, the complaint does not identify any representation, let

31

alone a misrepresentation that plaintiff reasonably relied upon to his detriment.  The complaint does not even generally state that plaintiff relied on a representation made by either defendant regarding the 2016 loan modification and that he was injured as a result of his reliance.  The fraud claim regarding the 2016 loan modification agreement is therefore subject to dismissal under Rule 12(b)(6).[18]  See, e.g., Kenney v. U.S. Bank, N.A., Civil Action No. 17-11427-FDS, 2017 WL 5196386, at *4 (D. Mass. Nov. 9, 2017) (dismissing fraud claim because "there is no allegation, in the text of the complaint itself or in the letter, that the bank knew at the time that the statement was false and intended that the plaintiff would rely on it to his detriment").

C.  Violation of Chapter 93A

Defendants move to dismiss the chapter 93A claim because the complaint fails to allege that plaintiff sent a demand letter 30 days prior to filing suit.  In a three-sentence argument, plaintiff submits that the complaint and accompanying documents "specifically and sufficiently establish" a chapter 93A claim.  Two of the three sentences simply quote the statute.  (Docket Entry # 34, pp. 20-21).

Plaintiff thus completely fails to address the demand letter argument.  His failure to address the argument amounts to a waiver

---

[18]  It is therefore not necessary to address defendants' Rule 9(b) argument regarding the 2016 loan modification agreement.

and, therefore, an adequate basis to dismiss the chapter 93A claim.

See Vallejo v. Santini-Padilla, 607 F.3d at 7, n.4; see also Curet-Velazquez v. ACEMLA de Puerto Rico, Inc., 656 F.3d at 54; Coons v. Industrial Knife Co., Inc., 620 F.3d at 44.

Examining the merits of the argument as an alternative basis to recommend dismissal of the chapter 93A claim, it is well settled that, at least 30 days before filing suit, a plaintiff must mail or deliver to the defendant a "written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon." Mass. Gen. Laws ch. 93A, § 9(3). The statutory notice requirement "is not merely a procedural nicety, but, rather, 'a prerequisite to suit.'" Rodi v. Southern New England School of Law, 389 F.3d 5, 19 (1st Cir. 2004) (quoting Entrialgo v. Twin City Dodge, Inc., 333 N.E.2d 202, 204 (Mass. 1975)). Furthermore, "as a special element" of the chapter 93A, "it must be alleged in the plaintiff's complaint." Id. A "'failure to send a demand letter is sufficient ground to justify dismissal of the Chapter 93A claim.'"[19] Okoye v. Bank of N.Y. Mellon, 2011 WL 3269686, at *4 (quoting Rodi, 389 F.3d at 19); see, e.g., McKenna v.

---

[19] Plaintiff does not assert, and therefore waives, the subsidiary argument that either defendant falls under an exception to the demand letter. See Mass. Gen. Laws ch. 93A, § 9(3); McKenna v. Wells Fargo Bank, N.A., 693 F.3d 207, 218 (1st Cir. 2012).

Wells Fargo Bank, N.A., 693 F.3d at 218 (affirming district court's dismissal of chapter 93A claim due to absence of demand letter).

Examining the correspondence attached to the complaint as possibly constituting a demand letter, it is axiomatic that "a demand letter must 'reasonably describe' the defendant's 'unfair or deceptive act or practice' relied on as a basis for liability." Passatempo v. McMenimen, 960 N.E.2d 275, 293 (Mass. 2012) (quoting chapter 93A, section 9(3)) (internal brackets omitted).  The statute "'requires claimants to set out specifically any activities in their demand letter as to which they seek relief'" and "'[s]eparate relief on actions not so mentioned is foreclosed as a matter of law.'"  Id. (quoting Clegg v. Butler, 676 N.E.2d 1134, 1141 (Mass. 1997)).  The complaint does not state that plaintiff mailed or delivered a demand letter to either defendant prior to filing suit.  In addition, none of the documents attached to the complaint and dated 30 days before the July 3, 2017 filing of the complaint in state court refer to chapter 93A or present other factors or markers, see Cassano v. Gogos, 480 N.E.2d 649, 651 (Mass. App. Ct. 1985), sufficient to give defendants notice that plaintiff "'intend[ed] to invoke the heavy artillery of c. 93A.'"  Id. (quoting Cassano v. Gogos, 480 N.E.2d at 651).

In short, the complaint fails to include any indication that plaintiff mailed or delivered a demand letter to defendants at least 30 days before filing suit.  Defendants' argument is well taken and

the chapter 93A claim is therefore dismissed on this alternative basis.

D.   Additional Claims

In the opposition to defendants' motion to dismiss, plaintiff attempts to plead additional claims, namely, breach of the covenant of good faith and fair dealing, promissory estoppel, and negligence.  (Docket Entry # 34).  The complaint designates the claims as follows:

Cause[s] of Action

Fraud/Breach of Contract/Violation of the Fair Housing Act and the Massachusetts Consumers Protection Law.

(Docket Entry # 15, p. 10).

"[T]rial judges are not 'mind readers,'" and "'[i]f claims are merely insinuated rather than actually articulated,' courts are not required to make determinations on them." Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 45 (1st Cir. 2011) (quoting McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991)).  The complaint does not articulate claims for breach of the covenant of good faith and fair dealing, promissory estoppel, and/or negligence.  Accordingly, they are not addressed.

CONCLUSION

In accordance with the foregoing discussion, this court

**RECOMMENDS**[20] that the motion to dismiss (Docket Entry # 22) be **ALLOWED** in part and **DENIED** in part.  This court will conduct a scheduling conference at 2:00 p.m. on July 26, 2018.


                              /s/ Marianne B. Bowler
                              **MARIANNE B. BOWLER**
                              United States Magistrate Judge

---

[20]   Any objection to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  See Fed. R. Civ. P. 72(b).  Any party may respond to another party's objection within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.