UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICHARD GRUNDY,
      Plaintiff,


      v.                                    CIVIL ACTION NO.
                                            17-11449-PBS

HSBC BANK USA, N.A., as Indenture
Trustee for the Registered
Noteholders of Renaissance Home
Equity Loan Trust 2006-3, and
OCWEN LOAN SERVICING, LLC, a
Division of Ocwen, Inc.,
      Defendants.


**REPORT AND RECOMMENDATION RE:**
**DEFENDANTS HSBC BANK USA, N.A., AS INDENTURE TRUSTEE FOR THE**
**REGISTERED NOTEHOLDERS OF RENAISSANCE HOME EQUITY LOAN TRUST**
**2006-3, AND OCWEN LOAN SERVICING, LLC, A DIVISION OF OCWEN,**
**INC.'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 76)**

**February 10, 2020**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment

filed by defendants HSBC Bank USA, N.A., as Indenture Trustee

for the Registered Noteholders of Renaissance Home Equity Loan

Trust 2006-3 ("HSBC"), and Ocwen Loan Servicing, LLC, a division

of Ocwen, Inc. ("Ocwen"), (collectively "defendants").  (Docket

Entry # 76).  Plaintiff Richard Grundy ("plaintiff") opposes the

motion.  (Docket Entry # 86).  After conducting a hearing, this

court took the motion (Docket Entry # 76) under advisement.

PROCEDURAL BACKGROUND

On July 3, 2017, plaintiff filed suit in Massachusetts Superior Court (Essex County) to prevent a foreclosure on his home.  (Docket Entry # 1-2, pp. 7-23) (Docket Entry # 15, pp. 5-21) (Docket Entry # 44, p. 2).[1]  The original complaint raises four counts against defendants: (1) breach of contract; (2) violation of the Fair Housing Act; (3) fraud; and (4) violation of Massachusetts General Laws chapter 93A ("chapter 93A"). (Docket Entry # 15, p. 10).  HSBC removed the case to federal court on August 4, 2017.  (Docket Entry # 1).  On September 25, 2017, defendants moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)").  (Docket Entry # 22). Plaintiff opposed the motion (Docket Entry # 34) and during a February 6, 2018 hearing withdrew the Fair Housing Act claim (Docket Entry # 43).

On September 11, 2018, the district judge adopted (Docket Entry # 57) this court's Report and Recommendation (Docket Entry # 44) that allowed in part and denied in part the motion to dismiss.  More specifically, the district judge adopted this court's recommended dismissal of: the fraud claims regarding a 2013 loan modification ("2013 Loan Modification") and a reserve repair fund ("Repair Fund") due to plaintiff's failure to plead

---

[1]  Page numbers refer to the page numbers on the upper, right-hand corner of the docketed filing.

fraud with particularity under Fed. R. Civ. P. 9(b) ("Rule 9(b)"); (2) the fraud claim regarding a 2016 loan modification ("2016 Loan Modification") due to his failure to state a claim under Rule 12(b)(6); and (3) the chapter 93A claim due to the absence of a demand letter. (Docket Entry # 44). Whereas the breach of contract claim regarding a second disbursement from the Repair Fund was dismissed, this court allowed the 2013 Loan Modification breach of contract claim to remain while leaving open the possibility to replead the 2016 Loan Modification breach of contract claim. (Docket Entry # 44).

On July 31, 2018, plaintiff filed a motion for leave to file an amended complaint. (Docket Entry # 49). Initially, defendants reserved the right to oppose the motion pending review of the proposed amended complaint. (Docket Entry # 50). Thereafter, on August 22, 2018, with leave of court and without objection, plaintiff filed an amended complaint. (Docket Entry ## 54, 55). In lieu of seeking to dismiss the amended complaint, defendants filed an answer and an amended answer to the amended complaint. (Docket Entry ## 63, 64). The amended complaint sets out six counts against defendants: (1) breach of contract ("Count One"); (2) breach of the implied covenant of good faith and fair dealing ("Count Two"); (3) promissory estoppel ("Count Three"); (4) fraud ("Count Four"); (5) gross

negligence ("Count Five"); and (6) violation of sections two and nine of chapter 93A ("Count Six").  (Docket Entry ## 54, 55).

In seeking summary judgment (Docket Entry # 76), defendants filed a LR. 56.1 statement of material facts (Docket Entry # 78); an affidavit (Docket Entry # 77-1, pp. 1-8) from Derrick Raleigh ("Raleigh"), a senior loan analyst with Ocwen; various exhibits (Docket Entry ## 77-1, 77-2, 77-4); and a deposition of plaintiff (Docket Entry # 77-3).  In addition to opposing the motion (Docket Entry ## 86, 86-1), plaintiff submitted a LR. 56.1 response to defendants' statement of material facts (Docket Entry # 86-2) as well as his own exhibits (Docket Entry ## 86-3 to 86-27, 88), affidavit (Docket Entry 88-6), and statement of additional material facts (Docket Entry # 89).

### STANDARD OF REVIEW

Summary judgment is designed "to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Tobin v. Fed. Express Corp., 775 F.3d 448, 450 (1st Cir. 2014) (internal citation omitted).  It is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  It is inappropriate "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material

factual dispute in favor of either side." Pierce v. Cotuit Fire
Dist., 741 F.3d 295, 301 (1st Cir. 2014).

"An issue is 'genuine' when a rational factfinder could
resolve it [in] either direction," and a "fact is 'material'
when its (non)existence could change a case's outcome." Mu v.
Omni Hotels Mgmt. Corp., 882 F.3d 1, 5 (1st Cir. 2018) (internal
citation omitted); accord Green Mountain Realty Corp. v.
Leonard, 750 F.3d 30, 38 (1st Cir. 2014). The record is viewed
in favor of the nonmoving party, and reasonable inferences are
drawn in the nonmoving party's favor. See Garcia-Garcia v.
Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017) (court
examines "'record in the light most favorable to the nonmovant'
and must make 'all reasonable inferences in that party's
favor'") (internal citations omitted); Ahmed v. Johnson, 752
F.3d 490, 495 (1st Cir. 2014). In reviewing a summary judgment
motion, a court may examine "all of the record materials on
file" even if not cited by the parties. Ahmed, 752 F.3d at 495;
Fed. R. Civ. P. 56(c)(3). "'"[C]onclusory allegations,
improbable inferences, and unsupported speculation"'" are
ignored. Garcia-Garcia, 878 F.3d at 417 (internal citations
omitted).

Local Rule 56.1 requires a moving party to "include a
concise statement of the material facts of record as to which
the moving party contends there is no genuine issue to be tried"

with citations to the record.  LR. 56.1.  In response, the non-moving party must set out his own statement with citations to the record showing that "there exists a genuine issue to be tried."  LR. 56.1.  Unless the non-moving party's statement controverts the moving party's statement, the moving party's facts are "admitted by [the] opposing part[y]."  LR. 56.1; see Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (plaintiff's failure to contest date in LR. 56.1 statement of material facts caused date to be admitted on summary judgment); Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003).

Statements regarding the law and legal argument are not properly a part of an LR. 56.1 statement of additional facts.  See Dukanci v. Ann Inc. Retail, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they . . . consist largely of legal argument"); Matt v. HSBC Bank USA, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); Neponset Landing Corp. v. Nw. Mut. Life Ins. Co., 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").  Plaintiff includes legal arguments in a number of responses to defendants' LR. 56.1 paragraphs.  For example, in

response to paragraph 14 in defendants' LR. 56.1 statement ("On
or about January 28, 2009, $12,500.00 was applied from an escrow
account to the outstanding principal and interest on the loan.")
(Docket Entry # 78, p. 3, ¶ 14), plaintiff's LR. 56.1 paragraph
14 states it "was a part of the mortgage and not an escrow that
would have resulted in the full amount of $12,500.00 being
credited to the principal if the money was not to be used for
its intended purpose." (Docket Entry # 86-2, p. 3, ¶ 14, sent.
2). The above-quoted response (Docket Entry # 86-2, p. 3, ¶ 14,
sent. 2) and other statements of the law and legal arguments in
plaintiff's LR. 56.1 response and additional statement (Docket
Entry ## 86-2, 89) are ignored and not afforded any weight.
Adhering to this framework, the summary judgment record sets out
the following facts.

## FACTUAL BACKGROUND

Plaintiff owns property located at 6 North Pine Street in
Salem, Massachusetts ("the property"). (Docket Entry # 77-3,
pp. 6-7). On August 17, 2006, he executed a promissory note
("the note") of $190,000 with a lender, Delta Funding
Corporation ("Delta"), to refinance his home. (Docket Entry #
77-1, p. 2, ¶ 4) (Docket Entry # 77-1, p. 10) (Docket Entry #
77-3, p. 7). The note states that although the "amount may
change," plaintiff agreed to make initial monthly payments of
$1,541.10 on "the first day of each month beginning on October

1st, 2006." (Docket Entry # 77-1, p. 10). The note set out an annual 0.03 rate of 9.090% on unpaid principal which may change on various "Change Dates" beginning on September 1, 2009. (Docket Entry # 77-1, pp. 10-11) (bold font omitted). If changed, the interest rate would not be "lower than 9.090[%]." (Docket Entry # 77-1, p. 11, ¶ 4(D)).

The note allows "the Note Holder" to collect a late charge if the monthly payment is overdue by 15 days equal to 3% of the overdue principal and interest payment. (Docket Entry # 77-1, p. 12). Plaintiff, as the borrower, agreed to pay this late charge. (Docket Entry # 77-1, p. 12). If plaintiff did not pay "the full amount of each monthly payment on the date it is due, [plaintiff would] be in default." (Docket Entry # 77-1, p. 12). The note also states that, if plaintiff defaulted, "the Note Holder may require [plaintiff] to pay immediately the full amount of Principal that has not been paid and all the interest that [plaintiff] owe[s] on that amount." (Docket Entry # 77-1, p. 12). If required to immediately pay in full, the note allows the Note Holder to recoup "its costs and expenses in enforcing" the note from plaintiff. (Docket Entry # 77-1, p. 12).

On or about August 17, 2006, plaintiff "granted a mortgage lien . . . to Mortgage Electronic Registration Systems, Inc. ('MERS') as nominee for Delta, encumbering the Property." (Docket Entry # 77-1, p. 2, ¶ 5) (Docket Entry # 77-1, pp. 16-

18, 31).   The relevant language of the mortgage includes the
following:

> Borrower understands and agrees that MERS holds only legal
> title to the interests granted by Borrower in this Security
> Instrument,[2] but, if necessary to comply with law or custom,
> MERS (as nominee for Lender and Lender's successors and
> assigns) has the right: to exercise any or all of those
> interests, including, but not limited to, the right to
> *foreclose* and *sell* the Property; and to take any action
> required of Lender including, but not limited to, releasing
> and canceling this Security Instrument.

(Docket Entry # 77-1, p. 18) (emphasis added).   The mortgage
also allowed MERS to assign the mortgage.  (Docket Entry # 77-1,
p. 18).   The pertinent language reads as follows:

> Borrower does hereby mortgage, grant and convey to MERS
> (solely as nominee for Lender and Lender's successors and
> assigns) and to the successors and assigns of MERS, with
> power of sale, the following described property . . . .

(Docket Entry # 77-1, p. 18).   On or about August 25, 2006,
"Ocwen began servicing [the] loan."  (Docket Entry # 77-1, p. 3,
¶ 12).   On March 2, 2011, MERS, "as nominee for DELTA . . . its
successors and assigns," executed an assignment of "all its
rights, title and interest in" the mortgage to HSBC as
"Trustee."  (Docket Entry # 77-1, p. 40) (Docket Entry # 77-1,
p. 2, ¶ 6) (Docket Entry ## 86-3, 86-4).   The terms of the
assignment state that it was "made and entered into as of this
26TH day of SEPTEMBER, 2006."  (Docket Entry # 77-1, p. 40).

---

[2]  The mortgage is also referred to as the "Security Instrument."
(Docket Entry # 77-1, pp. 16, 18).

A.  Repair Fund

On August 17, 2006, plaintiff and Delta entered into a
"REQUIRED DEPOSIT AGREEMENT," which included the Repair Fund
provisions.[3]  (Docket Entry # 86-6, p. 32).  The Repair Fund
consisted of $25,000 held by Delta under an "Escrow for Repairs"
for plaintiff's home improvement project.  (Docket Entry # 77-3,
p. 12) (Docket Entry # 86-5) (Docket Entry # 86-6, p. 32).
Plaintiff had certain responsibilities to Delta in order to
obtain a disbursement of funds in the Repair Fund.  (Docket
Entry # 86-6, p. 32) (Docket Entry # 77-3, pp. 12-13).  These
included making certain repairs to the property and that:

> Borrower(s) will have a period of 3 month(s) to clear this
> matter of record.  If the aforementioned item(s) is (are)
> not satisfactorily cleared of record in time provided in
> this agreement, then in that event Delta Funding
> Corporation shall have the option to (1) satisfy the
> aforementioned item(s) from the funds held; or (2) extend
> the Borrower's time period to cure the same; (3) take any
> other steps Delta Funding Corporation feels necessary to
> protect their rights in regard to the mortgage property
> . . . *including but not limited to paying down the
> principal of the loan with the deposit.*
>
> It is further understood that the monies held are being
> held . . . as a convenience to the undersigned and that
> Delta Funding Corporation makes no representation that said
> funds are sufficient to satisfy open liens or repairs on
> the above mentioned property.  In the event that these

---

[3]  A deposition of plaintiff refers to the Repair Fund in various
ways, such as the "escrow repair reserve," "escrow reserve
account," "reserve escrow," "reserve fund," "escrow reserve,"
and "repair reserve."  (Docket Entry # 77-3, pp. 9-12).  For
clarity and consistency, this court refers to the document and
its provisions as the "Repair Fund."  (Docket Entry # 86-6, p.
32).

funds are insufficient, then the undersigned agrees and
understands that it is his/her/their responsibility to make
up any deficiency, or if the items to be completed are not
finished by the required completion date and/or we have an
option to complete the work.

Upon receipt and review of the aforementioned item(s),
Delta Funding Corporation will distribute any balance of
these funds first to pay off any arrears due on the
undersigned's account and any remaining money will be
refunded directly to the undersigned.

(Docket Entry # 86-6, p. 32) (emphasis added); (Docket Entry #
77-3, pp. 12-13).

Although it is not known when plaintiff requested the first
$12,500 disbursement (Docket Entry # 77-3, p. 23), plaintiff
received the first disbursement of $12,500 from Ocwen on or
about September 18, 2007 (Docket Entry # 77-1, p. 3, ¶ 10)
(Docket Entry # 86-5).[4]  Despite requesting a second disbursement
of $12,500 in late 2008 or early 2009, plaintiff testified he
knew in 2009 that he had not received the second disbursement.
(Docket Entry # 77-3, pp. 12-14, 25).  On January 28, 2009,
marked as "Hazard Claim Transfer," "[t]he loan transaction
history establishes that . . . $12,500 from an escrow account

---

[4]  In his deposition, plaintiff testified that he "can't honestly
say" that there was an agreement as to how the $25,000 would be
disbursed.  (Docket Entry # 77-3, p. 10).  Additionally,
plaintiff stated that he could not "recall a specific agreement
as to [the Repair Fund] being put out on, in the increment of
$12,500."  (Docket Entry # 77-3, pp. 10-11).  But in his May 29,
2012 letter to Ocwen, plaintiff states that "these monies were
to be released as the construction progressed."  (Docket Entry #
86-13).

was applied to the outstanding principal and interest on the loan." (Docket Entry # 77-1, p. 3, ¶ 11) (Docket Entry # 77-4, p. 2). Later, in a facsimile cover sheet sent to Ocwen on October 5, 2009, plaintiff writes that he is "[c]ontacting [Ocwen] for the release of $25,000 held back at the time of the closing for this pre-construction loan (repairs) as work has been completed." (Docket Entry # 86-21). Additionally, on October 22, 2009, Ocwen disbursed $29,550.67 from a "Hazard Claim funds" for a "property damage claim" from a tree branch falling on plaintiff's house (Docket Entry # 77-3, p. 13) (Docket Entry # 86-24). Plaintiff testified that "[f]inancial constraints" ultimately prevented him from completing the renovations. (Docket Entry # 77-3, pp. 8-9).

In response to not receiving the second disbursement, plaintiff sent Ocwen a purported chapter 93A demand letter on May 29, 2012, warning Ocwen of a "potential 93(a) claim."[5] (Docket Entry # 86-13, p. 2). The letter states that plaintiff attached "documentation indicating the $25,000 set aside for home repairs in the initial loan document," which was "to be released as the construction progressed." (Docket Entry # 86-7, p. 4) (Docket Entry # 86-13, p. 2). The letter also states that Ocwen "failed to make the second disbursement despite the

_____

[5] The above date is based on a facsimile transmission sheet. (Docket Entry # 86-13, p. 2).

homeowners['] monies being spent on the repairs in reliance on this contract." (Docket Entry # 86-13, p. 2). The letter further states that Ocwen's failure to disburse the second $12,500 in funds led to the loan's default. (Docket Entry # 86-13, p. 2). Finally, the letter states that plaintiff was "seeking to have this matter addressed by using the owed monies towards rectifying the loan." (Docket Entry # 86-13, p. 2).

Rather than disburse the $12,500, Ocwen sent plaintiff a letter dated June 1, 2012 advising him that due to plaintiff "fail[ing] to comply with the terms of the repair reserve agreement" (Docket Entry # 77-1, p. 60) (Docket Entry # 86-22), the installment was "reversed" and Ocwen "applied the money to the outstanding loan balance" (Docket Entry # 77-1, p. 3, ¶ 13).[6] On July 16 and 19, 2012, plaintiff sent letters to Ocwen inquiring as to how he violated the Repair Fund agreement and demanded documentation regarding Ocwen's assertion.[7] (Docket Entry ## 86-7, 86-14, 86-23).[8] On August 9, 2012, Ocwen sent plaintiff a letter with information regarding his inquiry.

---

[6] At his deposition, plaintiff avers that it was not until 2012 that he was notified of the status of the second disbursement. (Docket Entry # 77-3, p. 14). He also disputes how the $12,500 was applied to his account. (Docket Entry # 77-3, pp. 15-25).
[7] Plaintiff testified that he was unaware what procedure(s) he violated. (Docket Entry # 77-3, pp. 14-15).
[8] Both letters contain the same content, and both have the same purported 2012 chapter 93A demand letter attached. (Docket Entry ## 86-7, 86-14, 86-23).

(Docket Entry # 86-24).  On August 11, 2012, plaintiff responded by letter that Ocwen's August 9, 2012 letter "fail[ed] to provide any of the requested information" he originally requested on July 16, 2012.  (Docket Entry # 86-25, pp. 2, 9). Plaintiff also attached Ocwen's June 1 and August 9, 2012 letters as well as his July 16, 2012 letter.  (Docket Entry # 86-25, pp. 7-9).

B.  Default on 2006 Note and 2013 Loan Modification

Sometime in 2010, plaintiff failed to make timely payments on the note.[9]  (Docket Entry # 77-3, p. 25).  As part of foreclosure proceedings, defendants filed an "Order of Notice concerning the Servicemember's Relief Act, dated September 28, 2011," that "was recorded on or about October 27, 2011 in the Essex (South) Land Evidence Records" ("the Land Records"). (Docket Entry # 77-1, p. 2, ¶ 7) (Docket Entry # 77-1, p. 42). Through correspondence beginning as early as "either 2010 or 2011 into 2012," plaintiff unsuccessfully attempted to obtain a modification of the mortgage.  (Docket Entry # 77-3, p. 26) (Docket Entry ## 86-15, 86-16).

Although "[n]o terms of the Mortgage require the lender or its successors or agents to modify the terms of the Mortgage or

---

[9]  As previously noted, plaintiff states in his May 29, 2012 letter to Ocwen that the default is due to him not receiving the second disbursement.  (Docket Entry # 86-13, p. 2).

Note," Ocwen on July 1, 2013 sent plaintiff a letter titled

"Shared Appreciation Modification Offer" ("SAM").  (Docket Entry

# 77-1, p. 3, ¶ 14) (italics omitted); (Docket Entry # 77-1, pp.

62-74) (bold font omitted).  The SAM outlined a:

> [T]emporary payment plan, which provided, among other terms
> and conditions, that if [plaintiff] made the initial
> payments and returned the modification agreement, his loan
> would be modified in compliance with the terms and
> conditions set forth in the SAM.

(Docket Entry # 77-1, pp. 3-4, ¶ 15).  The SAM offer required

plaintiff to sign and return the SAM along with an "initial

payment in place of [plaintiff's] normal monthly payment" by

August 1, 2013 and make one "[t]rial paymen[t]" of $1,525.77 by

September 1, 2013.  (Docket Entry # 77-1, pp. 62-63, 66).  The

offer also stated that "TIME IS OF THE ESSENCE" and the loan

would not be modified if plaintiff did not receive "from the

Servicer a copy of this Agreement signed by the Servicer."

(Docket Entry # 77-1, p. 66) (Docket Entry # 86-8, p. 3).  As

further stated in the offer, "If all preconditions to the

modification . . . have been met, then the Loan Documents shall

automatically become modified on 10/1/2013."  (Docket Entry #

77-1, p. 66) (Docket Entry # 86-8, p. 3).

On July 29, 2013, plaintiff signed and returned the SAM to

Ocwen, agreeing to the SAM's terms pursuant to an attached

addendum.[10]  (Docket Entry # 86-8).  In the addendum, plaintiff
states that, "The figures in the modification agreement
inadvertently included $8,584.39 of unpaid principal twice,"
leading to an incorrect higher balance, and he provides
calculations as to how he ascertained that amount.  (Docket
Entry # 86-8, pp. 8-9) (bold font omitted).  At his deposition,
plaintiff testified that, "Based on some people who are better
with numbers than" he, the addendum was the correct principal
balance.  (Docket Entry # 77-3, pp. 28, 31) (Docket Entry # 86-
8).

     In a letter dated November 26, 2013, Ocwen advised
plaintiff that it did not accept his changes because it did not
receive the "corrected final modification agreement within the
required timeframe," i.e., August 1, 2013.  (Docket Entry # 77-
1, pp. 62, 63, 76) (bold font omitted).  Although not reflected
in the letter, by affidavit Raleigh states that Ocwen did not
accept the changes because plaintiff tried to "unilaterally
alter the SAM agreement by changing the outstanding principal
balance."  (Docket Entry # 77-1, p. 4, ¶ 16) (Docket Entry # 77-
3, p. 31).  Raleigh also avers by affidavit that on November 27,

---

[10]  A handwritten asterisk is placed next to the SAM's terms
relating to the "New Principal Balance."  (Docket Entry # 86-8,
p. 4) (bold font omitted).  In addition, written next to
plaintiff's signature and date are the words, "Pursuant to
Addendum A Attached."  (Docket Entry # 86-8, p. 10).

2013, plaintiff telephoned Ocwen and said that "he would accept the terms of the SAM without his proposed unilateral changes and would fax the executed agreement that day."[11]  (Docket Entry # 77-1, p. 4, ¶ 17) (Docket Entry # 77-4, p. 5).  At his deposition, plaintiff testified he does not remember the conversation accepting the SAM without his revision, and he further testified that he received something with defendants' initials.  (Docket Entry # 77-3, pp. 32-34).

As stated in Raleigh's affidavit, on December 6, 2013, "Ocwen received the executed Sam agreement."  (Docket Entry # 77-1, pp. 1-2, 4, ¶¶ 2-3, 18).[12]  Having received the executed SAM after the August 1, 2016 due date, Ocwen advised plaintiff "he would need to make the missing payments for November 2013, and December 2013, and the payment for January 2014, to obtain the permanent loan modification."  (Docket Entry # 77-1, p. 4, ¶ 18).  Plaintiff submitted the three payments on January 10, 2014, and "Ocwen received and applied the three payments [. . .] on January 17, 2014."[13]  (Docket Entry 77-1, p. 4, ¶ 19) (Docket

[11]  Testimony during plaintiff's deposition alludes to an audio recording of the telephone call.  (Docket Entry # 77-3, p. 33).
[12]  Plaintiff disagrees.  (Docket Entry # 86-2, pp. 7-8).  Ultimately, because the parties agree that they entered into the 2013 Loan Modification which, construing the record in plaintiff's favor, included the addendum, the disagreement does not alter this court's recommended decision on the summary judgment motion.
[13]  Plaintiff provided a scanned copy of the check dated January 6, 2014.  (Docket Entry # 86-20, p. 3).

17

Entry # 86-20).  The mortgage was then "modified subject to the terms of the SAM."  (Docket Entry # 77-1, p. 4, ¶¶ 18-19).

On December 17, 2013, Ocwen sent plaintiff a letter with "an executed copy of [plaintiff's] Loan Modification Agreement." (Docket Entry # 86-8, p. 2).  The copy contains plaintiff's July 29, 2013 signature, his addendum and notations, as well as initials in the "Servicer" section dated December 17, 2013. (Docket Entry # 86-8, p. 10).  In light of the foregoing, it is a material issue of fact as to whether the agreed-upon 2013 Loan Modification included the $8,584.39 reduction in principal reflected in plaintiff's addendum.

The parties nevertheless agree that the 2013 Loan Modification took effect and the "loan was modified subject to the terms of the SAM."  (Docket Entry # 77-1, p. 4, ¶ 19) (Docket Entry # 77-3, pp. 31, 34).[14]  The SAM set out the agreed-upon permanent loan modification terms of the interest rate (2.00008%), the principal balance, the monthly principal and interest payment ($984.02), the estimated monthly escrow payment ($541.75), and the new total monthly payment ($1,525.77). (Docket Entry # 77-1, p. 67) (bold font omitted) (Docket Entry #

---

[14]  In addition to the above-cited factual support, plaintiff's LR. 56.1 response does not controvert defendants' LR. 56.1 statement in paragraph 25 that the "loan was modified subject to the terms of the SAM."  (Docket Entry # 78, p. 5, ¶ 25) (Docket Entry # 86-2, p. 8).

86-8, p. 4).  The 2013 Loan Modification therefore reduced the
monthly principal and interest payment to $984.02 and the
interest rate to 2.00008%, and set the monthly escrow payment to
$541.75.  (Docket Entry # 77-1, p. 67) (Docket Entry # 86-8, p.
4).

C.  Escrow Account

The mortgage required an escrow account ("Escrow Account")[15]
"for payment of property taxes and hazard insurance."  (Docket
Entry # 77-1, p. 4, ¶ 20) (Docket Entry # 77-1, pp. 19-20).  It
also requires the lender to provide the borrower with "an annual
accounting" of the escrow funds "as required by RESPA," 12
U.S.C. §§ 2601 et seq. ("RESPA").[16]  (Docket Entry # 86-6, p. 7,
¶ 3).  The mortgage provides that the lender is "permitted to
collect and hold escrow funds in amounts permitted by RESPA,"
and also allows the lender to "collect additional escrow
amounts, defined as a 'cushion,' to prevent the escrow account
from ever becoming overdrawn in the event of a tax or insurance
increase."  (Docket Entry # 77-1, p. 4, ¶¶ 21-22) (Docket Entry
# 77-1, pp. 19-20) (Docket Entry # 77-2, p. 5).  This cushion is

---

[15]  Plaintiff refers to the Escrow Account as the "2014-2016
Escrow Funds" in his amended complaint.  (Docket Entry # 55, p.
23).
[16]  RESPA is an acronym for the "Real Estate Settlement
Procedures Act," 12 U.S.C. § 2601 et seq.  (Docket Entry # 77-1,
p. 17).  RESPA also includes "its implementing regulation,
Regulation X (24 C.F.R. Part 3500)."  (Docket Entry # 86-6, p.
3).

calculated by taking 1/6th of the "total estimated yearly tax and insurance payments." (Docket Entry # 77-2, p. 8). As such, the mortgage states that the:

> Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.
>
> If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA . . . .

(Docket Entry # 86-6, p. 7, ¶¶ 2, 4).

The 2013 Loan Modification set out an estimated monthly escrow payment of $541.75. (Docket Entry # 86-8, p. 4). "After the SAM was processed, the escrow balance was $0.00." (Docket Entry # 77-1, p. 5, ¶ 23). Thereafter, Ocwen applied the October 1, 2013 payment "to the loan on or about December 11, 2013 and the escrow balance" increased to $541.75. (Docket Entry # 77-1, p. 5, ¶ 23). Ocwen provided plaintiff the calculations in a letter dated August 8, 2014. (Docket Entry # 86-10, pp. 2-6). "On or about December 27, 2013, Ocwen made a hazard insurance disbursement of $357.25 and on December 30, 2013 Ocwen made a tax disbursement of $3,822.76" (Docket Entry # 77-1, p. 5, ¶ 24), followed by crediting three cents of interest

on December 31, 2013 (Docket Entry # 86-10, p. 3), "resulting in a negative escrow balance" (Docket Entry # 77-1, p. 5, ¶ 24) of $3,638.23 carried into January 2014 (Docket Entry # 77-2, p. 2).[17]  Ocwen also provided this information to plaintiff in the same August 8, 2014 letter.  (Docket Entry # 86-10, p. 3).

Following the 2013 Loan Modification, plaintiff sent Ocwen a number of letters challenging Ocwen's requested amount due for "other charges" and "past due" amounts.[18]  (Docket Entry # 77-3, pp. 34-38) (Docket Entry # 86-18).  On or about February 15,

---

[17]  In letters dated July 21 and September 14, 2015 to Ocwen, plaintiff asserts that the Escrow Account did not have a deficit as of January 2014.  (Docket Entry # 86-18, pp. 24-25, 28-31). The amended complaint similarly challenges this balance (Docket Entry # 55, ¶¶ 49, 76) as does plaintiff's LR. 56.1 response and additional statement (Docket Entry # 86-2, p. 9, ¶ 33) (Docket Entry # 89, ¶ 5).  The amended complaint is not verified and the latter two filings do not cite to evidentiary material in the record to support the assertions.  Plaintiff's averment by affidavit that "OCWEN falsely reported an escrow account shortfall of $3,638.23" at the end of 2013 (Docket Entry # 55-1, ¶ 38) is conclusory.  See Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 315 (1st Cir. 2016) (rejecting "unsupported, speculative assertions" and conclusory statements in affidavit by summary judgment opponent); Méndez-Aponte v. Bonilla, 645 F.3d 60, 64 (1st Cir. 2011); see generally Garcia-Garcia v. Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017).  In contrast, defendants provide business records and an affidavit to support the above calculations.  (Docket Entry # 86-10, p. 3) (Docket Entry # 77-1, pp. 1-2, 5, ¶¶ 3, 23-24) (Docket Entry # 77-2, p. 2).  Finally, plaintiff's citation to two other exhibits consisting of Ocwen's 2015 Escrow Account statement and a loan transaction history (Docket Entry # 86-2, p. 10) (citing Docket Entry ## 86-10, 86-11) do not dispute the accuracy of the negative deficit.  Rather, the loan transaction history supports it.  (Docket Entry # 86-10, p. 3).
[18]  The amended complaint alleges that these "'other charges'" are not accurate.  (Docket Entry # 55, ¶¶ 50-52, 75, 77).

2014, plaintiff mailed a letter to Ocwen complaining about an incorrect and unexplained $1,475 charge in the February statement.  (Docket Entry # 86-18, pp. 5-6).  In a letter to Ocwen dated March 3, 2014 marked as a "93ANotice," plaintiff complained about the $1,475 additional charge and "the March statement" that "doubled" this amount with a "wrongly included amount" of $3,011.27 "for a 'past due amount.'"  (Docket Entry # 86-18, pp. 7-9, 33-36) (Docket Entry # 86-19).  Plaintiff continued mailing Ocwen regarding the Escrow Account's purported incorrect past due amounts and incorrect "other charges" with letters dated April 16, 2014, August 8, 2014, July 21, 2015, and September 14, 2015.[19]  (Docket Entry # 86-18).  On at least one occasion (September 14, 2015) plaintiff sent Ocwen a letter challenging the correct amount due in the Escrow Account while also attaching Ocwen's December 17, 2013 letter of an "executed Loan Modification Agreement," along with the 2013 Loan Modification document that included plaintiff's addendum with the reduction in principal, plaintiff's signature, and hand-

---

[19]  In the August 8, 2014 letter, plaintiff refers to two additional letters dated May 8, 2014 and July 19, 2014.  (Docket Entry # 86-18, p. 13).  The amended complaint identifies letters plaintiff sent Ocwen in "February, March, and May of 2014 as well as April, May, July and September of 2015" regarding the incorrect amounts due for these "'other charges.'"  (Docket Entry # 55, ¶¶ 51, 77).

written initials on the signature line for the servicer dated December 17, 2013.  (Docket Entry # 86-17) (bold font omitted).

"On February 25, 2015, Ocwen performed an escrow analysis and determined that there was an expected shortage, including the necessary cushion amount, in the amount of $3,987.08." (Docket Entry # 77-1, p. 5, ¶ 25) (Docket Entry # 77-2, pp. 2-9) (Docket Entry ## 86-9, 86-11).  Ocwen spread the amount "over 36 months for equal payments of $110.75 per month for the 36 months in order to resolve the shortage."  (Docket Entry # 77-1, p. 5, ¶ 25).  The escrow analysis also reflects an increase of the target escrow payment from "$533.39 per month to $562.09 per month," i.e., by $28.70 per month.  (Docket Entry # 77-1, p. 5, ¶ 26) (Docket Entry # 77-2, p. 6).  As a result, plaintiff's monthly overall payment increased from "$1517.41 to $1656.86," i.e., by $139.45 per month.[20]  (Docket Entry # 77-1, p. 5, ¶ 26). The increase took effect after the first quarter of 2015 on April 1, 2015.[21]  (Docket Entry # 77-1, p. 5, ¶ 26).  On February

_____

[20]  The $1,517.41 monthly payment plaintiff owed at the time of the February 25, 2015 analysis (Docket Entry 77-2, p. 2) was lower than the original $1,541.10 monthly payment on the 2006 note (Docket Entry # 77-1, p. 10).
[21]  Plaintiff complained about the raise in "the escrow" to Ocwen in the July 21, 2015 letter.  (Docket Entry # 86-18, pp. 24-25). The September 14, 2015 letter provides more detail regarding plaintiff's complaint.  (Docket Entry # 86-18, pp. 28-31).  It reads that, "[s]ubsequent to the first quarter of this year[,] Ocwen announced that the escrow payment would be raised by over one hundred and twenty five dollars ($125.00) per month."

26, 2015, Ocwen mailed plaintiff this analysis in a letter labeled "Annual Escrow Account Disclosure Statement," which detailed "all money paid into and out of the escrow account for property taxes and hazard insurance."  (Docket Entry # 77-1, p. 5, ¶ 27) (Docket Entry # 77-2, pp. 2-9) (bold font omitted).[22] In his July 21, 2015 letter, plaintiff states that "[f]or a brief period of time from 10/2014 to 3/2015 [Ocwen's] billings were accurate."  (Docket Entry # 86-18, p. 25).  But in the same letter and in a September 14, 2015 letter, plaintiff raises the issue of the incorrect negative deficit in the Escrow Account at the end of 2013, the inaccurate other charges, and the allegedly incorrect increase in the escrow payments following the February

---

(Docket Entry # 86-18, p. 30).  Specific to the breach of contract claim regarding the Escrow Account, the amended complaint alleges that, "[s]ubsequent to the first quarter of 2015, OCWEN, on behalf of HSBC, raised the monthly escrow payment without explanation by one hundred and twenty five dollars ($125) per month."  (Docket Entry # 55, ¶ 53).  The amended complaint asserts that the $125 increase "was not warranted."  (Docket Entry # 55, ¶ 76).  The $125 increase thus concerns the above-noted February 2015 escrow analysis and resulting increase in the escrow payment beginning after the first quarter of 2015, i.e., on April 1, 2015.  (Docket Entry # 86-1, p. 21) (Docket Entry # 86-18, p. 30) (Docket Entry # 55, ¶¶ 53, 76).
[22]  Ocwen sent plaintiff subsequent documents titled "Annual Escrow Account Disclosure Statement" dated February 4, 2016, December 14, 2016, December 18, 2017, and December 10, 2018. (Docket Entry # 77-2, pp. 2-46).

2015 escrow analysis.  (Docket Entry # 86-18, pp. 24-25, 28-31).[23]

D.  <u>2013 Loan Modification Default and 2016 Loan Modification Attempt</u>

Plaintiff "defaulted on the [2013 Loan Modification] by failing to make his full monthly payments beginning on April 1, 2015." (Docket Entry # 77-1, p. 5, ¶ 28) (Docket Entry # 77-1, pp. 49-58) (Docket Entry # 77-4, pp. 2-11) (Docket Entry # 77-3, pp. 34-35).  As part of foreclosure proceedings, defendants filed a "second Order of Notice concerning the Servicemember's [Civil] Relief Act, dated December 30, 2015." (Docket Entry # 77-1, p. 3, ¶ 9) (Docket Entry # 77-1, p. 46).  The notice was recorded on January 20, 2016 in the Land Records.  (Docket Entry # 77-1, p. 3, ¶ 9) (Docket Entry # 77-1, p. 46).  Additionally, "[a]n Affidavit Regarding Compliance with Mass. Gen. Laws ch. 244 § 35B dated December 10, 2015, was recorded on or about December 16, 2015, in the Land Records" averring that this statute "is not applicable to . . . [plaintiff's] mortgage." (Docket Entry # 77-1, p. 3, ¶ 8) (Docket Entry # 77-1, p. 44).

---

[23]  With respect to the breach of contract claim regarding the Escrow Account, the amended complaint raises claims based on the purportedly incorrect negative balance at the end of 2013, the "'other charges,'" and the $125 increase.  (Docket Entry # 55, ¶¶ 49-55, 74-78).

On June 10, 2016, Ocwen sent plaintiff a letter offering
him "a trial payment plan as a pre-curser to a potential HAMP[24]
loan modification."[25]  (Docket Entry # 77-1, p. 5, ¶ 29) (Docket
Entry # 77-2, pp. 48-63).  The offer required plaintiff to make
three trial period payments for the months of July, August, and
September 2016 to qualify for a permanent modification, and
plaintiff made these payments.  (Docket Entry # 77-1, p. 5, ¶
29) (Docket Entry # 77-2, p. 48) (Docket Entry # 77-3, p. 39).
The offer stated in bold text that, "If each payment is not
received by Ocwen in the month in which it is due, this offer
will end and your loan will not be modified . . . ."  (Docket
Entry # 77-2, p. 49).  The offer provided that if plaintiff
submitted "an Initial Package" by August 1, 2016 and Ocwen
"determine[d] that [plaintiff is] eligible for a lower monthly
payment under HAMP, that lower monthly payment will be reflected
in the modification agreement, which [Ocwen] will send to you
towards the end of the trial period."  (Docket Entry # 77-2, pp.
50-51).  The offer also informed plaintiff that his "existing
loan and loan requirements remain in effect and unchanged during
the trial period" and that he "may make the trial period payment

---

[24]  HAMP is an acronym for the Home Affordable Modification
Program.  (Docket Entry # 77-2, p. 48).
[25]  The proposed 2016 HAMP Loan Modification is also referred to
as the "'2016 TPP,'" with "TPP" standing for "trial payment
plan" or "'trial period payment.'"  (Docket Entry # 77-1, p. 5,
¶ 29) (Docket Entry # 77-2, p. 48).

instead of the payment required under [his] loan documents."
(Docket Entry # 77-2, pp. 49, 54) (bold font omitted).

On September 26, 2016, Ocwen sent plaintiff the above-
referenced modification agreement "entitled 'Home Affordable
Modification Agreement' . . . to be returned by October 10,
2016" (Docket Entry # 77-1, p. 6, ¶ 30) (Docket Entry # 77-2,
pp. 65-75), while also informing plaintiff that "[a]ll trial
period payments should continue to be made on time" (Docket
Entry # 77-2, p. 65).  The enclosed modification agreement,
i.e., the 2016 Loan Modification, offered a permanent loan
modification which included: a balloon payment of $141,933.30
due at the time of September 1, 2036 maturity date;[26] a new
interest rate of 3.25%; a slightly lower monthly payment of
$1,473.98; and a waiver of unpaid late charges.  (Docket Entry #
77-2, pp. 65-75).  The cover letter to the enclosed 2016 Loan
Modification explained "'How To Accept This Offer,'" namely, by
"sign[ing] and return[ing] the Modification Agreement(s) [to
Ocwen] . . . by 10/10/2016" and complying with the trial period
plan.  (Docket Entry # 77-2, pp. 65-66).  Defendants, however,
did not receive a signed 2016 Loan Modification agreement by the
prescribed date of October 10, 2016, and on November 18, 2016,

---

[26]  The 2013 Loan Modification likewise included a "balloon
payment" due on September 1, 2036 in an amount "based on the
future appreciation of the Property."  (Docket Entry # 77-1, p.
72).

Ocwen sent plaintiff a letter notifying him that he was "no longer eligible for the loan modification offer," and that Ocwen would deny the modification.  (Docket Entry # 77-1, p. 6, ¶ 31) (Docket Entry # 77-2, pp. 77-81).  It was not until December 5, 2016 that Ocwen received plaintiff's signed agreement.  (Docket Entry # 77-1, p. 6, ¶ 33) (Docket Entry # 77-2, p. 84).

On January 10, 2017, plaintiff emailed Ocwen that he had "made the three payments" (Docket Entry # 86-27, p. 2) and "returned the loan modification agreement and was holding mortgage payments in escrow," despite Ocwen's prior directive that plaintiff needed to continue his payments, as stated in the September 26, 2016 letter (Docket Entry # 77-1, p. 6, ¶ 32) (Docket Entry # 77-2, p. 65).  Additionally, on January 20, 2017 (Docket Entry # 86-26, pp. 2-40), plaintiff sent Ocwen a letter with documentation supporting his January 10, 2017 email and challenging foreclosure.  The letter includes an attached HAMP affidavit (Docket Entry # 86-26, pp. 13-15) and a purported HAMP agreement (Docket Entry # 86-26, pp. 25-32).[27]  On February 9, 2017, Ocwen sent plaintiff a document stating that Ocwen was willing to "make an exception" and would honor the signed 2016

---

[27]  Despite the letter's January 20, 2017 date, the date alongside a public notary's signature on the HAMP agreement is September 10, 2017.  (Docket Entry # 86-26, pp. 2-3, 31).  Additionally, the agreement does not include defendants' signature.  (Docket Entry # 86-26, p. 32).

Loan Modification if plaintiff made past-due payments for
November 2016, December 2016, January 2017, and February 2017
within 14 days of the letter.  (Docket Entry # 77-1, p. 6, ¶ 33)
(Docket Entry # 77-2, pp. 83-85) (Docket Entry # 86-27).  The
letter also provided a telephone number for plaintiff to call
Ocwen should he want "to discuss payment remittance options."
(Docket Entry # 77-1, p. 6, ¶ 33) (Docket Entry # 77-2, p. 84).
On February 28, 2017, plaintiff telephoned Ocwen and
acknowledged his receipt of the February 9, 2017 letter and
stated he "would send documentation showing he had mailed a
$6000 payment, along with the tracking information" for the
payment.  (Docket Entry # 77-1, pp. 6-7, ¶¶ 34-35) (Docket Entry
# 77-2, pp. 86-88).

     On or about March 1, 2017, plaintiff sent Ocwen a letter
notifying Ocwen that the date on Ocwen's February 9, 2017 letter
was "more than 10 days passed as of the day of [his] receipt" of
the letter, and that for the payment he is "assum[ing] that all
is good as outlined above regarding the 27th . . . ."[28]  (Docket
Entry # 88, p. 9).  The letter, faxed on March 1, 2017, informed
Ocwen that the "funds have been released on this matter and
forwarded to Ocwen."  (Docket Entry # 88, p. 10).  By affidavit,

---

[28]  The above date (March 1, 2017) is based on a facsimile date
and time stamp appearing on select pages.  (Docket Entry # 88,
pp. 5-10).

plaintiff avers that Ocwen assured him that it would accept the payment as timely.[29]  (Docket Entry # 77-3, p. 44) (Docket Entry ## 88, 88-1) (Docket Entry # 88-6, ¶ 5).  Additionally, on March 1, 2017, plaintiff sent a package by Federal Express ("FedEx") to Ocwen that arrived "on March 3, 2017, after the February 23, 2017 deadline set forth in the February 9, 2017 letter." (Docket Entry # 77-1, pp. 6-7, ¶ 35) (Docket Entry # 77-2, pp. 87-88) (Docket Entry # 88, pp. 3-4).  Also, on March 1, 2017, plaintiff sent an email to Ocwen forwarding documentation regarding the $6,000 payment and FedEx tracking information. (Docket Entry # 88).  At his deposition, plaintiff testified that he made the check out for $6,000 and sent it to Ocwen. (Docket Entry # 77-3, pp. 43-44).  On March 2, 2017, and without confirming receipt of the actual payment, Ocwen confirmed to plaintiff through email the receipt of plaintiff's "proof of payment" that plaintiff emailed the day before and stated that "[o]nce payment is received, it will be posted within 24 hours." (Docket Entry # 88-1).  Although Ocwen received the package on March 3, 2017, the package did not include the overdue payments as required in Ocwen's February 9, 2017 letter, according to Raleigh.[30]  (Docket Entry # 77-1, p. 7, ¶ 36).

---

[29]  Plaintiff identifies the Ocwen representatives as James Lewis and Jamie Taylor.  (Docket Entry # 88-6, p. 2, ¶ 5).
[30]  Plaintiff provided a scanned copy of the check in question. (Docket Entry # 88, p. 11).

Because the check in question was not cashed, nor the funds withdrawn, plaintiff made an inquiry to Ocwen on March 14, 2017 as to what happened to the check.[31]  (Docket Entry 77-3, p. 58) (Docket Entry # 88-2).  In a March 20, 2017 email, Ocwen notified plaintiff that it denied the 2016 Loan Modification because Ocwen "did not receive the permanent modification documents at the required time."  (Docket Entry # 77-2, p. 90) (Docket Entry # 77-1, p. 7, ¶ 37).  Furthermore, "any funds that might be received thereafter in March 2017 would be applied to cover past due payments under the Note and Mortgage."  (Docket Entry # 77-1, p. 7, ¶ 37) (italics omitted).  On March 21, 2017, Ocwen emailed plaintiff advising him it had not received any payment and suggested that plaintiff stop payment of any check and use other payment options, including a bank wire transfer or certified check, to pay Ocwen.  (Docket Entry # 77-1, p. 7, ¶ 38) (Docket Entry # 77-2, pp. 94-95).  The email also advised plaintiff that his account was restricted to accepting only certified funds.  (Docket Entry # 77-1, p. 7, ¶ 38) (Docket Entry # 77-2, p. 94).  Plaintiff did not use any of these

---

[31]  According to plaintiff's affidavit, after this inquiry Ocwen suggested that plaintiff "could start the application process over for a HAMP modification."  (Docket Entry # 88-6, p. 2, ¶ 8).  Plaintiff, however, avers that he would not have enough time to restart an application before the foreclosure date. (Docket Entry # 88-6, p. 2, ¶ 8).

options to send Ocwen a payment.  (Docket Entry # 77-3, pp. 58-
61).

On March 30, 2017, plaintiff sent Ocwen an email stating
that Ocwen had "been in possession of [his] check for $6000 for
close to a month and [he] still [had] not heard from anyone
about this," and that "[he] need[ed] to know what [was] going
on."  (Docket Entry # 88-4, p. 4).  Ocwen replied on March 31,
2017 with an email to plaintiff stating that Ocwen was
"currently trying to locate the missing funds" and asked
plaintiff for anything that could aid in Ocwen's investigation.
(Docket Entry # 88-4, pp. 6-7).  The email also notified
plaintiff that Ocwen would "postpone the foreclosure sale date"
to around early May while the funds were being located.  (Docket
Entry # 88-4, p. 6).

Over one month later, on May 1, 2017, plaintiff followed up
with an email asking about the investigation's status.  (Docket
Entry # 88-3, p. 2).  On May 2, 2017, Ocwen advised plaintiff by
email that, because Ocwen did not receive the necessary funds,
it would continue with the foreclosure proceedings set for May
5, 2017.  (Docket Entry # 77-1, p. 7, ¶ 39) (Docket Entry # 77-
2, p. 98).  On May 5 and 8, 2017, plaintiff sent Ocwen emails
wanting to establish contact with the "'APPOINTED CASE MANAGER –
Mr. James Lewis.'"  (Docket Entry # 88-3, pp. 3, 6).  Ocwen
responded by email on May 8, 2017 regarding plaintiff's

appointment request that due to scheduling, plaintiff's appointment would not be with James Lewis, but with another Ocwen representative.  (Docket Entry # 88-3, p. 7).  On May 9, 2017, plaintiff sent Ocwen a letter outlining his frustration with the current predicament.  (Docket Entry # 88-3, pp. 10-11).

On May 5, 9, and 10, 2017, Ocwen sent plaintiff correspondence advising him that it could not track or locate the payment.  (Docket Entry # 88-3, pp. 4-5, 13-17).  The May 9 and 10 emails advised plaintiff that now "the confirmed sale date on the property is on May 12, 2017."  (Docket Entry # 88-3, pp. 13, 17).  Plaintiff responded with an email on May 10, 2017 stating that he sent the requested $6,000 payment and asked if Ocwen had misplaced the package and check, and if Ocwen "really think[s] as the product of losing a payment [Ocwen] can foreclose on a home?"  (Docket Entry # 88-5, p. 2).  Ocwen replied to plaintiff's email on May 12, 2017 with a letter stating that Ocwen would provide a written response to plaintiff's email within ten business days or, if needed, within 30 days.  (Docket Entry # 88-3, p. 18).

In a May 30, 2017 email, plaintiff again asked Ocwen about the status of the investigation, to which Ocwen responded by email on May 31, 2017 stating there is still "an ongoing investigation on the account about the missing payment." (Docket Entry # 88-3, pp. 19-20).  On June 20, 2017, plaintiff

33

notified Ocwen that he was still waiting for an update on the investigation. (Docket Entry # 88-3, p. 21). Ocwen responded by email a few minutes after plaintiff's email stating that it would "make every effort to reply" to his email. (Docket Entry # 88-3, p. 22). Soon thereafter, plaintiff filed suit against defendants on July 3, 2017. (Docket Entry # 44, p. 2) (Docket Entry # 15). In light of the foregoing, it is a material issue of fact as to whether plaintiff sent the check for the missing payments and whether defendants received it in or around early March 2017.

There is no indication that plaintiff made a payment on the loan after sending Ocwen the $6,000 check, which, construing the record in plaintiff's favor, Ocwen received in early March 2017. Plaintiff defaulted on the loan in April 2015 by failing to make the full monthly payment. (Docket Entry # 77-1, p. 5, ¶ 28). The Escrow Account shows the last escrow payment in November 2016. (Docket Entry # 77-2, pp. 26-28, 37-39). The record fails to include monthly statements evidencing a payment after the March 2017 receipt of the $6,000. Plaintiff testified that he had not made any payments since filing suit on July 3, 2017. (Docket Entry # 77-3, p. 46). When asked whether he was making mortgage payments in late 2016 or early 2017, he identified only the "three trial periods and the [$]6,000." (Docket Entry # 77-3, p. 56).

DISCUSSION

Defendants move for summary judgment on the breach of
contract, breach of implied covenant of good faith and fair
dealing, promissory estoppel, fraud, negligence, and chapter 93A
claims.  (Docket Entry ## 76, 77).

I.  Breach of Contract (Count One)

The amended complaint subdivides the breach of contract
count into claims regarding the Repair Fund, the 2013 Loan
Modification, the Escrow Account, and the attempted 2016 Loan
Modification.  (Docket Entry # 55, pp. 21-29, ¶¶ 66-98).
Defendants seek summary judgment on the grounds that they did
not breach any contract and plaintiff did not suffer any
damages.  (Docket Entry # 77).

A breach of contract claim under Massachusetts law
"requires the plaintiff to show that (1) a valid contract
between the parties existed, (2) the plaintiff was ready,
willing, and able to perform, (3) the defendant was in breach of
the contract, and (4) the plaintiff sustained damages as a
result."  Bose Corp. v. Ejaz, 732 F.3d 17, 21 (1st Cir. 2013);
see Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 39 (Mass. 2016).
In other words, "'the plaintiff must prove that a valid, binding
contract existed, the defendant breached the terms of the
contract, and the plaintiff sustained damages as a result of the
breach.'"  Young v. Wells Fargo Bank, N.A., 828 F.3d 26, 32 (1st

Cir. 2016) ("Young II") (internal citations omitted).  "The
essential elements for the formation of a contract under
Massachusetts law consist of an offer, acceptance, and
consideration."  Doe v. Trs. of Bos. Coll., 892 F.3d 67, 89 (1st
Cir. 2018).

First, plaintiff must show there was a "'valid, binding
contract.'"  Young II, 828 F.3d at 32 (internal citations
omitted).  Ordinarily, it is a "'question of fact whether any
particular conduct or actions imply a contractual
understanding,'" Salem Laundry Co. v. New England Teamsters and
Trucking Indus. Pension Fund, 829 F.2d 278, 280 (1st Cir. 1987)
(internal citations omitted), unless "reasonable people could
not differ over" the meaning of the parties' words and actions.
Bourque v. Fed. Deposit Ins. Co., 42 F.3d 704, 708 (1st Cir.
1994) (internal quotation marks and citations omitted); accord
McGurn v. Bell Microproducts, Inc., 284 F.3d 86, 91 (1st Cir.
2002) ("'disputes about whether a contract has or has not been
formed as the result of words and conduct'" are traditionally
for the trier of fact "unless 'the manifestations of intention
of both parties to be bound, or of either not to be bound, are
so unequivocal as to present no genuine issue of fact'")
(internal citations omitted).

An offer by a party occurs when "it manifests 'a
willingness to enter into a bargain, so made as to justify

another person in understanding that his assent to that bargain
is invited and will conclude it.'" Bosque v. Wells Fargo Bank,
N.A., 762 F. Supp. 2d 342, 351 (D. Mass. 2011) (quoting Bourque,
42 F.3d at 709). TPPs may be considered offers for purposes of
a breach of contract claim, while signatures and trial period
payments may be considered acceptances. Bosque, 762 F. Supp. 2d
at 351; see Conte v. Bank of Am., N.A., 52 F. Supp. 3d 265, 268
(D. Mass. 2014). "During negotiations, [a] substantial
variation in contract terms incident to a purported acceptance
is not a binding acceptance but a counter offer, while a
comment, purported clarification, or expression of
dissatisfaction appended to an endorsement of acceptance is
considered a full acceptance." Penney v. Deutsche Bank Nat'l
Tr. Co., Civil Action No. 16-10482-ADB, 2017 WL 1015002, at *5
(D. Mass. Mar. 15, 2017) (internal quotation marks and citation
omitted). "A substantial variation in contract terms incident
to a purported acceptance is not a binding acceptance but a
counter offer." Mass. Hous. Fin. Agency v. Whitney House
Assocs., 638 N.E.2d 1378, 1380-81 (Mass. 1994). Consideration
is "'a bargained-for exchange in which there is a legal
detriment of the promisee or a corresponding benefit to the
promisor.'" Neuhoff v. Marvin Lumber and Cedar Co., 370 F.3d
197, 201 (1st Cir. 2004) (internal citation omitted).

"'It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement.'"  Lambert v. Fleet Nat'l Bank, 865 N.E.2d 1091, 1095 (Mass. 2007) (internal citation omitted); see also Rosenfield v. United States Tr. Co., 195 N.E. 323, 325 (Mass. 1935); Desmond Demontegnac v. Selene Fin. LP, Civil Action No. 18-12560-NMG, 2019 WL 3546885, at *8 (D. Mass. Apr. 16, 2019) ("'"[i]t is hornbook law that for an offer and acceptance to create a binding agreement there must be mutual assent"'" to the agreement's terms") (internal citations omitted).  Furthermore, "the determination of whether parties intended to be bound 'must be premised on the totality of all such expressions and deeds given the attendant circumstances and the objectives that the parties are attempting to attain.'" Sinotau Pharm. Grp. v. Navidea Biopharmaceuticals, Inc., 211 F. Supp. 3d 375, 379-80 (D. Mass. 2016) (internal citations omitted).

Second, plaintiff must show that he was "ready, willing, and able to perform his . . . part of the contract." Bulwer, 46 N.E.3d at 39.  This element can be demonstrated by a plaintiff's ability to make timely payments.  Carvalho v. JPMorgan Chase Bank, N.A., Civil Action No. 17-10723-PBS, 2019 WL 1921701, at *2 (D. Mass. Apr. 30, 2019).  The plaintiff in Carvalho,

however, "was not 'ready, willing, and able to perform his . . .
part of the contract'" because he had "stopped making complete
and timely payments on his loan" prior to the defendant's
purported breach of cancelling a modification. Id. (internal
citation omitted). As such, "Carvalho's nonpayment show[ed]
that he was not 'in a position to obtain the benefit of the
contract, but for the breach.'" Id. (internal citation
omitted).

Third, plaintiff must show that defendants were "in breach
of the contract." Ejaz, 732 F.3d at 21. "To establish a
breach, a plaintiff has the burden of proving the failure of the
defaulting party to conform to one or more of the contract's
material terms." In re JPMorgan Chase Mortg. Modification
Litig., 880 F. Supp. 2d 220, 233 (D. Mass. 2012). "A term is
material when it involves 'an essential and inducing feature' of
the contract." Id. (quoting Buchholz v. Green Bros. Co., 172
N.E. 101, 102 (Mass. 1930)). Conversely, if plaintiff has
violated a material term of the contract, defendants would be
relieved of their duty under the contract. See Young II, 828
F.3d at 32; HMC Assets, LLC v. Conley, Civil Action No. 14-
10321-MBB, 2016 WL 4443152, at *25 (D. Mass. Aug. 22, 2016)
("'"[a] material breach by one party excuses the other party
from further performance under the contract"'") (quoting

Teragram Corp. v. Marketwatch.com, Inc., 444 F.3d 1, 11 (1st
Cir. 2006)).

Fourth, plaintiff must show that he "sustained damages as a
result" of the breach.  Ejaz, 732 F.3d at 21.

> The rule of damages in an action for breach of contract is
> that the plaintiff is entitled in general to damages
> sufficient in amount to compensate for the loss actually
> sustained by [him], and to put [him] in as good position
> financially as [he] would have been if there had been no
> breach.

Young II, 828 F.3d at 32 (internal citations omitted); see also
S. Bos. Elderly Residences, Inc. v. Moynahan, 76 N.E.3d 272, 283
n.11 (Mass. App. Ct. 2017).

Damages can be calculated based on what is owed and what is
credited to plaintiff.  See generally Foregger v. Residential
Credit Solutions, Inc., Civil Action No. 12-11914-FDS, 2013 WL
6388665, at *6 (D. Mass. Dec. 5, 2013).  The court in Young II
affirmed the lower court's allowance of the defendants' summary
judgment motion because the plaintiff failed to provide even an
estimate of what she paid her attorney in pursuing litigation
and provided only "vague and conclusory testimony."  Young II,
828 F.3d at 33; see also Foregger, 2013 WL 6388665, at *6 (loan
servicer seeking summary judgment on its breach of contract
counterclaim did not prove damages due to its failure to provide
calculations of amount owed under mortgage note to support
affidavit statement of total amount owed, foreclosure sale

40

price, and litigation fees); Klevisha v. Provident Funding

Assocs. L.P., 167 F. Supp. 3d 250, 255 (D. Mass. 2016).

Typically, making a payment under a TPP does not constitute

damages because of a "preexisting mortgage obligation . . . that

[requires plaintiff to] make monthly payments toward" the home.

Young II, 828 F.3d at 33.

Reliance damages are appropriate "only when the expenses

would not have been incurred but for reliance on the contractual

obligation not performed." Aronovitz v. Fafard, 934 N.E.2d 851,

859 (Mass. App. Ct. 2010). Regarding "emotional distress,

damages for mental suffering are generally not recoverable in an

action for breach of contract." John Hancock Mut. Life Ins. Co.

v. Banerji, 858 N.E.2d 277, 288 (Mass. 2006). An exception

allows "[d]amages for emotional distress . . . if they result

from physical harm . . . or are the result of intentional or

reckless conduct of an extreme and outrageous nature." Id.

A.   2013 Loan Modification

Defendants move for summary judgment on the breach of

contract claim related to the 2013 Loan Modification because

they did not breach any contract "in relation to the 2013 [Loan

Modification]," and plaintiff neither suffered any damages nor

is able to prove any damages. (Docket Entry # 77, pp. 9-10).

Defendants submit that the parties did not agree to a binding

contract with the $8,584.39 reduction in principal. Defendants

41

maintain they never accepted a modification with this reduced principal balance.  Rather, they purportedly modified the loan without the reduction.  In support, defendants rely on the November 26, 2013 letter Ocwen sent to plaintiff rejecting plaintiff's revision.  Additionally, defendants aver that in the November 27, 2013 telephone call plaintiff said "he would accept the terms of the SAM without his proposed unilateral changes and would fax the executed agreement that day."  (Docket Entry # 77-1, p. 4, ¶ 17).  Defendants then point to plaintiff making the required payments, which in turn led to the loan being modified with the SAM's original terms.

Plaintiff argues that defendants accepted his proposed revision.  In support, plaintiff relies on the December 17, 2013 letter that Ocwen sent to him, attaching a copy of the SAM with his proposed revision along with Ocwen's initials.  As to defendants' argument that plaintiff accepted the SAM without his revision in the November telephone call, plaintiff's deposition testimony reflects that he could not remember if he ever accepted the SAM without his proposed revision.  (Docket Entry # 77-3, pp. 32-33).  Additionally, plaintiff points out that defendants did not produce the alleged recording of the call, and defendants' affiant had no personal involvement with the telephone call.  Furthermore, according to plaintiff, he acted

under the July 29, 2013 agreement when he made subsequent payments.

As to damages, plaintiff asserts in his memorandum and his unverified amended complaint that he did not receive "the full benefit of the contract as agreed, the forced payment of monies beyond that agreed to, the expense of the long standing effort to get OCWEN to correct the situation, and emotional distress." (Docket Entry # 86-1, p. 7) (Docket Entry # 55, p. 23, ¶ 73). Defendants counter by arguing that plaintiff did not suffer any damages because he was able to remain in his home "for a lower monthly payment for an extended period of time." (Docket Entry # 77, p. 10). They also submit that plaintiff "eventually defaulted on the SAM . . . has not paid the full principal amount on the loan, and did not pay the alleged additional $8,584.39." (Docket Entry # 77, p. 10).

Even assuming the 2013 Loan Modification included plaintiff's addendum with the reduced principal and that defendants breached the contract by not modifying the loan without the reduced principal, plaintiff ultimately fails to provide evidence of damages resulting from defendants' purported breach. With defendants pointing to the absence of evidence to support the essential element of damages, it is incumbent upon plaintiff to provide evidence of such damages to allow a jury to find in his favor in order to avoid summary judgment. In his

43

memorandum, plaintiff merely states that he "was clearly
damaged," without providing facts about how it was "clear."
(Docket Entry # 86-1, p. 7).

Examining each category of damages plaintiff identifies, he
initially claims he is not able to enjoy the full benefit of the
loan as agreed.  (Docket Entry # 86-1, p. 7).  First, he does
not identify any amount of money he lost as a result of
defendants' breach of not agreeing to the $8,584.39 reduction in
principal.  Second, he does not provide evidence of this lost
amount sufficient to allow a jury to find in his favor.  See
Foregger, 2013 WL 6388665, at *6; accord Young II, 828 F.3d at
32-33.  At most, plaintiff sent letters to defendants that they
were not honoring the 2013 Loan Modification with his revision.

Plaintiff next lists as damages his having to allegedly pay
higher amounts.  (Docket Entry # 86-1, p. 7).  Although not
articulated by plaintiff, presumably, if the loan was not
modified in accordance with plaintiff's reduced principal, he
would have paid more in interest.  Yet, he fails to provide any
evidence of such a loss and, instead, simply *alleges* the "forced
payment of monies beyond that agreed to."  (Docket Entry # 86-1,
p. 7); see Foregger, 2013 WL 6388665, at *6.  For example, he
provides 2014 and 2015 correspondence and billing statements
noting monthly principal, interest, and escrow payments of
$1,525.77 and $1,517.41, but fails to connect these amounts to

damages as a result of defendants' breach of modifying the loan
without the $8,584.39 reduction in principal.  (Docket Entry #
86-18).  Without more, billing statements showing charges for
principal and interest and plaintiff's past monthly payments do
not create a genuine issue of material fact that Ocwen charged
and collected interest on a principal loan amount that was
inflated by $8,584.39.  Moreover, the correspondence largely
complains about past-due amounts or escrow calculations in
billing statements rather than increased interest payments.
Overall, plaintiff does not identify evidence in the summary
judgment record that connects the improper $8,584.39 increase of
principal to a financial loss resulting from the breach of the
failure to modify the loan with the reduced principal.  As
defendants correctly point out, plaintiff's monthly payments
decreased following the modification and he eventually stopped
paying the mortgage loan.  In light of plaintiff's eventual
default on the loan, he not only failed to pay the full
principal amount but also the $8,584.39 principal and any
alleged interest thereon.  In short, plaintiff fails to provide
sufficient evidence to allow a jury to find he paid higher
amounts resulting from defendants' breach of the 2013 Loan
Modification.

Plaintiff next contends that he suffered expenses in trying
to get Ocwen into compliance.  (Docket Entry # 86-1, p. 7).

However, plaintiff has not provided an expense sheet or any other evidence resulting from the non-deduction of the $8,584.39 in principal.  See Foregger, 2013 WL 6388665, at *6.  Although he sent letters and asserts that he has legal fees (Docket Entry 86-19, p. 4), he is proceeding pro se and has not provided any evidence of legal fees he incurred.[32]  See Young II, 828 F.3d at 32-33.  He does not provide facts or point to evidence in the record of expenses he "incurred but for [his] reliance on," Aronovitz, 934 N.E.2d at 859, defendants' failure to honor the contractual obligation of the $8,584.39 reduction in principal.

As to emotional distress damages, plaintiff relies on allegations in his brief or the unverified amended complaint. (Docket Entry # 86-1, p. 7) (Docket Entry # 55, pp. 23, 26, ¶¶ 73, 89).  As previously explained, damages for mental suffering are generally not recoverable for a breach of contract claim, and plaintiff fails to proffer an argument that this principle does not apply or that he falls within the reach of an exception.  See Curet-Velázquez v. ACEMLA de Puerto Rico, Inc., 656 F.3d 47, 54 (1st Cir. 2011); Coons v. Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010).  Hence, there is no reason to deviate from this principle.

---

[32]  Plaintiff is an attorney and used to work in the Massachusetts "Attorney General's Office."  (Docket Entry # 77-3, pp. 6, 47).

46

Finally, the amended complaint sets out a general dollar
figure in the "Request for Relief" section in excess of $150,000
for "attempting to have defendants honor the contract, loss use
and value in the property . . . interests for costs incurred,"
and "all attorneys' fees and costs." (Docket Entry # 55, p. 35,
¶ 1) (emphasis omitted).  Like the plaintiff in Young II and the
defendants in Foregger, however, plaintiff fails to provide
calculations or evidence as to how he arrived at the $150,000
figure.  See Young II, 828 F.3d at 33; Foregger, 2013 WL
6388665, at *6.  In sum, he fails to provide evidence that would
allow a jury to find that he suffered damages as a result of
defendants' breach of the 2013 Loan Modification.  Summary
judgment is therefore warranted on this claim.

B.  Repair Fund

Defendants next move to dismiss the breach of contract
claim regarding the Repair Fund on two grounds.  First, they
maintain there was no "separate agreement with sufficient detail
for [d]efendants or this court to determine whether a breach of
contract occurred." (Docket Entry # 77, pp. 12-13).  In
response, plaintiff relies on the aforementioned document titled
"'REQUIRED DEPOSIT AGREEMENT,'" which includes the Repair Fund
provisions, as well as a $12,500 check receipt.  (Docket Entry #
86-1, pp. 7-9) (Docket Entry # 86-5) (Docket Entry # 86-6, p.
32).  Second, defendants contend that the breach of contract

47

claim regarding the Repair Fund is untimely because plaintiff
was aware in 2009 that defendants would not disburse the full
$25,000. (Docket Entry # 77, pp. 12-13). Specifically,
defendants point to plaintiff's deposition as supporting
evidence:

> Q. So it's fair to say that as of 2009 when you, early
> 2009, late 2008 when you requested the funds and didn't
> receive them, you were aware at that point that you had not
> received the full benefit of the $25,000?
>
> A. Yes.

(Docket Entry # 77-3, p. 25). Defendants therefore reason that
plaintiff knew or should have known in 2009 that defendants
breached the Repair Fund. Because plaintiff filed this action
in 2017, well after the six-year statute of limitations for a
breach of contract claim, the claim is untimely, according to
defendants.

Plaintiff argues that he did not know that Ocwen was
applying the remaining $12,500 to the principal until 2012,
pointing to the letter he received from Ocwen on June 1, 2012.
He maintains that the June 1, 2012 letter was the first time
Ocwen informed him that it would not fulfill its obligation to
disburse the remaining funds from the Repair Fund.
Additionally, he argues that although he knew in 2009 that he
had not received the second disbursement, he did not necessarily
know he would not eventually receive the funds.

Even if the parties agreed to a contract in the form of the
Required Deposit Agreement with the Repair Fund, as plaintiff
suggests, and that defendants breached this Repair Fund
agreement, plaintiff cannot overcome the time bar of the statute
of limitations.  In Massachusetts, a breach of contract claim
has a six-year statute of limitations.  Mass. Gen. Laws ch. 260,
§ 2; see also Saenger Org., Inc. v. Nationwide Ins. Licensing
Assocs., Inc., 119 F.3d 55, 64 (1st Cir. 1997); Schwartz v.
Travelers Indem. Co., 740 N.E.2d 1039, 1045 (Mass. App. Ct.
2001).  Ordinarily, "'a contract claim accrues at the time of
the breach.'"  Fisher v. HSBC Bank, 332 F. Supp. 3d 435, 440 (D.
Mass. 2018) (internal citation omitted); accord Zelby Holdings,
Inc. v. Videogenix, Inc., 82 N.E.3d 1067, 1071 (Mass. App. Ct.
2017) ("at common law an action for breach of contract accrues
at the time of the breach").  Contract claims in Massachusetts
are subject to the discovery rule, which tolls the limitations
period until a "'plaintiff learns or should have learned that he
has been injured.'"  Szymanski v. Bos. Mut. Life Ins. Co., 778
N.E.2d 16, 20 (Mass. App. Ct. 2002) (internal citation omitted).

Plaintiff's argument that he did not know or realize that
Ocwen would not disburse the remaining repair funds until 2012
implicates the discovery rule.  "In Massachusetts, when a
plaintiff can not reasonably ascertain the injury or breach at
the time it occurred, his cause of action accrues when the

plaintiff knows or should know that he has suffered appreciable harm resulting from the defendant's actions." Id. This "'"inherently unknowable" standard is no different from and is used interchangeably with the "knew or should have known" standard.'" Id. (quoting Albrecht v. Clifford, 767 N.E.2d 42, 49 (Mass. 2002)); accord Arcieri v. New York Life Ins. Co., 63 F. Supp. 3d 159, 164 (D. Mass. 2014) (quoting Williams v. Ely, 668 N.E.2d 799, 804 n.7 (Mass. 1996)). In other words, "'"a cause of action does not accrue until a plaintiff discovers, or reasonably should have discovered, that [he or] she may have been injured as a result of the defendant's conduct."'" Callahan v. Wells Fargo & Co., 747 F. Supp. 2d 247, 253 (D. Mass. 2010) (quoting Cambridge Plating Co., Inc. v. Napco, Inc., 991 F.2d 21, 25 (1st Cir. 1993)); see also Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 560 N.E.2d 122, 126 (Mass. 1990) ("[t]he inherently unknowable wrong must be incapable of detection by the wronged party through the exercise of reasonable diligence"). Under the "discovery rule, the limitation period accrues when the plaintiff has 'knowledge or sufficient notice of two related facts: (1) that [he] was harmed; and (2) that [the] harm was caused by the defendant's conduct.'" Bank of Am., N.A. v. Barnes Hill LLC, Civil Action No. 16-11583-DJC, 2019 WL 2085996, at *5 (D. Mass. May 13, 2019) (quoting Harrington v. Costello, 7 N.E.3d 449, 454 (Mass. 2014),

in applying discovery rule to breach of contract claim).  It is also well established that a breach of contract cause of action may begin to accrue "'even though a specific amount of damages is unascertainable at the time of the breach or even if damages may not be sustained until a later time.'"  Nortek, Inc. v. Liberty Mut. Ins. Co., 843 N.E.2d 706, 711 (Mass. App. Ct. 2006) (quoting Int'l Mobiles, 560 N.E.2d at 126); accord Feloni v. Coco, Civil Action No. 16-12178-GAO, 2019 WL 2387761, at *14 (D. Mass. Mar. 4, 2019);[33] see Callahan, 747 F. Supp. 2d at 252.

Here, it is undisputed that plaintiff received the first $12,500 disbursement on or around September 18, 2007.  Despite requesting the second $12,500 disbursement in late 2008 or early 2009, however, plaintiff did not receive these funds.  In his deposition, plaintiff admits to knowing that in 2009 he had not received the second disbursement.  (Docket Entry # 77-3, p. 25). In addition, plaintiff filed a facsimile cover sheet showing that he sent Ocwen the cover sheet on October 5, 2009.  (Docket Entry # 86-21).  In the cover sheet, plaintiff writes that he is "[c]ontacting [Ocwen] for the release of $25,000 held back at the time of the closing for this pre-construction loan (repairs) as work has been completed."  (Docket Entry # 86-21, p. 2).  But

---

[33] The decision in Feloni is in the form of a report and recommendation which was never formally adopted by the district court because the case settled.  The case is cited because it sets out the above law verbatim.

for the breach, the only reason for plaintiff to send this cover
sheet on October 5, 2009 to Ocwen was because at this point, he
knew he had not received the full benefit of the Repair Fund.
Consequently, at a minimum, plaintiff knew or should have known
of the breach no later than October 5, 2009, and have filed
suit, at the latest, on October 5, 2015 to satisfy the statute
of limitations.

Even giving plaintiff the benefit of the doubt that he did
not have actual knowledge of the breach in 2009, the facts
establish he should have known of the breach well before July 3,
2011, i.e., six years before filing suit on July 3, 2017.
Although is it not known when plaintiff requested the first
disbursement (Docket Entry # 77-3, p. 23), plaintiff entered
into the "Required Deposit Agreement" on August 17, 2006 (Docket
Entry # 86-6, p. 32) and received the first disbursement of
$12,500 from Ocwen on or about September 18, 2007 (Docket Entry
# 77-1, p. 3, ¶ 10) (Docket Entry # 86-5, p. 3).  Assuming the
plaintiff requested the first disbursement on August 17, 2006,
he therefore waited, at most, just over 13 months to receive the
first disbursement.  Plaintiff initially requested the second
disbursement in late 2008 or early 2009.  (Docket Entry # 77-3,
pp. 12-14, 25).  Thirteen months later in early 2010 he had yet
to receive the second disbursement.  At that point, he should
have known, or at least been on notice, that defendants were not

going to release the funds.  Even allowing him an additional
year thereafter to early 2011, his suit if filed then would
still be untimely.  Accordingly, plaintiff reasonably should
have known of defendants' breach well before July 3, 2011.

Plaintiff's reliance on the June 1, 2012 letter, in which
Ocwen advised plaintiff that it was not going to disburse the
second $12,500, is misguided.  To reiterate, plaintiff waited 13
months (at most) for the first disbursement.  He requested the
second disbursement in late 2008 or early 2009.  He repeated the
request in October 2009.  At this point in time, and, indeed
prior thereto as discussed, the breach of not disbursing the
remaining funds was not inherently unknowable.  No reasonable
jury could conclude that plaintiff falls under the discovery
rule.  The six-year statute of limitations therefore renders
this claim untimely.

C.  Escrow Account

In seeking summary judgment on the breach of contract claim
regarding the Escrow Account, defendants argue that Ocwen did
not wrongfully charge and collect an additional $125 per month
in escrow payments, and that it "only collected escrow amounts
due under the mortgage."  (Docket Entry # 77, pp. 10-11)
(emphasis and capitalization omitted).  They point out that the
mortgage "required an [E]scrow [A]ccount for payment of property
taxes and hazard insurance."  (Docket Entry # 77, p. 4) (Docket

Entry # 77-1, p. 4, ¶ 20) (Docket Entry # 77-1, pp. 19-22).
They also note that the mortgage expressly allows them "to
collect and hold escrow funds in amounts permitted by RESPA" and
"to collect additional escrow amounts, defined as a 'cushion,'"
under RESPA.  (Docket Entry # 77-1, p. 4, ¶¶ 21-22) (Docket
Entry # 77-1, pp. 19-20) (Docket Entry # 77-2, p. 5).
Defendants also point out that the annual Escrow Account
disclosure statements provided plaintiff with "detailed
explanations" of the charges and the withheld amounts.  (Docket
Entry # 77, p. 10).  Defendants additionally argue that
plaintiff fails to specify which months Ocwen wrongfully charged
plaintiff $125, let alone that the charge was for a wrongful
use.  (Docket Entry # 77, p. 11).  Because defendants "produced
admissible evidence" of "the propriety of all escrow
adjustments" (Docket Entry # 77, p. 11) (citing LR. 56.1
paragraphs 33 to 37),[34] defendants submit they did not breach the
mortgage provisions regarding the Escrow Account.  (Docket Entry
# 77, p. 11).

---

[34]  These paragraphs and the exhibits they cite address the
calculations of the $3,638.23 negative escrow balance as of
January 2014 and the February 2015 escrow analysis that resulted
in the April 1, 2015 increase in the escrow payment.  (Docket
Entry # 78, ¶¶ 33-37) (citing Docket Entry # 77-1, ¶¶ 23-27).
They do not address the so-called "other charges" and fees that
plaintiff challenges in a number of monthly loan statements in
2014 and 2015.

The amended complaint clarifies the Escrow Account claim as a breach of contract claim based on a breach of the mortgage and explains that plaintiff already paid for "all escrow fees." (Docket Entry # 55, ¶¶ 75-76).[35]  In particular, the amended complaint asserts that defendants: (1) improperly raised the monthly escrow payment by $125 after the first quarter of 2015, i.e., beginning on April 1, 2015, based on the February 2015 escrow analysis (Docket Entry # 55, ¶¶ 53-55, 76); (2) erroneously calculated a negative balance of $3,638.23 "at the close of 2013" (Docket Entry # 55, ¶¶ 49, 76); and (3) incorrectly charged and collected escrow fees for "'other charges'" (Docket Entry # 55, ¶¶ 50-51, 55, 75, 77).  Addressing these claims seriatim, this court initially turns to the purportedly erroneous $125 increase in the monthly escrow payment.

1.   Increase of $125 and 2015 Escrow Analysis

---

[35]  Although paragraph 75 also references defendants' collection of funds "not owed pursuant to . . . *any other contract* between the parties" (Docket Entry # 55, ¶ 75) (emphasis added), plaintiff does not develop this allegation in his summary judgment filings and therefore waives the argument that a contract other than the mortgage provides the basis for the breach of contract claim regarding the Escrow Account.  See Audette v. Town of Plymouth, MA, 858 F.3d 13, 23 (1st Cir. 2017) ("'[e]ven an issue raised in the complaint but ignored at summary judgment may be deemed waived'") (internal citations omitted).

Contracts "are interpreted according to their plain terms."
Barclays Bank PLC v. Poynter, 710 F.3d 16, 21 (1st Cir. 2013).
"When the words of a contract are clear, they must be construed
in their usual and ordinary sense."  The Gen. Convention of the
New Jerusalem in the United States of Am., Inc. v. MacKenzie,
874 N.E.2d 1084, 1087 (Mass. 2007); accord Barclays Bank PLC,
710 F.3d at 21.  The plain language of the mortgage obligates
plaintiff, as the borrower, to "pay funds for [the] Escrow
Items" and, "[i]f there is a deficiency of Funds held in escrow,
. . . Borrower shall pay to Lender the amount necessary to make
up the deficiency in accordance with RESPA . . . ."[36] (Docket
Entry # 86-6, p. 4, ¶ 1) (Docket Entry # 86-6, p. 7, ¶ 3).  The
mortgage allows the lender to collect funds for escrow items,
including amounts due for taxes and insurance, and, as explained
by defendants, it allows for an escrow account that requires
plaintiff to "make up [any] shortage."  (Docket Entry # 77, p.
10) (Docket Entry # 86-6, pp. 6-7, ¶ 3).  Whereas the mortgage

---

[36]  RESPA, 12 U.S.C. § 2609 ("section 2609"), outlines lenders'
and servicers' obligations regarding escrow accounts, including
the provision regarding cushions, and it expressly allows only
the Secretary of the Treasury to assess penalties for
violations.  12 U.S.C. § 2609.  As a result, "[t]he majority of
circuits" conclude there is no private right of action for
miscalculations under section 2609.  Okoye v. Bank of N.Y.
Mellon, Civil Action No. 10-11563-DPW, 2011 WL 3269686, at *16
(D. Mass. July 28, 2011) (collecting authority).  Plaintiff's
claim therefore succeeds, if at all, on the basis of a breach of
the mortgage.

states that the lender may collect amounts "not to exceed the
maximum amount" under RESPA (Docket Entry # 86-6, p. 7, ¶ 3),
there is no evidence that defendants attempted to collect more
than the maximum amount, which is $100,000.  See 12 U.S.C. §
2609(d).  The mortgage also allows and requires the lender to
"estimate the amount" due to the Escrow Account based on
"current data and reasonable estimates of expenditures of future
Escrow Items or otherwise in accordance with Applicable Law."
(Docket Entry # 86-6, p. 7, ¶ 3).  "'Applicable Law,'" which the
mortgage defines as "all controlling applicable federal . . .
statutes" and regulations, therefore includes RESPA, which the
mortgage expressly references throughout the escrow provisions
and elsewhere.  (Docket Entry # 86-6, pp. 3, 6-7) (bold font
omitted).  RESPA allows a servicer to charge a borrower "a
cushion that shall be no greater than one-sixth (1/6) of the
estimated total annual payments from the escrow account."[37]  12
C.F.R. § 1024.17(c)(1)(i); 12 U.S.C. § 2609(a).

Defendants initially contend they produced admissible
evidence as to the propriety of all escrow adjustments including
the February 2015 escrow analysis and resulting increase in the

---

[37]  In fact, plaintiff acknowledges that RESPA allows for this
"'cushion'" consisting of "1/6 of the total escrow outlay."
(Docket Entry # 86-2, p. 8, ¶ 32).  The annual account
statements include and expressly refer to this cushion.  (Docket
Entry # 77-2, pp. 5, 13).

monthly escrow payment in April 2015.  (Docket Entry # 77, pp. 4-5, 10-11) (Docket Entry # 78, p. 6, ¶¶ 33-37) (Docket Entry # 77-1, ¶¶ 25-26) (Docket Entry # 77-2, pp. 2-9).  Plaintiff's brevis argument in his memorandum regarding the Escrow Account states only that his monthly payment increased by $125 in February 2015.  (Docket Entry # 86-1, pp. 21-22).  In his LR. 56.1 response and the amended complaint, plaintiff disputes Ocwen's calculations of the monthly payments.  (Docket Entry # 86-2, pp. 9-10, ¶¶ 35/36, 37) (Docket Entry # 55, ¶ 76).

Plaintiff's original monthly payment due under the 2006 note was $1,541.10.  (Docket Entry # 77-1, p. 10).  Following the 2013 Loan Modification and up to the time of the February 25, 2015 analysis, plaintiff's monthly payment was lowered to $1,517.41, of which $984.02 was applied to principal and interest while the remaining $533.39 was applied to the Escrow Account.  (Docket Entry # 77-2, p. 2).  In Ocwen's projection for the upcoming year from April 2015 to March 2016, Ocwen estimated it would need to pay out $6,745.13 from the Escrow Account.  (Docket Entry # 77-2, pp. 4-5).  Spread out over 12 months, this meant that plaintiff's monthly escrow payment was increasing by $28.70, i.e., from $533.39 the previous year to $562.09 the next year.  (Docket Entry # 77-2, pp. 2-5).  The terms of the mortgage allow the lender to estimate the projected payments for the year and adjust the escrow payments

accordingly.  (Docket Entry # 86-6, pp. 6-7, ¶ 3) (requiring borrower to pay taxes and insurance premiums and allowing lender to collect and hold funds sufficient to apply them "at the time specified under RESPA"); 12 U.S.C. § 2609(a); 12 C.F.R. § 1024.17(c).

Plaintiff fails to provide evidentiary documentation that the estimated calculation based on projected outlays for insurance and taxes was incorrect.  Rather, as to the purportedly improper $125 increase, he relies on the unverified allegations in the amended complaint (Docket Entry # 55, ¶¶ 53, 76), an unsupported assertion in correspondence (Docket Entry # 86-18, p. 30), the two-paragraph argument in the memorandum in opposition (Docket Entry # 86-1, pp. 21-22).  Furthermore, plaintiff's affidavit statement (Docket Entry # 55-1, ¶ 42), which plaintiff neglects to cite, that Ocwen increased the escrow payment "without explanation" is conclusory.  See Garmon, 844 F.3d at 315; Méndez-Aponte, 645 F.3d at 68.  The statement is also misguided because Ocwen provided him with the 2015 escrow analysis outlining the projections.  (Docket Entry # 77-2, pp. 2-9) (Docket Entry # 55-1, ¶ 42).

Plaintiff also complains about the $125 increase in a manner related to the negative account balance at the close of 2013.  He argues that defendants' raising of the monthly payments by $125 "was not warranted" because "all uses for the

escrow account allowed under the mortgage and all other
agreements of the parties[] were covered without this increase."
(Docket Entry # 55, ¶ 76) (Docket Entry # 86-1, pp. 21-22)
(Docket Entry # 86-2, pp. 9-10, ¶ 35/36).

After the $541.75 Escrow Account credit for the October
2013 payment and the December 2013 tax ($3,822.76) and insurance
($357.25) disbursements, Ocwen accurately calculated the
negative escrow account balance of $3,638.23 by the end of
December 2013.  (Docket Entry # 77-1, pp. 1, 5, ¶¶ 2-3, 23-24)
(Docket Entry # 77-2, p. 2) (Docket Entry # 86-10, p. 3).  After
making payments ranging from $541.75 to $533.39 from 2014 to
March 2015, the negative balance of $3,638.23 decreased to the
negative balance of $1,634.54.  (Docket Entry # 77-2, pp. 2-3).
Whereas from January 2014 to March 2015 plaintiff paid $8,034.29
towards the Escrow Account, Ocwen made $7,097.38 in payments
from the Escrow Account, $4,409.02 more than the projected
payment of $2,688.36 from the Escrow Account.  (Docket Entry #
77-2, p. 3).

The April 1, 2015 increase also includes an amount for the
cushion, which the mortgage allows under the "Applicable Law,"
i.e., RESPA, as previously explained.  (Docket Entry # 86-6, pp.
3, 6-7) (bold font omitted); 12 U.S.C. § 2609(a); 12 C.F.R. §
1024.17(c).  Under RESPA, the lender or servicer may require the
borrower to pay a cushion, calculated by taking 1/6th from the

"total estimated yearly tax and insurance payments" for the upcoming year. (Docket Entry # 77-2, p. 8) (Docket Entry # 86-2, p. 8, ¶ 32); 12 U.S.C. § 2609(a); 12 C.F.R. § 1024(c). As such, taking 1/6th of Ocwen's projected $6,745.13 amount for insurance and taxes results in an allowable cushion of $1,124.18. (Docket Entry # 77-2, pp. 5-6). Again, despite acknowledging that RESPA allows defendants to collect 1/6th from the total estimated payment, plaintiff fails to show how Ocwen's calculations of the cushion were incorrect. (Docket Entry # 86-2, p. 8, ¶ 32).

Overall, in the 2015 escrow analysis Ocwen projected a shortage of $3,987.08, which includes the $1,634.54 shortage and the $1,124.18 cushion allowed under RESPA. (Docket Entry # 77-1, p. 5, ¶ 25) (Docket Entry # 77-2, p. 6). Ocwen decided to spread this $3,987.06 amount over 36 months, totaling $110.75 per month for 36 months (Docket Entry # 77-2, p. 6), which a RESPA regulation allows. See 12 C.F.R. § 1024.17(f)(3). It then combined the target escrow monthly payment of $562.09 with the additional monthly amount of $110.75 for the shortage, totaling a new escrow payment of $672.84 per month beginning April 1, 2015. (Docket Entry # 77-2, p. 6). As of April 1, 2015, plaintiff's monthly escrow payments increased from $533.39 to $672.84, i.e., an increase of $139.45. Although the amount due towards the principal and interest ($984.02) was the same as

prior payments, because of the increased monthly payment for the Escrow Account due to the shortage, plaintiff's overall monthly mortgage payment increased from $1,517.41 in 2014 to $1,656.86 as of April 1, 2015.  (Docket Entry # 77-2, pp. 2-9).  Ocwen's calculation of the projected payments for the Escrow Account, its negative account balance calculation, and its 1/6th cushion calculation under RESPA support and justify the increase.  As set forth in the annual statements and Raleigh's affidavit, the February 2015 escrow analysis properly calculates and accounts for the April 1, 2015 increase in light of the existing negative account balance and the anticipated estimate of a negative account balance.  Even taking into account plaintiff's assertions in his LR. 56.1 response (Docket Entry # 86-2, pp. 9-10, ¶¶ 35/36, 37) and the cited exhibits (Docket Entry ## 86-10, 86-11), there is insufficient evidence to allow a jury to find that the February 2015 escrow analysis and April 1, 2015 increase was an unreasonable estimate of future taxes and/or insurance premiums.  See, e.g., Murray v. Am.'s Servicing Co., No. 09-P-841, 2010 WL 565387, at *1-2 (Mass. App. Ct. Feb. 19, 2010) (unpublished);[38] Ford v. Specialized Loan Servicing, LLC,

---

[38]  The court in Murray affirmed the lower court's allowance of summary judgment on a breach of contract claim similar to the one in the case at bar.  Id.  After reciting the language in section three of the mortgage that "ASC would 'estimate the amount of Funds due on the basis of current data and reasonable

Case No. 2:16-cv-02414-JPM-tmp, 2018 WL 2363576, at *8-9 (W.D.
Tenn. Mar. 5, 2018) (rejecting argument that escrow estimates
deviated from actual amounts because contract required
plaintiffs "to pay Chase's estimates even if Plaintiffs' actual
tax and insurance amounts diverged from Chase's estimates").

Plaintiff fails to show that defendants breached a
particular provision of the mortgage in arriving at the
calculations they performed regarding the $125 increase.  He
also fails to show that defendants' resulting collections for
projected insurance and tax payments based upon their
"reasonable estimates of" these future escrow items breached the
mortgage.  (Docket Entry # 86-6, p. 7, ¶ 3).  Defendants'
argument that they did not breach the mortgage with respect to
the $125 increase therefore warrants summary judgment on the
breach of contract claim based on the Escrow Account's $125
increase (Docket Entry # 55, ¶¶ 53-55, 76).

2.  Negative Balance at Close of 2013

Plaintiff asserts there should have been a positive balance
in the Escrow Account from the August 2013 to January 2014
monthly payments of $1,517.41, which included six $541.75

_____

estimates of expenditures of future Escrow Items,'" the court
rejected the mortgagor's argument of improper escrow charges
because "the recalculation was based on a reasonable estimate of
anticipated expenditures for [the mortgagor's] property" in
light of the property tax bills.  Id. at *1.

payments ($3,250.50) dedicated to the Escrow Account.  (Docket
Entry # 86-2, p. 9, ¶ 33) (Docket Entry # 55, ¶¶ 49, 76).  As a
result, plaintiff submits, as stated in the amended complaint,
"all escrow fees had already been paid" but defendants
erroneously reported a negative Escrow Account balance of
$3,638.23 "at the close of 2013."  (Docket Entry # 55, ¶¶ 49,
76).  Defendants maintain they "produced admissible evidence" to
support the negative balance (Docket Entry # 77, p. 11) and that
the annual Escrow Account statements explain the negative
amounts in the account (Docket Entry # 77, p. 10).  The
averments by Raleigh, Ocwen's senior loan analyst, reflect that
Ocwen applied the November and December 2013 and the January
2014 escrow payments of $541.75 on January 17, 2014.  (Docket
Entry # 77-1, pp. 1, 4, ¶¶ 2-3, 18-19) (Docket Entry # 77-2, p.
2).  As previously explained, plaintiff sent one check dated
January 6, 2014 comprising the November and December 2013 and
the January 2014 payments (Docket Entry # 86-20), which Ocwen
received on January 17, 2014 (Docket Entry 86-10, p. 3).

     More to the point, the $541.75 Escrow Account credit
reflecting the October 2013 payment, the December 2013 insurance
payment, and the December 2013 tax payment resulted in the
correct calculation of a negative Escrow Account balance of
$3,638.23 by the end of December 2013.  (Docket Entry # 77-1, p.
5, ¶¶ 23-24) (Docket Entry # 77-2, p. 2).  Beyond averring that

the $3,638.23 was "false[]" (Docket Entry # 55-1, ¶ 38),

plaintiff provides no evidentiary documentation that Ocwen

failed to apply the August and September payments of $541.75 to

the Escrow Account or that the negative balance was otherwise

inaccurate.  As discussed in the previous section, defendants'

calculation of the negative balance as of the end of December

2013 was accurate and plaintiff fails to provide adequate

evidence to convince a reasonable jury to the contrary.  Summary

judgment on the breach of the mortgage based on the purportedly

erroneous negative balance in the Escrow Account at the close of

2013 (Docket Entry # 55, ¶¶ 49, 76) is therefore appropriate.

3.  Other Charges

    In seeking summary judgment on the breach of contract claim

regarding the escrow funds, defendants address the purportedly

improper $125 increase, along with the February 2015 escrow

analysis, as well as the negative balance as of January 2014.

(Docket Entry # 77, pp. 4-5, 10-11).  They do not, however,

address or refer to the purportedly improper "other charges,"

which are separately noted in the amended complaint (Docket

Entry # 55, ¶¶ 50-51, 55, 75, 77).  (Docket Entry # 77, pp. 4-5,

10-11).  At best, they maintain they "produced admissible

evidence of the propriety of all escrow adjustments" but, here

too, the evidence they identify addresses the February 2015

escrow analysis and the negative balance at the end of December

65

2013.[39]  (Docket Entry # 77, p. 11).  Plaintiff's opposition
asserts that defendants demanded escrow funds that were not due
as "'other' charges" (Docket Entry # 86-1, p. 1) (citing Docket
Entry # 89, ¶ 5 identifying monthly statements with improper
"other charges") and plaintiff's LR. 56.1 response correctly
points out that defendants did not address the allegations
regarding these other charges or fees[40] (Docket Entry # 86-2, p.
9, ¶ 33).  The argument is therefore waived.  See Curet-
Velázquez, 656 F.3d at 54; Coons, 620 F.3d at 44.

To briefly explain, the breach of contract count in the
amended complaint subdivides into four claims (Docket Entry #
55, ¶¶ 66-98) and the "2014-2016 Escrow Funds" is one of these
four claims (Docket Entry # 55, ¶¶ 74-78) (bold font and
capitalization omitted).  The Escrow Account claim in Count One
consists of five paragraphs: two devoted to the "other charges"
(Docket Entry # 55, ¶¶ 75, 77); one devoted to the $125 increase
and the balance at the close of 2013, one devoted to
incorporating prior paragraphs, and another devoted to alleging
harm from the demand for payments not due for the additional
funds and the "'other charges.'"  (Docket Entry # 55, ¶¶ 74-78).
Specific to "other charges," the amended complaint alleges that:

---

[39]  See footnote 34.
[40]  Plaintiff refers to the "other charges" interchangeably as
"Past Due Amounts" or "Other Fees."  (Docket Entry ## 86-1, 86-
2, 89).

(50) Also, . . . the defendants attempted to levy additional unspecified charges on the Plaintiff's monthly statements.  The charges fluctuated greatly from month to month and were noted simply as "other charges" with no further explanation . . .

(51) For the months of February, March, and May, of 2014, as well as April, May, July and September of 2015, the Plaintiff notified the Defendants through written correspondence that Defendants statements were not correct due to these unexplained and unwarranted "other charges". Please see Exhibit "J" (italics omitted)[41]. . .

75) In the years 2014 through 2017[,] the Defendant . . . collected and took possession of funds . . . not owed pursuant to the mortgage or any other contract between the parties, in the form of escrow fees or "other charges" . . .

77) During this period of time, 2014-2016, the Defendant regularly would include on monthly invoices, assessments for "other charges" . . . The Defendants insisted on payment of these "other charges" under threat of foreclosure.

(Docket Entry # 55, ¶¶ 50, 51, 75, 77).  Before defendants filed the summary judgment motion, plaintiff reiterated these concerns at his deposition.  (Docket Entry # 77-3, pp. 34-37, 51).  Given the structure of the pro se amended complaint, the "2014-2016 Escrow Funds" breach of contract claim includes a claim that defendants breached the mortgage by collecting payments for "'other charges'" that plaintiff did not owe during the 2014 to

---

[41]  Exhibit J consists of the letters dated February 15, March 3, April 16, and August 8, 2014 as well as March 8 and September 14, 2015 without the pertinent Escrow Account monthly statements added in a subsequently-filed summary judgment exhibit by plaintiff.  (Docket Entry # 54-1, pp. 46-56) (Docket Entry # 86-18).

2016 time period in monthly statements.  (Docket Entry # 55, ¶¶
75, 77) (bold font and capitalization omitted).  Plaintiff
notified defendants about these incorrect other charges or fees
in the February, March, and May 2014 and April, May, June, and
September 2015 letters and the additional letters in Exhibit J.[42]
(Docket Entry # 55, ¶¶ 51, 75, 77).  Accordingly, and in light
of the above-noted waiver, this limited breach of contract claim
based on the incorrect "other charges" in the monthly statements
for the Escrow Account (Docket Entry # 55, ¶¶ 50-51, 55, 75, 77)
remains in this action.[43]

D.  2016 Loan Modification Attempt

    Defendants next move for summary judgment on the breach of
contract claim related to the 2016 Loan Modification.  They
contend that Ocwen denied the modification because plaintiff
failed to submit the 2016 Loan Modification agreement on time
and did not make the required payments thereafter.  (Docket
Entry # 77, pp. 11-12).  Specifically, defendants argue that

---

[42]  The claim may also extend to objectionable escrow fees
depicted as "other charges" in additional monthly statements
during the 2014 to 2016 time period.  (Docket Entry # 55, ¶ 77).
Separately, although defendants rely on the 2015 annual escrow
account statement (Docket Entry # 77, pp. 10-11) (Docket Entry #
77-2, pp. 2-9), it does not elucidate or identify any of the
objectionable "other charges" in the monthly statements
plaintiff challenges.
[43]  The pro se amended complaint places the claim in the Escrow
Account section of Count One even though the "other charges" in
the monthly statements at issue are not necessarily limited to
escrow charges.

despite Ocwen advising plaintiff it would accept his late-signed agreement if he "made all missing payments . . . by February 23, 2017," plaintiff "failed to make the required payments" in a timely manner. (Docket Entry # 77, p. 11). Defendants point out that even though plaintiff sent Ocwen a package, it was after the February 23, 2017 deadline. (Docket Entry # 77, p. 12). Defendants further assert that the mortgage "did not require Defendants to modify the terms of the mortgage." (Docket Entry # 77, p. 12). Defendants also argue that plaintiff fails to show he suffered any damages. (Docket Entry # 77, p. 12).

In response, plaintiff argues that he fulfilled his obligations under the TPP by making the three, trial-period payments and returning the signed agreement. (Docket Entry # 86-1, p. 12). Furthermore, Ocwen's agent(s) later informed him that his agreement was "'in place and approved,'" but nevertheless demanded additional payments "for the modification to be put in place," according to plaintiff. (Docket Entry # 86-1, p. 12). Plaintiff was "aware that the funds could not be delivered" on time, and, when he advised the "OCWEN 'relationship manager'" about the delay, the manager informed plaintiff that this late payment would be acceptable, according to plaintiff. (Docket Entry # 86-1, pp. 12-13). Plaintiff also notes that he sent defendants proof of the delivery of a

69

package, defendants confirmed receiving his proof of payment,
and the package contained the check for the missing payments.
(Docket Entry # 86-1, pp. 13-14). Plaintiff therefore argues
that "[t]he enforceable TPP agreement was fulfilled when [he]
made the third payment and the Defendant accepted the signed
agreement." (Docket Entry # 86-1, p. 14). Overall, plaintiff
maintains he "established . . . the necessary aspects of a
contract to survive a motion for summary judgement [sic] . . .
." (Docket Entry # 86-1, p. 14) (Docket Entry # 55, ¶¶ 83-85).

In the amended complaint, plaintiff lists damages of
"emotional stress, loss of finances and time and expense in
attempting to get . . . OCWEN to address and correct the
situation" and in "fight[ing] the foreclosure" proceedings.[44]
(Docket Entry # 55, ¶ 89). The amended complaint also identifes
he "suffered by making the TPP payments." (Docket Entry # 55, ¶
89).

As previously noted, in order to succeed on a breach of
contract claim, the plaintiff must show that he "sustained

---

[44] Plaintiff's opposition to the summary judgment motion does
not identify or address damages specific to the breach of the
2016 modification. (Docket Entry # 86-1, pp. 11-14). It does
assert emotional distress and other damages with respect to the
2013 Loan Modification. (Docket Entry # 86-1, p. 7).
Plaintiff's failure to "mention damages from the alleged
breach," Young II, 828 F.3d at 32, of the failure to honor the
2016 Loan Modification itself warrants summary judgment on the
breach of contract 2016 Loan Modification claim. See id. at 32-
33.

damages as a result" of the breach.  Ejaz, 732 F.3d at 21; see
Young II, 828 F.3d at 32-33.  To avoid summary judgment,
plaintiff must therefore provide sufficient evidence for a jury
to find that he suffered damages as a result of defendants'
breach of not modifying the loan in 2016.  The amended complaint
identifies the above-noted emotional stress regarding the
attempted 2016 Loan Modification and the fight to avoid
foreclosure.  As discussed earlier with the 2013 Loan
Modification, however, emotional or mental distress is generally
not recoverable in breach of contract claims, see Banerji, 858
N.E.2d at 288, and plaintiff fails to argue, let alone provide
evidence, that he experienced "physical harm."  See id.

    As to the alleged "loss of finances" or "expense and loss
of time" (Docket Entry # 55, ¶ 89), here again plaintiff, who
bears the underlying burden of proof at trial, fails to provide
evidence that he incurred an expense stemming from the failed
2016 Loan Modification.  See Young II, 828 F.3d at 33.  Thus,
whatever expenses or financial loss plaintiff may have incurred
in both the foreclosure proceedings and with respect to his
inquiries regarding the 2016 Loan Modification, he does not
provide evidence of such damages caused by defendants' breach of
the 2016 Loan Modification.  See Foregger, 2013 WL 6388665, at
*6.

Next, although plaintiff did pay the TPP, he had a preexisting mortgage obligation under the 2013 Loan Modification to make payments toward his loan.  As such, making these TPP payments does not constitute damages resulting from the breach. See Young II, 828 F.3d at 33.  In addition, the TPP payments preceeded any breach of the 2016 Loan Modification that occurred when Ocwen refused to modify the loan even though it received the $6,000 check in or around early March 2017.[45]  See Young II, 828 F.3d at 33.  Furthermore, the record is undisputed that plaintiff did not make a payment on the loan separate and apart from the $6,000 after March 2017 when Ocwen failed to modify the loan upon receiving the payment in early March 2017.[46]  (Docket Entry # 77-1, p. 5, ¶ 28) (Docket Entry # 77-3, pp. 46, 56).[47] The payment itself represented past-due monthly payments for November 2016 to February 2017.  (Docket Entry # 77-1, p. 6, ¶ 33).  See Young II, 828 F.3d at 33 (TPP payments, which simply lowered preexisting monthly mortgage payments, did not constitute damages because of "preexisting mortgage obligation").  As such, plaintiff did not experience any

---

[45]  The above finding is made by construing the record in plaintiff's favor.
[46]  As previously explained, it is a genuinely disputed issue of material fact whether Ocwen received the $6,000 check. Construing the record in plaintiff's favor, Ocwen therefore received the payment.
[47]  The record does not include monthly statements for 2017 and thereafter.

financial loss as a result of defendants' failure to honor the 2016 Loan Modification after Ocwen made the exception in February 2017 to accept the signed 2016 Loan Modification and, construing the record in plaintiff's favor, received the $6,000 check in early March 2017.

Plaintiff also fails to provide evidence that he incurred legal fees as a result of the breach even assuming he asserts such fees as damages from the failed 2016 Loan Modification. See id. at 32-33.[48]  Plaintiff's failure to provide evidence that would allow a jury to find that he suffered damages as a result of defendants' alleged breach of the failed 2016 Loan Modification warrants summary judgment on the breach of contract claim regarding the 2016 Loan Modification.

## II.  Implied Covenant of Good Faith and Fair Dealing (Count Two)

Defendants argue they did not breach the implied covenant of good faith and fair dealing because the note and the mortgage do not require them to modify the loan and the covenant does not extend beyond the rights and duties of the existing contract, namely, the mortgage.  (Docket Entry # 77, pp. 14-15).  They also maintain that plaintiff does not allege an "'improper purpose'" related to their actions or inactions because, without more, errors by "'an unthinking and sloppy institution'" do not

---

[48]  The request for relief in the amended complaint seeks "attorneys' fees and costs."  (Docket Entry # 55, p. 35, ¶ 1).

show improper purpose.  (Docket Entry # 77, p. 14) (quoting

Young v. Wells Fargo Bank. N.A., 717 F.3d 224, 239 (1st Cir.

2013) ("Young I").  Finally, they submit that plaintiff was not

"denied the fruits of the *Mortgage*" because they lent him "the

agreed sum of money" and fully performed their obligations "upon

lending the money to Plaintiff."  (Docket Entry # 77, pp. 14-

15).

Plaintiff asserts that defendants' argument that they

performed their obligations by lending the money is misplaced

because defendants failed to perform their duties under the 2013

Loan Modification, the 2016 Loan Modification, and "the 'reserve

repair account,'" i.e., the Repair Fund.  (Docket Entry # 86-1,

pp. 14-18).  As to the 2013 Loan Modification, plaintiff argues

that defendants acted with an improper purpose by collecting

inflated amounts on a monthly basis and refusing to address the

concerns plaintiff raised regarding the matter.  (Docket Entry #

86-1, p. 16).  Also with respect to improper purpose, plaintiff

identifies defendants' collection of improper escrow amounts

beyond the permissible cushion and through unexplained other

charges throughout 2014.  (Docket Entry # 86-1, p. 16).  Here

again, plaintiff asserts that defendants ignored his repeated

requests for an explanation thereby evidencing their bad faith.

(Docket Entry # 86-1, p. 16).  Regarding the 2016 Loan

Modification, plaintiff argues that defendants did not honor the

2016 Loan Modification despite his completion of the necessary
prerequisites.  (Docket Entry # 86-1, p. 17) (Docket Entry # 55,
¶ 102).

Specific to the covenant of good faith and fair dealing
claim, the amended complaint alleges that: (1) defendants
"[f]ail[ed] to perform servicing functions," such as by not
acting in accordance with the 2013 Loan Modification, not
"offering a permanent modification agreement" after plaintiff
met the preconditions for the 2016 modification, and failing "to
release reserve account funds";[49] (2) defendants failed to
respond to plaintiff's requests for documentation and
explanations; and (3) defendants collected "escrow payments and
'other charges'" without explanations, and pursued foreclosure
when these charges remained unpaid.  (Docket Entry # 55, ¶ 102).
The covenant of good faith and fair dealing claim therefore sets
out allegations specific to the Repair Fund in the Required
Deposit Agreement, the Escrow Account payments, the 2013 Loan
Modification, and the 2016 Loan Modification.

As pointed out by plaintiff, the Required Deposit Agreement
is a contract separate from the mortgage.  Defendants' covenant
of good faith and fair dealing argument (Docket Entry # 77, pp.

---

[49]  The pro se amended complaint's allegation that defendants
failed "to release the reserve account funds" refers to the
failure to release the funds in the Repair Fund.

14-15) does not mention, let alone raise an argument, that their performance of the Required Deposit Agreement, which includes the Repair Fund provisions, warrants summary judgment based on the absence of an improper purpose or otherwise. Defendants' failure to adequately develop an argument relative to the Repair Fund regarding the breach of the covenant of good faith claim results in a waiver for purposes of the summary judgment motion. See Curet-Velázquez, 656 F.3d at 54; Coons v. Industrial Knife Co., Inc., 620 F.3d at 44. Instead, they interpret the implied covenant of good faith and fair dealing claim as raising allegations regarding "the alleged 2013 and 2016 loan modifications" and the "increasing escrow charges." (Docket Entry # 77, p. 7, ¶ 2). Summary judgment with respect to the Repair Fund allegations in Count II is therefore improper.

In contrast, defendants' argument adequately challenges the 2013 and 2016 Loan Modifications as well as the Escrow Account relative to the covenant of good faith and fair dealing claim. In addition to tailoring their argument to the mortgage contract, which both modifications and the Escrow Account implicate, defendants assert that they "lent the agreed sum of money," fully performed their obligations under the mortgage, and the covenant does not compel them to "modify" a loan. (Docket Entry # 77, pp. 14-15). Accordingly, this court turns to the 2013 Loan Modification, the Escrow Account, and 2016 Loan

Modification relative to the covenant of good faith and fair dealing claim.

"Under Massachusetts law, '[e]very contract implies good faith and fair dealing between the parties to it.'" In re McLain, 604 B.R. 108, 119 (Bankr. D. Mass. 2019) (quoting T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 924 N.E.2d 696, 703-04 (Mass. 2010)).  "The implied covenant provides that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract.'"  Id. (quoting T.W. Nickerson, Inc., 924 N.E.2d at 704).  "'In determining whether a party violated the implied covenant of good faith and fair dealing, [the court] look[s] to the party's manner of performance.'"  Id. (quoting T.W. Nickerson, Inc., 924 N.E.2d at 704) (citing Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 683-84 (Mass. 2005)).  "'There is no requirement that bad faith be shown; instead, the plaintiff has the burden of proving a lack of good faith.'"  Id. (quoting T.W. Nickerson, Inc., 924 N.E.2d at 704).

"Evidence that a party behaved in a manner 'unreasonable under all the circumstances' may indicate a lack of good faith, but the core question remains whether the alleged conduct was motivated by a desire to gain an unfair advantage, or otherwise had the effect of injuring the other party's rights to the fruits of the contract." Young I, 717 F.3d at 238 (internal

citations omitted) (emphasis added).  The First Circuit in Young I affirmed the lower court's Rule 12(b)(6) dismissal of the claim due to the complaint's failure "to plead that defendants' behavior was motivated by a desire to gain an unfair advantage or had the effect of injuring her ability to obtain the contract's fruits." Id. at 239.  The First Circuit considered the fact that the bank acted to correct its initial errors and eventually sent the plaintiff a permanent modification agreement which, if executed, would have prevented the foreclosure and allowed the plaintiff to reduce the monthly mortgage payments. Id. at 238-39.  The bank's conduct therefore did not deprive the plaintiff the fruits of the contract because she received the permanent modification.  Id.  There was also no showing that the bank's conduct was motivated by a desire to gain an unfair advantage even though its conduct necessitated the plaintiff to engage an attorney and it took the bank another five months of communications to rectify the error and achieve a permanent modification.  Id.  The court thereby distinguished an unthinking and sloppy institution's dilatory and careless conduct from acts evidencing an "improper purpose." Id. at 238.

The First Circuit in Young I cited two cases, Nile v. Nile, 734 N.E.2d 1153, 1160 (Mass. 2000), and T.W. Nickerson, Inc., 924 N.E.2d at 707, each illustrating different outcomes vis-à-vis the improper purpose element.  Young I, 717 F.3d at 238.  In

Nile, the plaintiff's father denied his son the fruits of a post-divorce settlement by subsequently creating a trust instructing the trustees to hold the bulk of his property for his current wife in contravention of a settlement requiring his son to receive two-thirds of the father's estate.  Nile, 734 N.E.2d at 1160.  Nile exemplifies circumstances showing a "lack of good faith where defendant's conduct destroyed [the other] party's right to [the] fruits of agreement."  Young I, 717 F.3d at 238 (summarizing Nile, 734 N.E.2d at 1160, in parenthetical). The circumstances also exhibited the father's motives of undertaking "a comprehensive estate plan" with the trustees' transfers "designed . . . to take effect on his death" even though, if structured under a will, the same result would violate the settlement.  Nile, 734 N.E.2d at 1160.

In T.W. Nickerson, Inc., the court examined the motive of the trustee bank in terminating a trust and found no evidence of a motive "to affect negatively the plaintiff's rights under [a] lease" with the bank giving the plaintiff a right of first refusal.  T.W. Nickerson, Inc., 924 N.E.2d at 704-707.  The right of first refusal never came to pass because the purchasers did not offer to purchase the property from the bank.  Id. at 705.  Thereafter, the trust terminated such that the bank no longer had the power to lease or sell the property and it advised the beneficiaries of the plaintiff's continued right of

first refusal.  Id. at 705-706.  In finding no improper purpose
regarding the right of first refusal, the court recognized,
"There is a presumption that all parties act in good faith, and
the plaintiff bears the burden of presenting evidence of bad
faith or an absence of good faith."  Id. at 706 (internal
citation omitted).  The court also found no evidence that the
bank terminated the trust "to gain an advantage for itself" by
recapturing opportunities and securing a better deal by its
actions of forcing financial concessions or extracting price
concessions.  Id. at 707 (citing Anthony's Pier Four, Inc. v.
HBC Assocs., 473, 583 N.E.2d 806, 820-21 (Mass. 1991)); cf.
Tufankjian v. Rockland Tr. Co., 782 N.E.2d 1, 5 (Mass. App. Ct.
2003) ("a number of the positions and actions taken by the Bank
were designed to force financial concessions from Tufankjian and
injured his right to receive the fruits of the contract").

## A.   2013 Loan Modification

Regarding the 2013 Loan Modification, plaintiff argues that
defendants acted in "bad faith" by refusing to address his
requests regarding the inflated principal, while still
collecting payments on that inflated principal.  (Docket Entry #
86-1, p. 16).  Conversely, defendants argue there was no
"'improper purpose'" and they did not deny him "the fruits" of
the mortgage.  (Docket Entry # 77, pp. 14-15).

Construing the record in plaintiff's favor, plaintiff and defendants entered into the 2013 Loan Modification on December 17, 2013, with his attached addendum for the lower principal. (Docket Entry # 86-8, pp. 8-10).  Examining defendants' *performance* of this agreement, plaintiff objected to the "error in the accounting" of the amount owed, as reflected in "Addendum A," i.e., the $8,584.39 increase in principal, in the September 14, 2015 letter.  (Docket Entry # 86-18, p. 29).[50]  Ocwen's business records indicate that an individual from Ocwen's Office of the Consumer Ombudsman mailed plaintiff a lengthy reply to the September 2015 letter.  (Docket Entry # 77-4, pp. 7-10) (setting out extensive letter with notation "Ombudsman Mail Completed"); (Docket Entry # 77-1, ¶¶ 2-3); (Docket Entry # 77-3, p. 43) ("there was an ombudsman that I had correspondence with").  Finally, in a conclusory affidavit statement, plaintiff states that, "Despite numerous efforts and notification by the Plaintiff, OCWEN did not adjust the principal pursuant to the terms and conditions of the 2013 modification."  (Docket Entry # 88-6, p. 2, ¶ 7); see Méndez-Aponte v. Bonilla, 645 F.3d 60, 68 (1st Cir. 2011) ("agree[ing] with the district court that . . .

---

[50]  The letter characterizes the inadvertent inclusion of $8,584.34 in unpaid principal as a "slight error."  (Docket Entry # 86-17, pp. 17-18).

the only evidentiary support is Méndez–Aponte's sworn affidavit, which itself contains conclusory allegations").

In light of the underlying presumption of good faith, plaintiff fails to provide sufficient evidence of a genuine issue of material fact that defendants acted with a motive to affect negatively plaintiff's rights under the 2013 Loan Modification.  Ocwen responded to plaintiff's September 2015 complaint regarding the matter at length and otherwise engaged in, at most, "unthinking and sloppy" conduct in performing the contract after the loan modification by possibly calculating the principal based on the inadvertent error.  Defendants did not deny plaintiff "the fruits" or benefits of the 2013 Loan Modification with a reduced principal because he defaulted on the loan by not making the full monthly payment beginning in April 2015 and eventually stopped making payments on the loan completely.  (Docket Entry # 77-1, p. 5, ¶ 28).  Hence, the covenant of good faith and fair dealing claim with respect to the 2013 Loan Modification is subject to summary judgment.

B.  Escrow Account

In contrast to the correspondence relative to the error in the principal amount regarding the 2013 Loan Modification, plaintiff points to more extensive correspondence with Ocwen in which he alerted Ocwen about the inaccurate and/or unexplained charges in numerous monthly statements.  At a minimum, plaintiff

points to defendants' imposition of $1,475.00, $3,011.27, $1,485.50, $3,002.91, and $3,152.85 in charges for past due fees or amounts or other charges in monthly statements dated January 17, February 17, March 17, April 17, May 19, and July 17, 2014, respectively.  (Docket Entry # 86-1, pp. 1-2, 16, 18) (Docket Entry # 89, ¶ 5) (Docket Entry # 86-18, pp. 6, 9, 16, 18, 20). The charges were separate from the escrow charges for taxes and insurance as well as for principal and interest.[51]  (Docket Entry # 86-18, pp. 6, 9, 16, 18, 20).  Plaintiff sent letters to Ocwen asking for an explanation of the charges and objecting to them on February 15, March 3, April 16, and August 8, 2014.  (Docket Entry # 86-18, pp. 5, 7-8, 13-15) (Docket Entry # 55-1, ¶¶ 39-41).

Defendants nevertheless argue that the annual escrow account disclosure statement for the 2014 year and later years detail the money paid into and out of the Escrow Account. (Docket Entry # 77, p. 5).  Dated February 26, 2015, the 2014 statement (Docket Entry # 77-2, pp. 2-3), however, does not reflect these $1,485.00, $3,011.27, $1,485.50, $3,002.91, and $3,152.85 charges (Docket Entry # 86-18, pp. 5-9, 11, 13-16, 18-

---

[51]  Defendants do not separately address the foregoing charges and do not adequately develop an argument that they constitute allowable late fees or other permissible charges.  See Coons, 620 F.3d at 44.  As explained below, the annual escrow account statements by themselves do not explain the basis for these charges.

20, 26-27) and is not enlightening regarding the reasons for them.  This annual escrow account disclosure statement and the ones for the following years are not directly responsive to plaintiff's above-noted letters.  (Docket Entry # 77-1, pp. 2-3).  The transaction history also fails to elucidate these charges.  (Docket Entry # 86-10).  Overall, a jury could find that Ocwen was attempting to collect amounts beyond the escrow amounts for taxes and insurance and, drawing reasonable inferences in plaintiff's favor, not for the RESPA cushion.  A jury could also conclude that these attempts by Ocwen to collect payments beyond the escrow amounts for taxes and insurance and otherwise not for a RESPA cushion were in excess of plaintiff's reasonable expectations of what the mortgage allowed, including beyond the loan's allowable principal and interest amounts, and motivated by a desire to gain an unfair advantage.  See Young I, 717 F.3d at 238.  Viewing the record in plaintiff's favor, Ocwen's repeated and sustained inattention to plaintiff's letters in 2014 and 2015 regarding these charges provides a basis for a jury to find improper purpose.  See Young I, 717 F.3d at 239 ("there may be circumstances in which an unreasonable delay in performance or sustained inattention would give rise to an implied covenant claim").  Accordingly, the covenant of good faith and fair dealing claim with respect to the Escrow Account is not subject to summary judgment.

C.  2016 Loan Modification

Turning to the 2016 Loan Modification, plaintiff argues
that defendants did not honor the 2016 Loan Modification despite
his completion of the necessary "prerequisites." (Docket Entry
# 86-1, p. 17).  Defendants, on the other hand, maintain that
plaintiff fails to show an "improper purpose." (Docket Entry #
77, p. 14).

Although plaintiff made the TPP payments for the 2016 Loan
Modification, he did not return a signed agreement by the
prescribed deadline of October 10, 2016. (Docket Entry # 77-1,
p. 6, ¶ 31).  Instead, Ocwen received the agreement on December
5, 2016. (Docket Entry # 77-1, p. 6, ¶ 33) (Docket Entry # 77-
2, p. 84).  Nevertheless, defendants decided to "make an
exception" and honor the late agreement if plaintiff sent Ocwen
missing monthly payments for the November 2016 to February 2017
time period. (Docket Entry # 77-1, p. 6, ¶ 33) (Docket Entry #
77-2, p. 84) (Docket Entry # 86-27, p. 4).  As set out in the
factual background, a genuine issue of material fact exists
regarding whether plaintiff sent the check for the missing
payments and whether defendants received it.

Construing the record in plaintiff's favor and therefore
finding that he sent the check and defendants received it,
plaintiff fails to show how defendants acted with improper
purpose.  After plaintiff inquired as to why the check was not

cashed, Ocwen responded on March 31, 2017 that it was "currently trying to locate the missing funds." (Docket Entry # 88-4, p. 6). Subsequently, on May 5, 9, 10, and 31, 2017, Ocwen advised plaintiff that, despite its investigation, it still could not track or locate the missing check. (Docket Entry # 88-3, pp. 4, 13, 17, 20). The above-referenced correspondence show that Ocwen was trying to find the missing check in response to plaintiff's requests. Although plaintiff claims defendants allegedly lost payments in the past (Docket Entry # 86-18, p. 23), nothing in Ocwen's correspondence suggest that Ocwen acted intentionally or with purpose in misplacing plaintiff's $6,000 check or package as a means to gain an unfair advantage for itself. At best, a reasonable jury could find that Ocwen's failure to find the missing check, or even losing the check was negligent. A jury could not, however, find that Ocwen acted with an improper purpose.

Young I illustrates that Ocwen's mishandling of the funds is, at most, conduct of an "unthinking and sloppy institution" that negligently mishandled the funds and was ultimately unable to recover the funds. Young I, 717 F.3d at 238-39. There is also an inadequate showing to allow a jury to find in plaintiff's favor that defendants' conduct had the effect of injuring plaintiff's ability to obtain the fruits of a modification. In February 2017, Ocwen stated it would honor the

signed 2016 Loan Modificaiton received on December 5, 2016 if
plaintiff made the above-noted payments in 14 days.  It
conducted an investigation and acted reasonably in responding to
plaintiff's inquiries as detailed above.  Consequently,
plaintiff fails to provide sufficient facts that defendants
acted with an improper purpose.  The covenant of good faith and
fair dealing claim with respect to the 2016 Loan Modification is
therefore subject to summary judgment.

III.  Promissory Estoppel

Defendants seek summary judgment on the promissory estoppel
claim because plaintiff cannot prove he relied on the promise to
modify the loan "in 2013 and 2016 to his detriment."  (Docket
Entry # 77, pp. 15-17).  As to the 2013 Loan Modification,
defendants assert plaintiff did not experience any detriment
because he received a lower monthly payment with the
modification.  They point out that plaintiff "was already
obligated to make the higher full contractual payments pursuant
to the *Note* and *Mortgage*."  (Docket Entry # 77, p. 15).  As to
the attempted 2016 Loan Modification, defendants likewise
maintain that plaintiff was already obligated to make monthly
payments and therefore did not suffer any detriment.  (Docket
Entry # 77, pp. 15-17).  They additionally argue that plaintiff
did not experience a detriment vis-á-vis the attempted 2016 Loan
Modification because he stopped making any payment on the loan.

87

(Docket Entry # 77, pp. 16-17).  Defendants further submit they
did not fail to follow through on any alleged promise or make
representations because they modified the loan with the 2013
Loan Modification and plaintiff failed to fully comply with the
prerequisites for the 2016 Loan Modification.  (Docket Entry #
77, pp. 15-17).

     In response, plaintiff argues that, "The enforceability of
a promise [o]n the basis of detrimental reliance has been
recognized by the courts," and he acted in reliance on
statements regarding the 2013 and 2016 Loan Modifications.
(Docket Entry # 86-1, pp. 18-19).  Citing Dixon v. Wells Fargo,
N.A., 798 F. Supp. 2d 336, 340 (D. Mass. 2011), plaintiff argues
that he relied on defendants' statements by signing the 2013
Loan Modification Agreement with the addendum and, as to the
2016 Loan Modification, by forwarding defendant the payment by
FedEx on March 1, 2017 in accordance with Ocwen's statements.
(Docket Entry # 86-1, pp. 18-19).

     The amended complaint bases the promissory estoppel claim
solely on the 2013 and 2016 Loan Modifications.  (Docket Entry #
55, ¶¶ 107-109).  In particular, the amended complaint alleges
that under the 2013 and 2016 modification agreements, defendants
"made a representation to the Plaintiff that if [he] returned
the TPP Agreement executed" and made the "TPP payments, [he]
would receive permanent HAMP modifications."  (Docket Entry #

88

55, ¶ 107).  As to the 2013 Loan Modification, defendants
purportedly agreed to the reduction of the principal in excess
of $8,500 in December 2013 but then refused to reduce the
principal and purportedly billed plaintiff for amounts based on
a loan principal without the $8,584.39 reduction.  (Docket Entry
# 55, ¶¶ 48, 68, 72, 106-111) (Docket Entry # 77-3, pp. 30-32)
(Docket Entry # 86-1, pp. 4, 6-7, 19).  The amended complaint
further alleges that "[d]efendants' HAMP modification TPP
Agreements were intended to induce [p]laintiff's to reply to
them and make monthly TPP payments."  (Docket Entry # 55, ¶
108).  Plaintiff's reliance consists of making the "TPP
payments," according to the amended complaint.  (Docket Entry #
55, ¶ 109).  With respect to the alleged detriment regarding the
2013 Loan Modification, the amended complaint identifies:
defendants' refusal to perform "the amount financed," i.e., the
refusal to reduce the principal by the $ 8,584.39 addendum
amount; "the payment amount"; and "the escrow payment called
for."  (Docket Entry # 55, ¶ 111).  As to the attempted 2016
Loan Modification, the amended complaint identifies the
detriment as not "receiv[ing] a permanent modification."
(Docket Entry # 55, ¶ 111).

Under Massachusetts law, "[p]romissory estoppel requires
'(1) a representation intended to induce reliance on the part of
a person to whom the representation is made; (2) an act or

omission by that person in reasonable reliance on the
representation; and (3) detriment as a consequence of the act or
omission.'"  Nickerson-Reti v. Bank of Am., N.A., Civil Action
No. 13-12316-FDS, 2018 WL 2271013, at *16 (D. Mass. May 17, 2018)
(quoting Anzalone v. Admin. Office of the Trial Court, 932
N.E.2d 774, 786 (Mass. 2010)), appeal filed, No. 19-1912 (Sept.
14, 2019).  A promissory estoppel claim "requires both a
statement intended to induce reliance by the defendant, and
detrimental reliance by the plaintiff."  Thrivent Fin. for
Lutherans v. Strojny, 882 F. Supp. 2d 260, 270 (D. Mass. 2012).
"The promise on which a claim for estoppel is based must
demonstrate 'an intention to act or refrain from acting in a
specified way, so as to justify a promise in understanding that
a *commitment* has been made.'"  Kirtz v. Wells Fargo Bank N.A.,
Civil Action No. 12-10690-DJC, 2012 WL 5989705, at *7 (D. Mass.
2012) (quoting R.I. Hosp. Trust Nat'l Bank v. Varadian, 647
N.E.2d 1174 (Mass. 1995)) (emphasis in original); see Dixon, 798
F. Supp. 2d at 340 ("even where detrimental reliance acts as a
substitute for consideration, the promise on which a claim for
promissory estoppel is based must be interchangeable with an
offer 'in the sense of "commitment."'") (internal citation
omitted).  "Moreover, '[i]n order to succeed on an estoppel
theory, it must be shown that one has been induced by the
conduct of another to do something different from what otherwise

90

would have been done and that harm has resulted.'" <u>Kirtz</u>, 2012
WL 5989705, at *7 (citing <u>Lumbermens Mut. Cas. Co. v. Offices
Unlimited, Inc.</u>, 645 N.E.2d 1165, 1169 (Mass. 1995)).

    With respect to the 2013 Loan Modification, the purported
representation or promise consists of agreeing to reduce the
principal by $8,584.39 and thereafter billing plaintiff for
amounts based on the principal without the $8,584.39 reduction
(Docket Entry # 55, ¶¶ 48, 68, 72, 106-111) (Docket Entry # 77-
3, pp. 30-32), as argued by plaintiff (Docket Entry # 86-1, pp.
4, 6-7, 19).  Viewing the record in plaintiff's favor,
defendants agreed to the reduced principal and made a
representation that they agreed to the $8,584.39 reduced amount.
(Docket Entry # 86-8, pp. 4, 8-10).  It is undisputed that the
parties entered into the 2013 Loan Modification with the terms
set out in the SAM.  Under that agreement, plaintiff's interest
rate was reduced from 9.090% or greater to 2.0008%.  (Docket
Entry # 77-1, pp. 10-11) (Docket Entry # 86-8, p. 4).  The
monthly payments were also reduced from $1,541.10 to $1,525.77.[52]
Plaintiff fails to provide evidence that the amounts charged and
collected for interest after the 2013 Loan Modification were
based on a principal inflated by $8,584.39.  The billing
statements reflecting charges for principal and interest do not

---

[52]  The monthly payments subsequently increased due to the
February 2015 escrow analysis.

show the calculation of the interest payments as based on a
principal amount that was $8,584.34 higher than it should have
been.  Thus, even assuming plaintiff relied on the promise to
reduce the principal by $8,584.39, he does not provide facts
showing that Ocwen actually calculated the principal or interest
payments based on this inflated amount.  For reasons fully
explained in Roman numeral I(A), plaintiff fails to show damages
as a result of defendants' breach of not reducing the principal
by $8,584.39 regarding the 2013 Loan Modification.  For similar
reasons, he fails to show evidence that he suffered a detriment
in reliance on the promise to reduce the principal by $8,584.39
with respect to the promissory estoppel claim.

As to the amended complaint's asserted detriment of "the
escrow payment called for" (Docket Entry # 55, ¶ 111), plaintiff
does not assert this as a detriment in his opposition memorandum
or adequately develop the argument.  The opposition memorandum
refers back to his arguments in sections "A, B, and C," i.e.,
the breach of contract arguments regarding the 2013 Loan
Modification's $8,584.39 reduction in principal, the Repair
Fund, and the 2016 Loan Modification.  (Docket Entry # 86-1, pp.
3-14, 19).  He therefore waives this argument.  See Eldridge v.
Gordon Bros. Grp., L.L.C., 863 F.3d 66, 84 (1st Cir. 2017);
Curet-Velázquez, 656 F.3d at 54; Vallejo v. Santini-Padilla, 607
F.3d 1, 7 & n.4 (1st Cir. 2010).  Likewise, to the extent

92

plaintiff argues he experienced a detriment in the form of
emotional distress (Docket Entry # 86-1, p. 7), he fails to
develop the argument which is therefore waived.  See Curet-
Velázquez, 656 F.3d at 54 ("[a]rguments alluded to but not
properly developed before a magistrate judge are deemed
waived"); Coons, 620 F.3d at 44 ("district court was 'free to
disregard' the state law argument that was not developed in
Coons's brief") (internal citation omitted).  Finally, any
reliance on the representation that if plaintiff made the "TPP
payments," defendants would modify the loan (Docket Entry # 55,
¶¶ 107, 111) was to plaintiff's benefit in the form of lower
monthly payments.  See Kiluk v. Select Portfolio Servicing,
Inc., Civil Action No. 11-10731-FDS, 2011 WL 8844639, at *5
(Dec. 19, 2011) (relying on representation was to plaintiff's
benefit in the form of lower monthly payments regarding
negligent misrepresentation claim).

With respect to the attempted 2016 Loan Modification,
defendants' argument that plaintiff fails to establish a
detriment is well taken.  For reasons explained in Roman numeral
I(D), plaintiff fails to provide evidence that he made a payment
on the loan after Ocwen received the $6,000 in early March 2017
and failed to modify the loan.  In fact, the record evidences
the contrary, namely, that plaintiff did not make a payment on
the loan after sending Ocwen the $6,000 check which, construing

93

the record in plaintiff's favor, Ocwen received in early March 2017. (Docket Entry # 77-1, p. 5, ¶ 28) (Docket Entry # 77-3, pp. 46, 56). As also explained in Roman numeral I(D), plaintiff fails to provide evidence that he incurred an expense stemming from the failed 2016 Loan Modification. As alleged in the amended complaint, plaintiff purportedly relied on the promise to modify the loan as set forth in the 2016 Loan Modification agreement. (Docket Entry # 55, ¶ 107). There is insufficient evidence or facts in the summary judgement record, however, that he experienced a financial detriment as a consequence of defendants' failure to enter into the 2016 Loan Modification for reasons outlined in Roman numeral I(D). Separately, plaintiff does not adequately develop an argument that he experienced a detriment in the form of emotional distress (Docket Entry # 86-1, pp. 7, 19) or identify material in the summary judgment record to support such emotional distress as a consequence of his reliance on the promise to enter into the 2016 Loan Modification. See Curet-Velázquez, 656 F.3d at 54; Coons, 620 F.3d at 44.

Accordingly, the absence of the required detriment for the promissory estoppel claim based on the 2013 and the 2016 Loan Modifications warrants summary judgment on the claim.

IV. Fraud

Defendants next move for summary judgment on the fraud claim because plaintiff fails "to plead fraud with the requisite particularity" and also "cannot prove multiple elements" of fraud.  (Docket Entry # 77, p. 17) (capitalization and bold font omitted).  Specifically, defendants argue that the amended complaint "fails to adequately address the prior deficiencies" under Rule 9(b) and continues to fail "to state a claim for fraud."  (Docket Entry # 77, p. 17).  In relation to the 2013 Loan Modification, defendants argue that plaintiff cannot prove defendants ever accepted plaintiff's proposed revision reducing the principal balance by $8,584.39.  Defendants assert that plaintiff produced no evidence that they either agreed to lower the principal or failed to lower the principal.  (Docket Entry # 77, p. 18).  They additionally argue that plaintiff failed to prove any damages as a result of the alleged fraud because "he is in default on the loan, and thus never paid the additional" $8,584.39.[53]  (Docket Entry # 77, p. 18).

_____

[53]  The entire argument reads as follows: "Further, Plaintiff cannot prove any damages, as he is in default on the loan, and thus never paid the additional funds he claims Defendant wrongfully collected from him."  (Docket Entry # 77, p. 18). This sentence does not develop a damages argument on the fraud claim as to the unexplained "other charges" in the 2014 to 2016 monthly statements.  See Curet-Velázquez, 656 F.3d at 54; Coons, 620 F.3d at 44.  Because the immediately preceding sentence argues that plaintiff did not produce evidence that defendants agreed to remove the $8,584.39 principal, and the overall paragraph addresses this improper increase in the principal

In response, plaintiff maintains that defendants accepted the proposed revision reducing the principal amount by $8,584.39 in the 2013 Loan Modification and refers to his breach of contract argument regarding the 2013 Loan Modification to establish that defendants accepted and entered into the 2013 Loan Modification with the reduced principal balance. (Docket Entry # 86-1, p. 19). Presumably with respect to the Rule 9(b) argument, plaintiff notes that, "as pled, the Defendant demanded monies under this known falsity in monthly statements and accepted them as the Plaintiff was performing on the contract and in response to these demands." (Docket Entry # 86-1, p. 19). Plaintiff further argues that during discovery he provided defendants with the "January, February, March, April, May, July, October, November, 2014 statements" in which defendants "demanded payments as 'other fees' and 'past due' monies without" addressing plaintiff's correspondence questioning these charges. (Docket Entry # 86-1, pp. 19-20) (citing paragraph five of plaintiff's additional statement of material facts).[54]

balance, the damages argument pertains to the improper $8,584.39 increase in principal as opposed to the "other charges" in the monthly statements. Defendants' challenge to the fraud claim based on the "other charges" in the monthly statement therefore succeeds, if at all, based on their Rule 9(b) argument.

[54] The fraud claim limits the escrow account allegations to seeking payment for "other charges." (Docket Entry # 55, ¶¶ 50, 113, 115-116). The paragraphs specific to the fraud count do not raise or address the $125 increase. Even assuming dubítante

The July 2018 Report and Recommendation dismissed the fraud claim with respect to the 2016 Loan Modification on the merits as opposed to a Rule 9(b) failure to plead the claim with particularity. (Docket Entry # 44). Based on plaintiff's representation that the fraud claim in the original complaint encompassed only the reserve Repair Fund, the 2013 Loan Modification, and the 2016 Loan Modification allegations, this court deemed the fraud claim deficient under Rule 9(b) with respect to the Repair Fund and the 2013 Loan Modification regarding the $8,584.39 principal balance adjustment. (Docket Entry # 44).

The newly-pled fraud claim reasserts the 2013 Loan Modification allegations that defendants collected monthly amounts based on the inflated $8,584.39 principal balance. (Docket Entry # 55, ¶ 114). The fraud claim also adds the allegations that defendants levied and collected unspecified "'other charges'" in the monthly statements from 2014 to 2016 that were not due. (Docket Entry # 55, ¶¶ 50, 112-113, 115-116). As pled, the fraud claim presently consists of the 2013

---

that the claim includes the $125 increase because the count incorporates all prior paragraphs, the amended complaint does not set out the time, place, and content of the false representations relative to the charges for the $125 increase. (Docket Entry # 86-1, pp. 19-20) (Docket Entry # 89, ¶ 5) (Docket Entry # 86-18). Any fraud claim based on the $125 increase of the escrow fee is therefore subject to summary judgment.

Loan Modification with the inflated principal and the collection of unexplained "'other charges'" in the 2014 to 2016 monthly statements.  (Docket Entry # 55, ¶¶ 50, 112-116).  With respect to damages, the fraud claim alleges that plaintiff "suffered the loss of monies" and "emotional stress under the threat of foreclosure, as well as the loss of time and expenses in the attempt to have the Defendants stop and/or explain their actions, as well as the loss of time and money in defense of a foreclosure proceeding pursued by the Defendants."  (Docket Entry # 55, ¶ 117).

A.  2013 Loan Modification

Turning to the 2013 Loan Modification, defendants initially argue that plaintiff failed to provide evidence that they agreed to the reduction in principal.  As explained in the factual background, it remains a genuine issue of material fact regarding whether the 2013 Loan Modification included the $8,584.29 reduction of the principal balance.  Whereas the factual background provides greater detail, Ocwen sent plaintiff a letter dated December 17, 2013 with an "executed copy" of the "Loan Modification Agreement."  (Docket Entry # 86-8, p. 2). The attached executed copy with both Ocwen's and plaintiff's signatures includes the addendum with the reduction in the principal balance.  (Docket Entry # 86-8, pp. 8-10). Defendants' merits-based argument that they never agreed to the

reduction and, hence, there was no fraud with respect to the 2013 Loan Modification therefore fails.

Defendants' remaining merits-based argument is the absence of any damages or injury resulting from the failure to reduce the principal by $8,584.39. (Docket Entry # 77, pp. 17-18). They maintain that plaintiff never paid the additional $8,584.39 increase in principal because he was in default on the loan. (Docket Entry # 77, pp. 17-18). In Massachusetts, the elements of a common law fraud claim are as follows:

> (1) [T]hat the statement was knowingly false; (2) that [defendants] made the false statement with the intent to deceive; (3) that the statement was material to the plaintiffs' decision . . .; (4) that the plaintiffs reasonably relied on the statement; and (5) that the plaintiffs were injured as a result of their reliance.

Juárez v. Select Portfolio Servicing, Inc., 708 F.3d 269, 279 (1st Cir. 2013) (internal citations omitted); accord Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 357 (1st Cir. 2013) ("fraud requires that the defendant made a knowingly false statement concerning a material matter that was intended to, and did in fact, induce the plaintiff's reliance and, through that reliance, created an injury"); see also Balles v. Babcock Power Inc., 70 N.E.3d 905, 913 (Mass. 2017).

With respect to the $8,584.39 increase in principal, plaintiff fails to show that he suffered damages, i.e., an injury, caused by the misrepresentation. Plaintiff's memorandum

refers back to his argument regarding the breach of contract claim.  For reasons previously explained, plaintiff fails to show breach of contract damages or promissory estoppel detriment for the 2013 Loan Modification from the failure to reduce the principal balance by $8,584.39.  Likewise with respect to the fraud claim, plaintiff fails to provide evidence of damages or injury caused by the misrepresentation regarding the principal balance.  Plaintiff defaulted on the mortgage and he fails to provide evidence that he was injured as a result of his reliance on the misrepresentation regarding the principal balance of the 2013 Loan Modification.  He did not pay the full amount of principal and does not provide sufficient evidence to allow a jury to find that he paid additional money as a result of his reliance on the reduction in principal.

The allegations in the amended complaint of emotional stress likewise do not avoid summary judgment.  As the summary judgment target with the underlying burden of proof, it was incumbent upon plaintiff to identify facts of such an emotional or mental injury in reliance on defendants' misrepresentation regarding the $8,584.39 principal.  Plaintiff fails to identify such facts and argue that they show his emotional injury or damages.  He therefore waived the argument.  See Eldridge, 863 F.3d at 84; Curet-Velázquez, 656 F.3d at 54.  Accordingly, summary judgment is warranted on the fraud claim that defendants

sought payment under the 2013 Loan Modification based on the inflated principal balance.  (Docket Entry # 55, ¶ 114).

B.  Escrow Account

Turning to the Rule 9(b) argument pertaining to the only remaining fraud claim, i.e., the allegations regarding the "'other charges'" (Docket Entry # 55, ¶¶ 50, 112-113, 115-116),[55] the rule requires the amended complaint to include "'the time, place, and content of the alleged false representations.'" Juárez, 708 F.3d at 280 (internal citations omitted).  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  "[M]ere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too [conclusory] to satisfy the particularity requirement, no matter how many times such accusations are repeated."  Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985).

For example, the First Circuit in Woods considered a complaint insufficient because, although it "include[d] a basic recitation of the elements of fraud, [Woods did] not indicate when, where, and how often the allegedly false statements were made or what, specifically, was stated."  Woods, 733 F.3d at

---

[55] See the previous footnote.

358. The complaint was also "wholly silent on the issue of her actual reliance." Id.

The purpose of the particularity requirements in Rule 9(b) is "to give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information during discovery." Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996). These purposes are not necessarily served when applying Rule 9(b) on summary judgment after discovery. The First Circuit in Bonilla treated the plaintiff's summary judgment opposition and related discovery material as providing sufficient notice of fraudulent acts to the defendants in the context of a default judgment. Bonilla v. Trebol Motors Corp., 150 F.3d 77, 81 (1st Cir. 1998). Concluding that a remand to allow an amendment to the complaint to include the information was unnecessary, the court held that, "in special circumstances and only for Rule 9(b) purposes, . . . the plaintiffs' opposition to summary judgment—of which the defaulting defendants had notice—[was] a de facto amendment or supplement to the complaint's allegations." Id.

The case at bar, however, does not entail a defaulting defendant. In circumstances not involving a defaulting defendant, the First Circuit affirmed a district court's Rule

102

9(b) dismissal on summary judgment.  See Sanchez v. Triple-S

Mgmt., Corp., 492 F.3d 1, 12-14 (1st Cir. 2007).  The First

Circuit in Sanchez acknowledged the plaintiff's argument that

expert declarations cured the deficiencies of the complaint but

noted that, as correctly reasoned by the district court, the

declarations themselves did not lend detail to the fraudulent

scheme.  Id.  The court therefore affirmed the application of

Rule 9(b) in the context of a summary judgment motion and stated

that, "'A district court may enter summary judgment dismissing a

complaint alleging fraud if the complaint fails to satisfy the

requirements of Rule 9(b).'"  Id. at *12 (quoting Murr Plumbing,

Inc. v. Scherer Bros. Fin. Servs. Co., 48 F.3d 1066, 1070 (8th

Cir. 1995), in parenthetical); see also Caballero-Rivera v.

Chase Manhattan Bank, N.A., 276 F.3d 85, 87 n.3 (1st Cir. 2002)

("find[ing] no procedural error in the district court's decision

to grant summary judgment on the basis of plaintiffs' inability

to satisfy the pleading requirements of [Rule] 9(b)") (citing

Murr Plumbing, 48 F.3d at 1070).  Accordingly, this court turns

to the amended complaint's allegations of the "other charges" in

the monthly statements as pled in the fraud count.

     Specific to the allegations of "'other charges,'" the

amended complaint notes the following:

     50) . . . the defendants attempted to levy additional
     unspecified charges on the Plaintiff's monthly statements.
     The charges fluctuated greatly from month to month and were

noted simply as "other charges" with no further
explanation.

The monthly loan payment due was a fixed amount, based on a
fixed rate loan and comprised of a payment towards the
principal, interest and escrow account.  The escrow account
was strictly for real estate taxes and insurance on the
property.

What OCWEN reported only as "other charges", and demanded
and accepted funds for on behalf of the lienholder, remain
unexplained to this date, despite numerous demands from the
plaintiff for an explanation of these "other charges", and
despite not being a part of any contract, mortgage,
modification or other agreement between the plaintiff and
the defendants.

(51) For the months of February, March, and May, of 2014,
as well as April, May, July and September of 2015, the
Plaintiff notified the Defendants through written
correspondence that Defendants statements were not correct
due to these unexplained and unwarranted "other charges"[56]
. . . These statements, issued monthly by OCWEN, on behalf of
HSBC, were fraudulently made by OCWEN - there was no
contract, modification, mortgage or note that called for
any "other charges".  The Defendants were well aware that
all charges listed on the statements were to be either
principal on the loan, interest on the principal or for the
escrow account to be used towards insurance and tax
payments. Regardless OCWEN continued to issue the demands
on a monthly basis, and accept funds that they were aware
they were not due . . .

77) During this period of time, 2014-2016, the Defendant
regularly would include on monthly invoices, assessments
for "other charges".  The amount of these assessments
varied greatly from month to month.  The Plaintiff on many,
many occasions alerted OCWEN to this malfeasance and
demanded that they either remove the expenses listed simply

---

[56]  Plaintiff's affidavit attached to the amended complaint
likewise states that for "the months of February, March, and
May, of 2014, as well as April, May, July and September of
2015," plaintiff notified defendants that their billing was not
correct due to these "'other charges.'"  (Docket Entry # 55-1, ¶
40).  The amended complaint also references the correspondence.
(Docket Entry # 55, ¶ 51).

as "other charges" or provide an explanation as to what
they were for.  OCWEN elected to do neither.  The
Defendants insisted on payment of these "other charges"
under threat of foreclosure.

(Docket Entry # 55, ¶¶ 50-51, 77).  The paragraphs specific to

the fraud count similarly state that:

> (113) In monthly statements from 2014-2016 from OCWEN, on
> behalf of HSBC, (as noted in Paragraph 50 of this Amended
> Complaint) the Defendants demanded payment by the
> Plaintiff, under threat of foreclosure, for monies that
> they knew and acknowledged they were not due.  As a result
> of these demands the Defendants knowingly and intentionally
> received and kept funds of the Plaintiff that they knew
> they were not entitled . . .
>
> (115) Despite this, and numerous written notifications by
> the Plaintiff that the Defendants were acting in breach of
> their agreement, OCWEN, sent monthly billing statements to
> the Plaintiff throughout 2014-2016, which included demands
> for the additional funds not owed . . .
>
> (116) Similarly, on various months noted in 2014 and 2015,
> OCWEN, sent statements to the Plaintiff seeking payment for
> "other charges".  Despite the Defendants being alerted by
> the Plaintiff via the noted numerous correspondence,
> (please see paragraph 50 of this document) the Defendant
> continued to collect funds for these "other charges"
> without explanation, knowing the Defendants were not owed
> these monies by the Plaintiff and with the intention to
> deprive the Plaintiff of these funds.
>
> These actions constitute fraud.

(Docket Entry # 55, ¶¶ 113, 115-116) (italics omitted).

The amended complaint thus sets out the time during which

defendants made the fraudulent "'other charges,'" i.e., the

monthly statements for the above-noted "months of February,

March, and May, of 2014, as well as April, May, July and

September of 2015."  (Docket Entry # 55, ¶ 51) (Docket Entry #

55-1, ¶ 40).  It identifies the place, i.e., the monthly
statements that attempt to collect amounts for the unexplained
"other charges."  The amended complaint also identifies the
content of the false representations, i.e., the unexplained
"other charges" on these statements which were not for principal
or interest on the loan or escrow charges for insurances and tax
payments.  The Rule 9(b) argument therefore fails to warrant
summary judgment regarding the unexplained "'other charges'" in
the monthly statements in the fraud claim.  (Docket Entry # 55,
¶¶ 113, 115-116).

V.  <u>Negligence</u>

With respect to the negligence claim, defendants seek
summary judgment on the basis that they did not owe plaintiff
any duty and plaintiff cannot "prove that such a duty exists."
(Docket Entry # 77, p. 18).  Defendants submit that in
Massachusetts a relationship between a lender and borrower is at
"arm's length."  (Docket Entry # 77, p. 18).  Defendants also
contend that the "economic loss doctrine bars recovery under a
negligence claim."  (Docket Entry # 77, p. 19).  As such,
defendants argue that plaintiff's lack of an allegation "of any
personal injury or property damage" is enough to bar recovery
under the negligence claim.  (Docket Entry # 77, p. 19).

In response, plaintiff maintains that "[s]imilar to the
finding of contractual rights based on the TPP alone, a duty of

106

care can be owed [by the] parties in the handling of the TPP."
(Docket Entry # 86-1, p. 20).  Plaintiff points to the attempted
2016 Loan Modification in which he alleges that defendants lost
his check, thus violating defendants' duty towards plaintiff.
(Docket Entry # 86-1, p. 20).  In the amended complaint,
plaintiff alleges "actionable gross negligence based on a breach
of duty of care in handling the Plaintiff's funds," particularly
the Repair Fund, the Escrow Account, and the 2013 Loan
Modification.  (Docket Entry # 55, p. 33).

    "To prevail on a claim for negligence under Massachusetts
law, 'a plaintiff must carry the burden of proving the elements
of duty, breach, causation, and damages.'"  Potvin v. Speedway
LLC, 891 F.3d 410, 414 (1st Cir. 2018) (internal citation
omitted); see Delaney v. Reynolds, 825 N.E.2d 554, 556 (Mass.
App. Ct. 2005).  "Although the issues of breach, causation, and
damages are determined by a factfinder . . ., the existence vel
non of a legally cognizable duty is typically a question of law
. . . ."  Potvin, 891 F.3d at 414.  "An essential element of
every negligence claim is the existence of a legal duty . . . ."
Afarian v. Mass. Elec. Co., 866 N.E.2d 901, 905 (Mass. 2007).
Duty is a determination of "'"whether the plaintiff's interests
are entitled to legal protection against the defendant's
conduct."'"  Id. (internal citations omitted).

A duty of care can be established from the relationship between the parties.  See Dhimos v. Cormier, 509 N.E.2d 1199, 1200-1201 (Mass. 1987); accord MacKenzie v. Flagstar Bank, FSB, 738 F.3d 486, 495 (1st Cir. 2013) ("'[g]enerally, a duty of care arises from the relationship of parties to one another'") (internal citation omitted).  In Massachusetts, however, "the mere relationship between mortgage holder or servicer and borrower does not give rise to a fiduciary duty to the latter." Shaw v. BAC Home Loans Servicing, LP, Civil Action No. 10-11021-DJC, 2013 WL 789195, at *4 (D. Mass. Mar. 1, 2013); see Frappier v. Countrywide Home Loans, Inc., 645 F.3d 51, 59 & n.5 (1st Cir. 2011) ("'under Massachusetts law, the relationship between a lender and a borrower, without more, does not establish a fiduciary relationship'") (internal citations omitted); Corcoran v. Saxon Mortg. Servs., Inc., Civil Action No. 09-11468-NMG, 2010 WL 2106179, at *4 (D. Mass. May 24, 2010); Islam v. Option One Mortg. Corp., 432 F. Supp. 2d 181, 195 (D. Mass. 2006) ("'a bank's relationship to its customers [is] simply [] one of creditor and debtor . . .'—an arm's length, business relationship" where "no *fiduciary* duty is owed") (internal citations omitted and emphasis in original); see also Shawmut Bank, N.A. v. Wayman, 606 N.E.2d 925 927-28 (Mass. App. Ct. 1993); Patrocinio v. A.M.R. Realty, LLC, No. CV200700360, 2011 WL 1366640, at *4 (Mass. Super. Ct. Mar. 23, 2011) ("[i]n

Massachusetts, the lender-borrower relationship is regarded as being at arms length," and "no special duties are imposed on the lender").

Simply stated, "[t]he relationship between a borrower and lender does not give rise to a duty of care under Massachusetts law." MacKenzie, 738 F.3d at 495.  Consequently, "Massachusetts courts generally view the commercial bank-customer relationship as [a] contractual one." Kriegel v. Bank of Am., N.A., Civil Action Nos. 07-12246-NG, 08-11598-NG, 2010 WL 3169579, at *13 (D. Mass. Aug. 10, 2010).

"'[A]n exception' to the no-duty rule applies inasmuch as 'a mortgagee does owe a fiduciary duty to a mortgagor "to refrain from committing fraud, bad faith or failing to use reasonable diligence in the context of a foreclosure sale."'" HMC Assets, LLC v. Conley, 2016 WL 4443152, at *29 (internal citations omitted).[57]  Moreover, "'HAMP . . . does not create an

---

[57] Plaintiff fails to identify this exception or argue that the exception applies.  He therefore waives the argument.  See Curet-Velázquez, 656 F.3d at 54; Coons, 620 F.3d at 44; see also Eldridge, 863 F.3d at 84 (rejecting plaintiff's argument that district judge should have exercised his discretion and addressed the merits of plaintiff's waived summary judgment argument rather then rely on waiver).  Although "Massachusetts case law does allow some room for unusual facts in which one side invites, and the other side reposes, a special trust and reliance," Frappier, 645 F.3d at 59 (citing Patsos v. First Albany Corp., 741 N.E.2d 841 (Mass. 2001), and Warsofsky v. Sherman, 93 N.E.2d 612, 614-16 (Mass. 1950) (emphasis added), as examples of such unusual and extreme facts), plaintiff likewise

independent duty for mortgagors where no other basis for that duty exists.'"  Shaw, 2013 WL 789195, at *4 (internal citation omitted).  "[W]hile violation of a regulation such as HAMP may provide evidence of a breach of a duty *otherwise owed*, it does not create such a duty in the first place."  Brown v. Bank of Am. Corp., Civil Action No. 10-11085-GAO, 2011 WL 1311278, at *4 (D. Mass. Mar. 31, 2011) (emphasis in original).

Here, no duty exists.  Throughout the applicable time period, Ocwen was the servicer of the loan, while Delta, and then HSBC, were the mortgagee banks holding the loan.  As such, there was an arm's length relationship between defendants and plaintiff.  See Islam, 432 F. Supp. 2d at 195; Patrocinio, 2011 WL 1366640, at *4; accord MacKenzie, 738 F.3d at 493-495 (there is no duty of care between a lender and a borrower).

Plaintiff argues that a duty of care exists in the handling of his TPP payments "[s]imilar to the finding of contractual rights based on the TPP alone."  (Docket Entry # 86-1, p. 20) (citing Bosque, 762 F. Supp. 2d at 350).  He asserts that

---

waives any reliance on such unusual circumstances with respect to the Escrow Account funds or the Repair Fund because he does not mention either when addressing the negligence claim (Docket Entry # 86-1, p. 20).  See Curet-Velázquez, 656 F.3d at 54; Coons, 620 F.3d at 44; see also Eldridge, 863 F.3d at 84. Rather, he proposes that a duty to care arises "in the handling of the TPP."  (Docket Entry # 86-1, p. 20).

defendants violated this duty when they lost the check for the 2016 Loan Modification.  (Docket Entry # 86-1, p. 20).

   As discussed in Shaw and Brown, HAMP does not create a duty of care where, as here, no other basis for a duty exists.  See Shaw, 2013 WL 789195, at *4; Brown, 2011 WL 1311278, at *4.  In other words, a duty of care must already be owed.  Plaintiff's position regarding defendants' handling of the TPP is therefore misguided and contrary to Massachusetts law.  See MacKenzie, 738 F.3d at 495; Shaw, 2013 WL 789195, at *4; Brown, 2011 WL 1311278, at *4; Corcoran, 2010 WL 2106179, at *4; Islam, 432 F. Supp. 2d at 195.  Moreover, plaintiff's reliance on Bosque, 762 F.2d Supp at 350 (cited at Docket Entry # 86-1, p. 20), is misplaced.  The decision, which discusses the TPP process at length and the "duties that each party must perform under the bargain" in the context of a contract claim, does not address the existence of a duty in a negligence claim because it does not include a negligence claim.  See Bosque, 762 F. Supp. 2d at 348-52.  As such, it does not lend credence to the existence of a duty in Ocwen's handling of TPP payments via-à-vis the negligence claim.

   Finally, even assuming the existence of a duty for purposes of argument only, the negligence claim still fails because of the economic loss doctrine.  "[E]ven if a duty existed, [a negligence] claim is barred by the economic loss doctrine which

provides that, in negligence actions, 'purely economic losses
are unrecoverable . . . in the absence of personal injury or
property damage.'"   Corcoran, 2010 WL 2106179, at *4 (quoting
FMR Corp. v. Bos. Edison Co., 613 N.E.2d 902, 903 (Mass. 1993));
see Cummings v. HPG Int'l, Inc., 244 F.3d 16, 24 (1st Cir.
2001).   The economic loss doctrine provides "that for claims
based on negligence, 'purely economic losses are unrecoverable .
. . in the absence of personal injury or property damage.'"
Afridi v. Residential Credit Sols., Inc., 189 F. Supp. 3d 193,
199 (D. Mass. 2016) (internal citation omitted).   The court in
Afridi allowed a motion for judgment on the pleadings on a
negligence claim in a mortgage foreclosure case on the basis of
the absence of a duty and, alternatively, failure to allege
damages based on the economic loss doctrine.   Id. at 196-201.
The plaintiff in Afridi simply "alleged a loss of equity in his
property, increased mortgage arrears, damage to his credit,
stress and anxiety due to the increased risk of losing property
and costs and legal expenses."   Id. at 199 (also noting that
these allegations did not "amount[] to either personal injury or
property damage").   Similarly, the amended complaint does not
allege and, more notably, plaintiff fails to identify sufficient
evidence that he was physically hurt or experienced physical
damage to his property from the supposed mishandling of funds.
In his opposition memorandum, plaintiff fails to even address

the economic loss doctrine thereby waiving an argument that it does not apply.  The negligence claim is therefore subject to summary judgment.

VI.  <u>Chapter 93A Demand Letters</u>

As a final matter, defendants move for summary judgment on the chapter 93A claim because the amended complaint does not allege "any *adequate* demand letter was sent to the Defendants relating to all counts in the *Amended Complaint*." (Docket Entry # 77, pp. 20-21) (emphasis added).[58]  Defendants argue that a purported chapter 93A letter attached to the amended complaint (Docket Entry # 54-1, pp. 6-10) is "insufficient to constitute a 93A demand letter" because:

> It does not set forth in any conspicuous way that failure to make a reasonable offer of settlement could result in litigation and requests attorneys fees and triple damages under 93A, as required by the statute.  The letter simply requests Ocwen contact the borrower regarding the purported Repair Fund Agreement.

(Docket Entry # 77, p. 21).[59]  The May 2012 letter is also deficient because it "relates solely to the Repair Fund

---

[58]  This court dismissed the chapter 93A claim in the original complaint because of plaintiff's failure to allege that he sent a demand letter at least 30 days prior to filing suit.  (Docket Entry # 44, pp. 32-35).

[59]  Defendants' additional argument that the letter is undated and contains only a fax receipt designating a month and day, "5/29," without a year (Docket Entry # 77, p. 21) is unavailing. Plaintiff correctly points out that the fax receipt in the upper left-hand corner of the letter (Docket Entry # 54-1, p. 10) (Docket Entry # 86-13, pp. 2, 5) includes the year, i.e., 2012.

Agreement and not to any other allegation or count," according
to defendants.  (Docket Entry # 77, p. 21).

Plaintiff submits he sent defendants two demand letters,
one consisting of the above-noted letter regarding the Repair
Fund dated May 29, 2012 ("the May letter") and the other
regarding the Escrow Account dated March 3, 2014 ("the March
letter").[60]  (Docket Entry # 86-1, p. 20) (Docket Entry # 86-2,
p. 12) (Docket Entry # 54-1, pp. 7, 10) (Docket Entry # 86-18,

---

(Docket Entry # 86-1, p. 20).  Separately, defendant's new
argument raised for the first time at the September 2019 hearing
that the chapter 93A claim is derivative of other claims and
therefore subject to summary judgment to the same extent is
procedurally inappropriate and waived.  See Reisman v.
Associated Faculties of the Univ. of Me., 939 F.3d 409, 414 (1st
Cir. 2019) ("[c]ontentions 'raised for the first time at oral
argument are waived'") (quoting Bernardo ex rel. M & K Eng'g,
Inc. v. Johnson, 814 F.3d 481, 492 n.17 (1st Cir. 2016), in
parenthetical) (brackets and ellipses omitted), petition for
cert. filed, 88 U.S.L.W. 3238 (U.S. Jan. 2, 2020) (No. 19-847).
[60]  In the summary judgment exhibits, plaintiff provides the
March letter.  (Docket Entry # 86-18, pp. 7-8) (Docket Entry #
86-19, pp. 2-4).  The summary judgment copy includes "93ANotice"
typewritten above the salutation.  (Docket Entry # 86-18, p. 7)
(Docket Entry # 86-19, pp. 2-3).  The copy of the same letter
attached to the amended complaint does not include this
"93ANotice" language or any reference to chapter 93A.  (Docket
Entry # 54-1, pp. 48-49).  Defendants' memorandum states,
correctly, that none of the letters attached to the amended
complaint refers to chapter 93A, except for the May letter.  The
amended complaint refers to "Exhibits C and E" as the demand
letters but these exhibits refer to the May letter rather than
the March letter, which is "Exhibit J."  (Docket Entry # 55, ¶
123) (Docket Entry # 54-1, pp. 6-10, 13-16, 48).  Hence,
defendants had no reason to challenge the March letter as a
demand letter in their supporting memorandum.  Accordingly, they
appropriately and timely addressed and challenged this purported
demand letter at the September 2019 hearing.

114

pp. 7-8) (Docket Entry # 86-19).  At the September 2019 hearing, plaintiff argued that the May letter met the requirements of a chapter 93A demand letter because it demanded the second $12,500 payment and prominently displayed the words "93(a) claim." (Docket Entry # 86-13, pp. 2, 5).  Additionally at the hearing, plaintiff argued that the March letter regarding the Escrow Account laid out the allegations, the demand, and displayed the "93ANotice."  (Docket Entry # 86-18, pp. 7-8) (Docket Entry # 86-19, pp. 2-4).

Section 9(3) of chapter 93A sets out the requirement that, at least 30 days before filing suit, the plaintiff must provide the defendant a "written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon."  Mass. Gen. Laws ch. 93A, § 9(3). This statutory notice "requirement is not merely a procedural nicety, but, rather, a prerequisite to suit."  Young II, 828 F.3d at 34 (internal citations and quotation marks omitted); McKenna v. Wells Fargo Bank, NA, 693 F.3d 207, 217-18 (1st Cir. 2012) (same).

The purpose of the notice requirement is twofold.  Spring v. Geriatric Auth. of Holyoke, 475 N.E.2d 727, 736 (Mass. 1985); see McKenna, 693 F.3d at 218.  First, "[t]he demand letter requirement puts the defendant on notice of the plaintiff's claim, thereby encouraging negotiation and settlement."  Young

115

II, 828 F.3d at 34.  Second, the demand letter "operate[s] as a
control on the amount of damages which the complainant can
ultimately recover if [the plaintiff] proves his case."  Slaney
v. Westwood Auto, Inc., 322 N.E.2d 768, 779 (Mass. 1975); accord
McKenna, 693 F.3d at 218 (demand letter encourages "'negotiation
and settlement' and" acts "'as a control on the amount of
damages'") (internal citation omitted).

     The demand letter must describe the unfair or deceptive
acts with reasonable specificity that is "sufficient to give the
defendant an opportunity to review the facts and the law to see
if the requested relief should be granted and to make a
reasonable settlement offer so as to limit damages."  Piccuirro
v. Gaitenby, 480 N.E.2d 30, 34 (Mass. App. Ct. 1985); accord
Smith v. Jenkins, 777 F. Supp. 2d 264, 267 (D. Mass. 2011)
("demand letter must describe the complained-of acts with
reasonable specificity"); see generally Mass. Gen. Laws ch. 93A,
§ 9(3) (limiting recovery to settlement proffered by defendant
within 30 days in response to demand letter).

     Massachusetts courts often consider six factors in
evaluating the sufficiency of a demand letter:

     (1) [A]ny express reference to c. 93A; (2) any express
     reference to the consumer protection act; (3) any assertion
     that the rights of the claimants as consumers have been
     violated; (4) any assertion that the defendant has acted in
     an unfair or deceptive manner (G.L. c. 93A, § 2[a]); (5)
     any reference that the claimants anticipate a settlement
     offer within thirty days . . .; or (6) any assertion that

                              116

the claimant will pursue multiple damages and legal
expenses, should relief be denied.

Cassano v. Gogos, 480 N.E.2d 649, 651 (Mass. App. Ct. 1985); see
Costello v. Bank of Am., Civil Action No. 13-11424-DJC, 2014 WL
293665, at *4-5 (D. Mass. Jan. 27, 2014); Reichenbach v. Fin.
Freedom Ctrs., Inc., Case No. 1652, 2006 WL 279025, at *2 (Mass.
App. Div. Jan. 23, 2006).

"Consistent with the purposes of the demand letter, there
is no right to obtain relief for any wrongful act that is not
described in the letter." Smith v. Jenkins, 777 F. Supp. 2d at
267; see Bressel v. Jolicoeur, 609 N.E.2d 94, 98 (Mass. App. Ct.
1993) (affirming trial court's decision to reject that part of
chapter 93A claim that demand letter failed to reference as
foreclosed at trial due to lack of sufficient demand letter).
Indeed, by its terms, the statute requires the letter to
"reasonably describ[e] the defendant's unfair or deceptive act
or practice relied on as a basis for liability." Passatempo v.
McMenimen, 960 N.E.2d 275, 293 (Mass. 2012) (quoting chapter
93A, § 9(3)) (internal quotation marks omitted). The statute
thereby "'requires claimants to set out specifically any
activities in their demand letter as to which they seek
relief.'" Id. (internal citation omitted). "'Separate relief
on actions not so mentioned is foreclosed as a matter of law.'"
Id. (internal citation omitted).

For example, in Da Silva, although the plaintiff sent a demand letter to the defendant, the letter did not describe the alleged HAMP violations that the defendant committed, thus neither describing the acts nor allowing the defendant to settle any violations it may have committed.  Da Silva v. U.S. Bank, N.A., 885 F. Supp. 2d 500, 506 (D. Mass. 2012).  Additionally, the plaintiff sent a demand letter prior to when the purported violation happened.  Id.  As a result, the plaintiff could not proceed with a chapter 93A claim.  Id.

To provide another example, a demand letter sent to only one of two defendants that describes only the recipient defendant's unfair or deceptive acts is deficient regarding the non-recipient defendant.  See Passatempo, 960 N.E.2d at 293.  In Passatempo, the demand letter "did not mention Armstrong's name and failed to identify or describe any unfair or deceptive act or practice committed by Armstrong."  Id.  As a result, "Armstrong was 'without warning that the claimant intended to invoke the heavy artillery of c. 93A.'"  Id. (internal brackets and citation omitted).  The trial judge therefore correctly rejected the chapter 93A claim against Armstrong.  Id.; see Young II, 828 F.3d at 34-35.  Likewise, in Young II, the plaintiff sent the defendants a demand letter, but named only one of the two defendants, thus precluding a chapter 93A claim against the unnamed party because it was not on notice.  Young

II, 828 F.3d at 34; see Spring, 475 N.E.2d at 736.  In the case
at bar, neither the May letter nor the March letter references
HSBC or identifies unfair or deceptive conduct specific to HSBC.
Moreover, plaintiff sent both letters to Ocwen as opposed to
both Ocwen and HSBC.  Summary judgment on the chapter 93A claim
is therefore appropriate as to HSBC.  See Passatempo, 960 N.E.2d
at 293; Young II, 828 F.3d at 34-35.  Accordingly, the remaining
chapter 93A discussion is confined to Ocwen.

A.  May Letter (Ocwen)

    Plaintiff sent the May letter to Ocwen, in particular, its
research department.  The letter references the loan number and
states that, "[a]s a direct result" of the failure to make the
second disbursement of $12,500 of "the $25,000 set aside for
home repairs," the loan is in default.  (Docket Entry # 54-1,
pp. 7, 10).  The substance of the letter complains only about
the Repair Fund and Ocwen's failure to make the second
disbursement, notwithstanding plaintiff's "numerous requests"
over "several years."  (Docket Entry # 54-1, pp. 7, 10).  The
letter asks to use "the owed monies towards rectifying the loan
short of court activity."[61]  (Docket Entry # 54-1, pp. 7, 10).

---

[61]  The May letter thus asks to use the remaining $12,500 balance
to rectify the loan presumably by applying the monies owed to
pay down the loan.  In June 2012, Ocwen notified plaintiff that
it applied the amount to the outstanding loan balance.  (Docket
Entry # 77-1, p. 3, ¶ 13).  As noted previously, plaintiff

119

It summarily concludes, "Please also receive this as notice of a potential 93(a) claim." (Docket Entry # 54-1, pp. 7, 10). Plaintiff signed the letter using stationery from a law firm in the same office building as plaintiff's law firm.

The letter does not: mention the expectation of receiving a settlement offer in 30 days; assert that plaintiff will pursue multiple damages; or assert that Ocwen acted in an unfair or deceptive manner.  The letter also fails to note the violation of plaintiff's rights as a consumer.  On the other hand, it reasonably and specifically describes the misconduct, suggests a solution in the form of applying the amount to the loan balance to avoid court activity, and refers to chapter 93A with attorney letterhead.  As such, it puts Ocwen on notice of a potential chapter 93A claim if Ocwen did not accept the solution offered. Although a close issue, the letter sufficiently constitutes a chapter 93A demand letter.  As such, it operates as a demand letter *limited* to the unlawful act described therein, namely, the failure to make the Repair Fund's second disbursement of $12,500.  See Passatempo, 960 N.E.2d at 293; Bressel, 609 N.E.2d at 98 (affirming decision of trial judge on chapter 93A claim as to particular act omitted from demand letter).  While there may

---

nevertheless disputes how Ocwen applied the second $12,500 amount.  (Docket Entry # 77-3, pp. 15-25).

be other grounds to avoid Ocwen's chapter 93A liability on the
Repair Fund, defendants do not adequately develop them.

B. <u>March Letter (Ocwen)</u>

Plaintiff sent the March letter to Ocwen on his law firm's
letterhead. It complains generally about Ocwen's "lack of care
and efficiency," which "raise serious violations" and puts Ocwen
"at risk of adverse civil decisions." (Docket Entry # 54-1, pp.
48-49) (Docket Entry # 86-18, pp. 7-8) (Docket Entry # 86-19,
pp. 2-4). It references the loan number and the "modification
that was entered into less than a year ago," i.e., the 2013 Loan
Modification. (Docket Entry # 54-1, pp. 48-49) (Docket Entry #
86-18, pp. 7-8) (Docket Entry # 86-19, pp. 2-4). The letter
does not identify any conduct on the part of Ocwen regarding the
process that led up to the modification. Rather, it challenges
as incorrect charges for past due fees or amounts of: (1)
$3,011.27 in the "March statement";[62] and (2) $1,475.00 in the
February statement. (Docket Entry # 54-1, p. 49) (Docket Entry
# 86-18, p. 8) (Docket Entry # 86-19, p. 4). The letter warns
that if Ocwen does not "fix this," then "legal fees" will
prevent Ocwen from "making a profit on this loan" and Ocwen does
not "want this before a Massachusetts jury." (Docket Entry #

---

[62] The figure appears in the monthly statement dated February
17, 2014. (Docket Entry # 86-18, p. 9) (Docket Entry # 86-19,
p. 5).

54-1, p. 49) (Docket Entry # 86-18, p. 8) (Docket Entry # 86-19,
p. 4).  It also references the February 15, 2014 letter that
complains about the February statement's inclusion of the
$1,475.00 additional charge.  (Docket Entry # 54-1, p. 49)
(Docket Entry # 86-18, p. 8) (Docket Entry # 86-19, p. 4).

        The letter therefore threatens litigation, refers to a
"Massachusetts jury" and "legal fees," denotes the letter as
"93ANotice" above the salutation, and specifically refers to the
above two "unsubstantiated," incorrect, and "wrongly included"
charges of $3,011.27 and $1,475.00.  Similar to the May letter,
the March letter fails to note the violation of plaintiff's
rights as a consumer.  It also fails to include any reference to
multiple damages or the consumer protection act.  See Cassano,
480 N.E.2d at 651.  The letter does not expressly refer to
anticipating a settlement offer in 30 days, see id., although it
does demand that Ocwen "[a]ddress this, fix this, [and] come
into compliance."  (Docket Entry # 54-1, p. 49) (Docket Entry #
86-18, p. 8) (Docket Entry # 86-19, p. 4).  Overall, it
describes the unlawful conduct with reasonable specificity,
i.e., the wrongful inclusion of $1,475.00 and then $3,011.27 in
charges in the February and March statements, respectively.
(Docket Entry # 54-1, p. 49) (Docket Entry # 86-18, p. 8)
(Docket Entry # 86-19, p. 4).  The letter also warns Ocwen that
it will face a Massachusetts jury and incur legal fees if it

does not rectify the charges.  Here again, although the issue is
close, the March letter adequately serves as a chapter 93A
demand letter, albeit limited to the activities identified in
the letter consisting of the wrongful charges in the amounts of
$3,011.27 and $1,475.00.  See Passatempo, 960 N.E.2d at 293
(chapter 93A "'relief on actions not'" mentioned in demand
letter is foreclosed) (internal citations omitted); Bressel, 609
N.E.2d at 98.  Chapter 93A recovery against Ocwen for any other
misconduct beyond these two improper charges (and the $12,500
charge regarding the Repair Fund) is foreclosed.

        In sum, the following claims remain in this action: the
breach of contract claim in Count One limited to the "other
charges"; the breach of the implied covenant of good faith and
fair dealing claim in Count Two only with respect to the Repair
Fund and the Escrow Account; the fraud claim in Count Four
solely with regard to the "other charges"; and the chapter 93A
claim in Count Six limited to the above, two improper charges
against Ocwen.

                          CONCLUSION

        In accordance with the foregoing discussion, this court
**RECOMMENDS**[63] that defendants' motion for summary judgment (Docket

---

[63]  Any objections to this Report and Recommendation must be
filed with the Clerk of the Court within 14 days of receipt of
the Report and Recommendation to which objection is made and the

Entry # 76) be **ALLOWED** in part and **DENIED** in part.  Because of the age of this case, there shall be no extensions of the June 28, 2019 deadline for dispositive motions.


                              /s/_Marianne B. Bowler_____
                              **MARIANNE B. BOWLER**
                              United States Magistrate Judge

---

basis for such objection.  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.